UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

WHITE LILLY, LLC and JONATHAN BERNSTEIN,    Civil Action No: 1:18-cv-12404

                 Plaintiffs,

-- Against –

BALESTRIERE PLLC, BALESTRIERE FARIELLO,
JOHN BALESTRIERE, THE LAW OFFICES OF
ADINA G. STORCH, PLLC,
and ADINA STORCH,

                 Defendants.

----------------------------------------------------------------x

## COMPLAINT

Plaintiffs White Lilly LLC and Jonathan Bernstein ("Plaintiffs"), by their attorneys, Gallagher Law, PLLC, as and for their Complaint against Balestriere PLLC, Balestriere Fariello, John Balestriere, the Law Offices of Adina G. Storch PLLC, and Adina Storch, allege as follows:

## PRELIMINARY STATEMENT

This is an action to recover damages stemming from Defendants' unethical, fraudulent and tortious acts that have harmed Plaintiff White Lilly, LLC ("White Lilly") and to enjoin an arbitration proceeding (the "Arbitration") improperly filed by Balestriere Fariello (the "Balestriere Firm") against one of White Lilly's members, Jonathan Bernstein, who never agreed to arbitrate any of the claims asserted against him.

The conduct at issue here shocks the conscience. Both the Balestriere Firm and its principals already have been found by a court in this district to have participated in a fraud,

misappropriated escrowed funds, and billed clients for work they never performed.[1]  This very same misconduct is at issue in this action.  The Balestriere Firm's recidivist, unethical conduct includes: (a) misappropriating $1.4 million of disputed, escrowed settlement funds in clear violation of their own engagement agreement, the law and their professional duties; (b) advising clients to embark on litigation that was – from the outset – doomed to fail, all in an effort to generate fees to pay off creditors from their earlier, undisclosed fraud; (c) unremittingly churning and overbilling client accounts to that same end; and (4) litigating multiple cases with a staggering level of incompetence, not least because the cases largely were run day-to-day by law students and college graduates with no legal training whatsoever who apparently engaged in the unauthorized practice of law, also in violation of Defendants' ethical duties.

Plaintiff White Lilly is a litigation funder that partially financed actions brought by Juan Diaz Rivera and certain of his entities against one of the world's largest private companies in New York state and federal courts and before  the International Chamber of Commerce (the "Underlying Actions").  Defendants represented Mr. Diaz Rivera in those actions.  The Balestriere Firm now seeks – through private arbitration beyond the eyes of the courts charged with policing the legal profession – to hold Mr. Bernstein personally liable for $14.6 million in hourly fees and so-called "success" fees, despite a distinct lack of anything approximating success in the Underlying Actions and having already been paid or misappropriated approximately $4 million.  Mr. Bernstein, however, never was a client of the Balestriere Firm.  Rather, he is a member of White Lilly which, despite having invested over $2 million to finance Mr. Diaz Rivera's litigation, has not received a

---

[1] *See Balestriere PLLC v. CMA Trading, Inc.*, 2014 WL 7404068, *9 (S.D.N.Y. December 31, 2014) ("We also note in this respect that the conduct of plaintiff – both in facilitating a fraud (even if arguably unknowingly) and then quite knowingly paying itself from escrowed funds – reflects, at the least, ethically challenged conduct of its affairs.").

dime in return on its investment.  He personally owes nothing to the Balestriere Firm and likewise is free to litigate the instant claims in this Court.

Perhaps more importantly, John Balestriere and his firm – each of which was subject to $2 million judgments pending when Mr. Diaz Rivera engaged them – fraudulently induced White Lilly to fund the Underlying Actions as part of a scheme to generate fees to pay off their debts and enrich themselves.  Defendants and the clients they represented lost each of those actions for the simple reason that they were based on flimsy arguments and non-existent evidence and thus stood no chance of success from the outset, as Defendants well knew.

Among other relief, Plaintiffs seek to enjoin the Arbitration, a declaration that neither White Lilly nor Mr. Bernstein owe any amounts to Defendants, and damages at least equal to the sums White Lilly paid to fund Defendants' misguided litigation.

## THE PARTIES, RELEVANT PERSONS AND ENTITIES

1.      White Lilly, LLC is a limited liability company organized and existing under the laws of the State of  Delaware, with its principal place of business located at Palm Beach Gardens, Florida 33418.

2.      Jonathan Bernstein ("Mr. Bernstein") is a resident of the State of Florida and a real estate consultant, investor and attorney admitted to the practice of law in the State of New York. Mr. Bernstein is a member of White Lilly, which was formed to provide finite litigation funding for the Underlying Actions more fully described below.

3.      While Mr. Bernstein is a seasoned real estate transactional lawyer, he is not (and has never been) a litigator.  Accordingly, Mr. Bernstein relied on the advice of his long-time litigation counsel and friend, Adina Storch, in all matters relevant to this action.

4.      Upon information and belief, John Balestriere ("Balestriere") is a resident of the State of New York, an attorney admitted to practice in the State of New York, and the managing partner of the law firm of Balestriere PLLC.

5.      Upon information and belief, Balestriere PLLC is a professional limited liability company organized and existing under the laws of the State of New York, with is principal place of business located at 225 Broadway, Suite 2900, New York, New York, 10007 (the "Balestriere Firm").

6.      Upon information and belief, Balestriere PLLC sometimes conducts business under the name Balestriere Fariello (Balestriere, the Balestriere Firm, and Balestriere PLLC are referred to herein collectively as the "Balestriere Defendants").

7.      Upon information and belief, Adina Storch ("Storch") is a resident of the State of New York and an attorney admitted to the practice of law in the State of New York.  For many years, up to and including when the material events in this matter transpired, Storch served as litigation counsel to Mr. Bernstein and certain entities he is or was associated with.

8.      Upon information and belief, Storch was at all relevant times an attorney with the Law Offices of Adina G. Storch, PLLC (the "Storch Firm"), which was registered with the New York Department of State on March 14, 2014, and remains active today.  (Storch and the Storch Firm collectively are referred to herein as the "Storch Defendants.")

9.      Upon information and belief, Storch served at all relevant times (and continues to serve) as General Counsel to Cedar Realty Trust, which is a publicly held real estate investment trust with offices located at 44 South Bayles Avenue, Port Washington, New York 11050.

10.      Although not a party to this action, Juan Diaz Rivera is, upon information and belief, a Mexican national who resides in Cabo San Lucas, Mexico ("Mr. Diaz Rivera").

11.     Upon information and belief, Mr. Diaz Rivera and his family own or have interests in Mexican companies (also not parties to this proceeding), including Desarrollos Farallon, S. de R.L. de C.V. ("Farallon") and Desarrollos Inmobilarios Del Pedregal S.A. de C.V. ("Pedregal"), that were involved in developing the resort project (the "Resort") which was the subject of the Underlying Actions discussed below.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as the parties to this action are citizens of different States, and the amount in controversy exceeds the jurisdictional amount of $75,000.00

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, as Defendants are either organized in or located in this judicial District.

## FACTUAL BACKGROUND

### The Balestriere Defendant's Past Frauds and "Ethically Challenged" Conduct Lead to the Instant Action

#### The CMA Action

14.     Just a few months before Plaintiffs were introduced to the Balestriere Defendants, the Balestriere Firm had been found by a federal court to have participated in a fraud and to have invaded an escrow account containing the ill-gotten gains of that fraud to pay itself improperly a quarter of a million dollars.  See, *Balestriere PLLC v. CMA Trading, et al.* (Index No. 11 Civ. 9459 (S.D.N.Y.)) (the "CMA Action").[2]

---

[2] "Plaintiff concedes that it received $252,000.00 to offset some of the fees engendered by its representation of CMA. All but $2,000.00 of this amount represents escrowed investment moneys received from the allegedly defrauded investors and arguably placed in an escrow fund by the plaintiff law firm."  *Balestriere PLLC v. CMA Trading, Inc.*, 2014 WL 7404068, at *2, n.2.

15.     In the CMA Action, the Balestriere Firm sued its former client, CMA Trading, Inc. ("CMA"), for over $680,000.00 in fees CMA purportedly owed for the Firm's work on certain commodity transactions that were, in fact, never consummated.

16.     In denying the Balestriere Firm's <u>unopposed</u> motion for summary judgment in March 2014 due to an utter lack of competent evidence to support it, Magistrate Judge Dollinger noted that "Balestriere does not deny, and in effect concedes, that the [Balestriere] law firm was withholding $250,000.00 from both CMA and the investor plaintiffs – indeed, the law firm appropriated this money to pay itself for accrued legal fees assertedly owed by [Defendants]," and that such "conduct by the law firm can colorably be viewed as improper…."

17.     In a second decision in the CMA action in December 2014, Judge Dollinger found that the Balestriere Firm had, in addition to facilitating a fraud and invading an escrow account, overbilled CMA, including billing for work it never performed, by (among other things) making identical or nearly identical time entries for numerous hours of work relating to commodities transactions that concededly were never done.

18.     Although CMA was not represented in the action and had a default judgment entered against it, the Court nonetheless denied the Balestriere Firm's application for $680,000.00 in fees, citing the firm's: (a) "ethically challenged … conduct of its affairs;" (b) the "generally unimpress[ive] quality of its legal work;" (c) a performance in the litigation that "left much to be desired;" and (d) its misappropriation of $250,000.00 through its invasion of the escrow account.

<u>The Fraudulent Transfer Case Against the Balestriere Firm and Its Principals</u>

19.     In March 2014 – just months before Plaintiffs were introduced to the Balestriere Defendants – Counsel Financial II LLC ("Counsel Financial") sued the Balestriere Firm and its

principals, Balestriere and his wife, Vittoria Fariello, in New York Supreme Court for fraudulent conveyance (the "Counsel Financial Action").

20.     Counsel Financial alleged that it had loaned Balestriere PLLC approximately $1.7 million pursuant to a line of credit, the collateral for which was the fees and reimbursable expenses from the cases then handled by the firm (the "Collateral Cases").

21.     The Balestriere Defendants defaulted on the Counsel Financial loan in approximately June 2013.

22.     On approximately February 20, 2014, Counsel Financial secured judgments against the Balestriere Firm and its principals individually in the amount of $2,003,684.93.

23.     Counsel Financial alleged that after defaulting on the loan, the Balestriere Defendants formed another law firm, Balestriere, Fariello & Abrams LLP, to which they then fraudulently transferred the Collateral Cases in order to prevent Counsel Financial from collecting on the loan.

24.     Upon information and belief, the Balestriere Defendants settled the Counsel Financial Action in approximately June 2014, after agreeing to pay certain outstanding amounts pursuant to a forbearance agreement (the "Forbearance Agreement") between Counsel Financial and the Balestriere Firm, Balestriere and Fariello.

25.     Under the Forbearance Agreement, Counsel Financial agreed to dismiss its action with prejudice only after the Balestriere Firm and its principals paid the outstanding amounts.

26.     The Counsel Financial Action was finally dismissed with prejudice over two years later, pursuant to a stipulation of dismissal dated September 7, 2016.  By that time, White Lilly had paid the Balestriere Firm over $1.5 million.

27.    Upon information and belief, as of 2014, the Balestriere Firm and its principals were in financial distress after: (a) having defaulted on a $1.7 million loan; (b) having judgments of over $2 million entered against each of them; and (c) having failed to collect over $680,000.00 in fees purportedly owed by CMA.

<u>Defendants' Scheme to Repay Their Creditors</u>

28.    Upon information and belief, as of the time that the Balestriere Defendants were engaged to litigate the Underlying Actions described below, and were seeking cases and clients they could use to dig themselves out of their financially compromised position, regardless of the strength or weakness of the claims to be prosecuted or defended.

29.    With the aid of Storch, Defendants found  their "marks" in Mr. Diaz Rivera and Farallon, to the detriment of White Lilly, which ultimately agreed to fund – partially – litigation brought by Mr. Diaz Rivera and his companies against their co-investors in the Resort project in Mexico (the "Co-Investors").[3]

30.    After Farallon provided the Balestriere Defendants with thousands of documents concerning the Resort development and its interactions with the various entities involved in the project, Defendants recommended that Farallon proceed with its claims against the Co-Investors, and repeatedly (including throughout virtually the entire life of the cases) expressed a high degree of confidence that Farallon and Mr. Diaz Rivera would ultimately prevail in such litigation.

---

[3] This Complaint does not identify the Co-Investors by name because White Lilly has entered into agreements with the Co-Investors that contains certain confidentiality provisions.  Plaintiffs have refrained from identifying the Co-Investors out of an abundance of caution.

<u>Storch's Recommendation to Retain the Balestriere Firm in the Underlying Actions</u>

31.     For over six years, Storch served as a trusted litigation advisor to Mr. Bernstein and entities he is or was affiliated with, including when the initial Engagement Agreement (defined below) at issue in this action was signed.

32.     In approximately mid-2014, Storch referred Messrs. Bernstein and Diaz Rivera to the Balestriere Firm and, in particular, Balestriere whom she highly recommended as a litigator and described in glowing terms.

33.     Given her influence over Mr. Bernstein and the trust he reposed in her over many years, Storch effectively selected the Balestriere Defendants as lead counsel in the Underlying Actions.

34.     Through her arrangement with Balestriere, Storch served as co-counsel in the Underlying Actions and was to be paid all of the fees she billed to the cases, 20% of the Balestriere Firm's billings, and 35% of any contingency or "success fee" received.

35.     Mr. Bernstein, as representative of White Lilly, continued to rely on Storch for her litigation counsel and expertise throughout the Underlying Actions, and he specifically asked her to serve as White Lilly's "ombudsman" to oversee the cases it ultimately invested in, and to ensure that the Underlying Actions asserted viable claims and were litigated properly and efficiently. Although Storch contractually agreed to these responsibilities and repeatedly represented that she would perform them during the course of the Underlying Actions, she failed to do so.

36.     Storch also failed to inform Mr. Bernstein that she was hopelessly conflicted given her relationship with the Balestriere Defendants.

37.     Neither Storch nor Balestriere informed Mr. Bernstein or White Lilly that by the time Storch made her recommendation to engage the Balestriere Firm, the Balestriere Defendants

9

had been found by a federal court to have participated in a fraud, invaded an escrow account to pay itself hundreds of thousands of dollars, had been sued for fraudulent conveyance, and had $2 million judgments pending against them.

38.     Neither Storch nor Balestriere informed Mr. Bernstein or White Lilly that by the time Storch made her recommendation, the Balestriere Firm had sued several of its clients for purportedly unpaid fees, in addition to the CMA Action.[4]

39.     White Lilly relied on, and was induced to fund the Underlying Actions by, Storch's glowing recommendation of the Balestriere Defendants, and by the Balestriere Defendants' affirmative misrepresentations and omissions.

40.     Plaintiffs thus were not fully informed of material facts and circumstances concerning the Balestriere Defendants, some of which Defendants affirmatively concealed from them, and were laboring under the misconception that the Balestriere Defendants were competent and ethical attorneys who were free from any improper financial motive.

<u>White Lilly's Decision to Fund Affirmative Claims Against the Co-Investors</u>

41.     Mindful that the Co-Investors in the Resort were subsidiaries or affiliates of one of the world's largest private companies (if not the largest) and had far more resources than Farallon, the Diaz Rivera family and White Lilly combined, Mr. Bernstein met with Balestriere to discuss the prospective cases before White Lilly agreed to fund any litigation.

42.     Mr. Bernstein pointedly asked Balestriere whether the proposed claims against the Co-Investors were viable and could succeed.  Balestriere responded – falsely and deliberately so – in sum and substance that the claims were slam dunk winners or words to that effect.

---

[4] *See, e.g.,* <u>Balestriere Lanza PLLC v. Salemo</u> (Index No. 116158/2009 (Sup. Ct., N.Y. Cty. 2009)); <u>Balestriere PLLC v. Shuman</u> (Index No. 103237/2009 (Sup. Ct., N.Y. Cty. 2009)); <u>Balestriere Lanza PLLC v. Donner</u> (Index No. 109831/2009 (Sup. Ct., N.Y. Cty. 2009)); <u>Balestriere Lanza PLLC v. The Bobker Group, *et al.*</u> (Index No. 116159/2009 (Sup. Ct., N.Y. Cty. 2009)).

43.     Balestriere also claimed represented to Mr. Bernstein in this meeting that he and his firm had done substantial work analyzing the materials provided by Farallon and its potential claims against the Co-Investors, that the claims would succeed, and that White Lilly would make millions if it provided funding to prosecute them.

44.     Also due to the disparity of resources between the putative Co-Investor defendants and the Diaz Rivera family, Mr. Bernstein made it clear to Balestriere that White Lilly could not afford to fund a protracted litigation against the Co-Investors, and it would only provide a finite amount of such funding provided the odds were good that Defendants could obtain an early and favorable settlement from them.

45.     Balestriere assured Mr. Bernstein that the proposed litigation would quickly bring the Co-Investors to the settlement table, and that White Lilly would profit from its investment in the litigation.

46.     The cases and causes of action Defendants counseled Farallon to bring and White Lilly to fund stood no chance of success, which Defendants knew from the outset.  Ultimately, many of the actions were dismissed at the pleadings stage, and none resulted in a liability finding in favor of Farallon or the Diaz Rivera family.

The Capitalization Agreement

47.     Based on Defendants' knowingly false representations, White Lilly entered into a "Capitalization Agreement" with Farallon on approximately November 5, 2014, whereby White Lilly agreed to provide up to $750,000.00 to fund litigation to be brought by Farallon and the Diaz Rivera family relating to the Resort.

48.     Defendants not only were aware of the Capitalization Agreement but both Balestriere and Storch personally reviewed and approved the agreement before White Lilly and Farallon executed it.

49.     Defendants were well aware that White Lilly (rather than Mr. Bernstein personally) was the litigation funder, and that it would only provide funding up to $750,000.00, which should have been ample given Balestriere's representations that Farallon's claims were so strong that the Co-Investors would seek to settle quickly.

50.     White Lilly paid more than the $750,000.00 it committed to provide through the Capitalization Agreement with Farallon.

Mr. Bernstein is Not a Client Under the Engagement Agreement

51.     On approximately November 24, 2014, Farallon and White Lilly executed the Engagement Agreement with the Balestriere and Storch Firms.

52.     The Engagement Agreement states in its first paragraph: "This letter confirms the discussions we have had regarding the Firm's representation of Desarrolladora Farallon, S. de R.L. de C.V. ("you," the "Company" or the "Client") ("you," "your," "your," "his," "her," "its," or similar pronouns mean the party or parties who are seeking representation) in your matter."

53.     Mr. Bernstein had no personal basis for asserting claims in the Underlying Actions as he had no ownership interest in the Resort, and thus was not seeking to have Defendants represent him personally.

54.     Mr. Bernstein is not a "client" by the terms of the Engagement Agreement, and signed the Engagement Agreement solely as a representative of White Lilly, crossing out the portion of the signature block in the Engagement Agreement that incorrectly stated he was signing it on his own behalf.

12

55.     The Engagement Agreement was amended on March 17, 2015 (the "First Amended Engagement Agreement").   Mr. Bernstein is not identified as a client in the First Amended Engagement Agreement.

56.     The Balestriere Defendants proposed a second amendment to the Engagement agreement by letter dated February 2, 2016 (the "Second Amended Engagement Agreement").

57.     The Second Amended Engagement Agreement states  "This letter amends and adds to the existing agreement the Firm has with Desarrollos Inmobilarios Del Pedregal [s/b Farallon] S.A. de C.V. ("Farallon") and While Lilly, LLC ("White Lilly") and collectively referred to here as the Parties, dated March 17, 2015 and attached hereto."

58.     The Second Amended Engagement Agreement further states that "Jon Bernstein confirms that he has the right and authority to bind White Lilly, LLC to the terms of this Amended Agreement and Jon Bernstein is, in fact, binding White Lilly to such terms."

59.     The relevant signature block in Second Amended Engagement Agreement reads "Jon Bernstein, on behalf of White Lilly, LLC."

60.     The Capitalization Agreement, which Balestriere and Storch and approved reviewed before Farallon and White Lilly executed it, reflects that Mr. Bernstein was not a client of the Balestriere Firm.

61.     The Capitalization Agreement defines the "Parties" to that agreement as Farallon and White Lilly, and states that they agreed to fund $750,000.00 each in litigation fees and expenses "pursuant to the "Legal Representation Agreement" … between the Parties [Farallon and White Lilly] and the attorneys described therein."  The "Legal Representation Agreement" referred to is the Engagement Agreement, which was attached to the Capitalization Agreement.

62.     As with the Engagement Agreement, Mr. Bernstein was not personally a party to the Capitalization Agreement.

63.     In response to one of the Co-Investor's motion to amend its complaint to add Storch, White Lilly and Mr. Bernstein as defendants in one of the Underlying Actions, Defendants themselves successfully argued that White Lilly was merely a litigation funder, and never represented that Mr. Bernstein personally was a client of the Balestriere Firm.

64.     Throughout the Underlying Actions, the Balestriere Defendants sent its invoices to Farallon and White Lilly, not to Mr. Bernstein personally.

<u>The Engagement Agreement Is Ambiguous and Unconscionable</u>

65.     The Engagement Agreement, which White Lilly never would have signed had it been advised properly by Storch, is ambiguous in numerous regards and was either exceedingly poorly drafted by the Balestriere Defendants or was drafted to deceive Plaintiffs.

66.     The Engagement Agreement can be read as benefitting the Balestriere and Storch Firms in all events, including at the expense of their clients.

67.     Although the Engagement Agreement was styled as a contingency or risk sharing agreement, and Defendants repeatedly represented that it was, under one reading of the Engagement Agreement, Defendants took no risk at all.

68.     The Engagement Agreement ostensibly required that Defendants bill their attorneys out at discounted rates, in return for which Defendants were to receive a contingency payment or "success fee" of up to 35% of any recovery.

69.     The Engagement Agreement can be read as a "heads I win, tails you lose" arrangement under which Defendants would receive – at their sole discretion – the <u>greater</u> of either:

(a) their fees billed at <u>un</u>discounted rates for the duration of the engagement, or (b) the "success fee."

70.     The Engagement Agreement can be read to give Defendants the right to charge their full, undiscounted rates, if the "Client" received any form of "Recovery," which was defined exceedingly broadly to include virtually anything of value, including (in addition to a cash recovery) any services of value, rights in any asset, and reduction of any debt of any kind.

71.     Under one reading of the Engagement Agreement, if Defendants obtained any "Recovery" but their portion of that recovery was worth less than their time billed at undiscounted rates, Defendants retroactively could convert the agreement into an hourly billing arrangement and charge their full, undiscounted rates, which for Balestriere and Storch was – in 2014 – $900.00 per hour and by 2018 had, for Balestriere, climbed to $1,085.00 per hour.

72.     In the CMA Action, the court found that the appropriate rate for Balestriere's time was, given the quality of his legal services, $350.00 per hour.

73.     Although the Engagement Agreement is ambiguous, under one reading, it appears to provide that if Farallon chose to terminate the Engagement Agreement without cause, the Balestriere and Storch Firms could, in their sole discretion, require Farallon to pay the discounted fees and any success fee, <u>or</u> fees calculated at the Balestriere and Storch Firms' undiscounted rates for the entire life of the case.

74.     The Engagement Agreement thus can be read to contain an improper financial penalty that precluded Farallon and, by extension, White Lilly from terminating that agreement.

75.     The Engagement Agreement can be read to allow the Balestriere and Storch Firms to withdraw from the representation and receive their full, undiscounted fees for the duration of the case due to "misconduct" by the clients.  "Misconduct" is defined as "a misrepresentation or

material omission by you, illegal or unethical conduct in the matter, or engagement in conduct which, in the opinion of the Firm and/or Storch Firm, endangers the reputation of the Firm and/or Storch Firm."

76.     The Balestriere Firm has invoked this "misconduct" provision in the Arbitration, and claims that it allows for a recovery from Mr. Bernstein of not only its undiscounted fees, but any success fee and interest at 9%, as well.

77.     White Lilly relied on Storch to ensure that its interests were protected in entering into the Engagement Agreement.  Mr. Bernstein also relied on Storch as his litigation counsel of many years to advise him regarding the Engagement Agreement, yet Storch never pointed out the ambiguities and potential one-sided nature of that agreement to him.

78.     In the Engagement Agreement, Storch agreed that she would, on White Lilly's behalf, "make reasonable efforts to assure the adequacy of representation, provide adequate client communication, respond to client questions, and assist the Firm when necessary."

79.     Storch and her firm failed to carry out this contractual duty.

<u>The Engagement Agreement Terms on Dispute Resolution</u>

80.     The Engagement Agreement contains numerous contradictory and internally inconsistent provisions relating to how disputes between the parties were to be resolved, including an arbitration provision and a separate provision relating to fee disputes that can be read to require litigation of such disputes.  The contradictory dispute resolution provisions cannot be reconciled.

81.     The arbitration provision appears under the heading "Scope and Enforcement of This Agreement" and states:

> If any dispute or claim between the parties shall arise, the parties shall submit to and have such shall [sic] be settled by arbitration administered by the American Arbitration Association, in New York before one arbitrator, in accordance with its Commercial Arbitration Rules ("Arbitration Rules"), and judgment on the award

rendered by the arbitration [sic] may be entered in any court having jurisdiction thereof.

Notwithstanding any other provision in those Arbitration Rules, each party shall pay its own professional services fees (including attorney's fees) and costs relating to the arbitration, and New York law shall apply to the extent possible regarding any claims or defenses.

82.   The Engagement Agreement also states that "The Firm reserves all rights, including the right to litigate to seek any unpaid fees, should we so choose."

83.   The Engagement Agreement also states that "If there is any dispute regarding fees, then the non-prevailing party shall pay the prevailing party's attorney's fees and **court costs** incurred in resolving the fee dispute."  (Emphasis added.)

84.   The Engagement Agreement thus can be read to require that fee disputes be litigated in court, where the prevailing party would be entitled to its fees and court costs, while other claims would be subject to arbitration in which case each party would bear its own fees and costs.

85.   On December 20, 2018, the Balestriere Firm sent a letter to the AAA in the Arbitration regarding the instant fee dispute, stating that:

The Firm reserves its right to collect fees from Respondents in the event of an award in the Firm's favor, pursuant to the relevant engagement agreement between Respondents and the Firm, which states that '[i]f there is any dispute regarding fees, then the non-prevailing party shall pay the prevailing party's attorney's fees and court and **court costs** incurred in resolving the fee dispute.'  (Engagement Agreement at 8.)  (Emphasis added.)

86.   The Balestriere Firm has thus invoked in the instant fee dispute the provision of the Engagement Agreement that subjects such disputes to litigation, not arbitration.

<u>The Background of Farallon and the Underlying Actions</u>

87.   The Underlying Actions involved a dispute between the Diaz Rivera family and its companies and various Co-Investor entities over the Resort development in Cabo San Lucas, Mexico.

17

88.     In approximately 2006, the Diaz Rivera family entered into an agreement with one of the Co-Investors to develop the Resort on land the Diaz Rivera family then owned.  Pursuant to a "Contribution Agreement," The Diaz Rivera family contributed approximately 23.7 acres of land on which the Resort was to be built, and a Co-Investor entity contributed $15 million.

89.     In approximately May 2006, Farallon, a Co-Investor entity, and a division of Banco J.P. Morgan S.A. entered into a "Trust Agreement," thereby forming a trust (the "Trust") to hold and govern the Resort and its assets.  Simultaneously with the execution of the Trust Agreement, Farallon, the Co-Investor and another entity entered into a Trust Governance Agreement (the "TGA"), which contained a merger clause, expressly superseded the Contribution Agreement, and set forth the interests, roles and responsibilities of the various parties regarding the Resort.

90.     In order to develop the Resort, the Trust obtained a $65 million construction loan (the "Construction Loan") from a German bank, WestLB AG, New York Branch ("WestLB"), and pledged the Trust's assets as collateral for the loan under a separate "Pledge Agreement."  After further financing from WestLB fell through, a Co-Investor entity made three loans totaling approximately $73 million (the "Mezzanine Loans") to the Trust to continue construction.

91.     In approximately February 2011, Portigon AG ("Portigon"), to which WestLB had assigned the Construction Loan, commenced a foreclosure action in Mexico against the Trust, and in January 2013, a Mexican court issued a foreclosure judgment in favor of Portigon and against the Trust in excess of $52 million.

92.     After Farallon took steps to take control of the Resort and its bank accounts in 2013, an affiliate of the Co-Investors purchased the defaulted Construction Loan in an effort to protect the Co-Investors' investment in, and to retake control of, the Resort from Farallon, which it eventually succeeded in doing.

18

<u>The Underlying Actions</u>

93.     After the Co-Investors purchased the Construction Loan, a series of legal actions ensued between the Co-Investors, the Diaz Rivera family and its entities, including Farallon, regarding who owned and should control the Resort.

94.     Defendants represented the Diaz Rivera family and its entities in the Underlying Actions, which included four cases brought in New York state or federal courts, as well as an arbitration before the International Chamber of Commerce (the "ICC Arbitration").

95.     The Diaz Rivera family and its entities brought their claims, and White Lilly agreed to provide litigation funding pursuant to the Capitalization Agreement for them, based on Defendants' repeated misrepresentations that these claims were strong and would cause the Co-Investors to settle quickly .

96.     Defendants lost each of the Underlying Actions, mostly at the pleadings stage.

<u>Defendants' Misappropriation of Escrowed Funds</u>

97.      In approximately May 2017, and after Defendants suffered one loss after another in the Underlying Actions, Mr. Diaz Rivera initiated settlement negotiations directly with the Co-Investors, thereby materially reducing the need for Defendants' involvement in the cases.

98.     Storch was not only of no help in negotiating the settlement, but was actually an impediment to it, after one of the Co-Investors sought to amend its complaint in November 2017 to add claims against White Lilly, Storch and Mr. Bernstein because of their alleged financing of the Underlying Actions.

99.     The Court denied that motion to amend, but the application nonetheless spooked Storch sufficiently that she urged White Lilly and Farallon to settle the Underlying Actions,

without regard to whether settlement was in her clients' best interests, repeatedly urging that the actions be settled quickly.

100.    Storch was so distressed by the motion to amend that she was told not to attend a settlement meeting with the Co-Investors out of fear that the Co-Investors might use her palpable anxiety to their advantage in the negotiations.

101.    Ultimately, the parties to the Underlying Actions reached a global settlement in January 2018.

102.    As a result of these settlements, certain members of the Diaz Rivera family and its companies received payments (the "Settlement Proceeds").   Balestriere insisted that these recipients wire the Settlement Proceeds to his firm's escrow account as soon as they received them, and even pressed Mr. Diaz Rivera to fly from Cabo San Lucas, Mexico to San Diego, California on short notice to ensure that these funds were transferred.

103.    As litigation funder, White Lilly was entitled to a portion of the Settlement Proceeds pursuant to the Capitalization Agreement, as were the members of the Diaz Rivera family who had received them.

104.    At this point in the litigation of the Underlying Actions, the Balestriere Defendants had billed far more than the $750,000.00 that White Lilly had agreed to fund, and a dispute had arisen between the Balestriere Defendants on the one hand, and White Lilly and Farallon on the other, as to how the Settlement Proceeds were to be distributed.

105.    Farallon and Mr. Bernstein (on behalf of White Lilly) made clear that the Settlement Proceeds were disputed and must be held in escrow pending agreement by all the concerned constituencies as to how they were to be distributed.   Balestriere agreed.

106.    In the months leading up to the settlement, Balestriere and other members of his firm repeatedly represented in numerous emails and conversations that he and his firm would hold the disputed funds in escrow pending a resolution of the dispute.

107.    As far back as November 15, 2017, even before any settlement had been finalized, Balestriere insisted that any settlement monies be sent to his firm's trust account "to protect all parties," and they that would only be distributed by mutual agreement.

108.    Balestriere also made this same representation in numerous phone calls with Farallon and White Lilly.

109.    Storch was copied on multiple emails in which the dispute over the funds was referenced.

110.    On March 12, 2018, Mr. Diaz Rivera wrote to Balestriere regarding the settlement payments, stating in relevant part:

> It is essential to my family that funds from this are not touched and remain in your trust account until we have a three way agreement on how they are applied.  Jon assured us this was his understanding as well.

> Lets [sic] set the date for our get together ASAP so we can finalize that[.]

111.    In response, Balestriere wrote, in relevant part:

> [The] engagement agreement specifically contemplates us having a discussion regarding distribution of not just moneys [sic] but real estate.  And under any circumstances we all expect many millions more to come later on; this is just the first stage.  I expect we will sit down and work everything out but the agreement also contemplates mediation and arbitration if needed.

> I agree on scheduling the meeting ASAP….

112.    Also on March 12, 2018, a representative of Farallon wrote that Farallon was signing a wire transfer agreement to transfer the Settlement Proceeds to the Balestriere Firm's escrow account only on the condition, and with the understanding, that the "funds will remain in

escrow in your trust account until Mr. Jon Bernstein / Juan Diaz Rivera … agree on their use and destination."

113.   Mr. Bernstein separately wrote to Balestriere that same day concerning the Settlement Proceeds, stating "Nothing gets touched until we all agree."

114.   Balestriere wrote back again, on behalf of himself and his firm, as follows:

Emails got crossed.  I state the obvious when I write that I'm not going to violate my lawyer duties to anyone here by playing games with funds, real estate or anything else.  Such obligations go beyond the engagement agreement or any one relationship with any client.

I know we need to sit down with all of us to decide how things get divided….

115.   Upon information and belief, based upon Balestriere's representations that his firm would hold the funds in escrow, the Diaz Rivera family members and their entities wired the Settlement Proceeds to Balestriere Firm's escrow account, to be held in trust pending resolution of the fee dispute.

116.   The Engagement Agreement required Defendants to retain in escrow any disputed funds.

117.   Not long after agreeing that none of the Settlement Proceeds were to be touched absent agreement as to their disbursement, and after acknowledging that these funds were disputed, Defendants misappropriated $1.4 million, comprising the entirety of the Settlement Proceeds wired to the Balestriere Firm's account.

118.   Upon information and belief, Storch and her firm knew that Balestriere and his firm had misappropriated the Settlement Proceeds and received some portion of these misappropriated funds, but failed to alert either her long-time client, Mr. Bernstein, White Lilly, or any relevant Bar or other authorities to this unethical conduct.

119.     In the months following Defendants' misappropriation of the disputed Settlement Proceeds, Balestriere continued to communicate with White Lilly's representative, Mr. Bernstein, and Mr. Diaz Rivera about setting up a meeting to discuss the disputed funds, thereby feigning that they were still held in escrow when, in fact, Balestriere knew that they were not.

120.     Balestriere did not reveal to White Lilly that he had withdrawn the disputed funds from his firm's escrow account until approximately June 7, 2018.

121.     After misappropriating the Settlement Proceeds, the Balestriere Defendants sought a written representation from the "Clients" ratifying their conduct throughout the Underlying Actions, including their overbilling (discussed below) and Defendants' misappropriation of the Settlement Proceeds.

Defendants' Overbilling and Churning

122.     In addition to providing consistently poor legal advice and subpar work product, as discussed more fully below, the Balestriere Defendants engaged in blatant overbilling of both fees and expenses.

123.     After Mr. Diaz Rivera began settlement negotiations in approximately May 2017, and all but essential litigation work should have ceased, the Balestriere Defendants billed over $650,000.00 in fees and expenses to the cases.

124.     Despite the Engagement Agreement's requirement that Defendants obtain prior approval for expenses in excess of $5,000.00, Defendants engaged Mexican counsel to opine on the tax consequences of transferring the Settlement Proceeds to the Balestriere Defendants directly versus paying them to the actual litigants, all without authorization from Farallon and White Lilly. Although this unauthorized work only benefited Defendants, the Balestriere Firm nonetheless

23

seeks to recover this expense, which is in excess of $50,000.00, from Mr. Bernstein personally in the Arbitration.

125.    The Balestriere Defendants routinely used non-lawyers, including college graduates with no legal training, to perform substantive legal work on the Underlying Actions, including work on drafting dispositive motions and discovery requests, conducting document reviews, preparing deposition examination outlines, researching legal issues, and preparing for and assisting in evidentiary hearings.

126.    In several months throughout the Underlying Actions, these untrained legal analysts billed – at undiscounted rates as high as $325.00 per hour – significantly more hours, including for substantive legal work, than did the Balestriere Firm attorneys.

127.    The Balestriere Defendants also billed numerous times for the same work, apparently had lawyers redo the work that unqualified "analysts" and "apprentices" had done in the first instance, and billed numerous improper expenses to the Underlying actions.

128.    For example, Defendants' uncredentialed "legal analysts" purportedly worked over 280 hours on a "summary of authorities" for a summary judgment motion at an average undiscounted rate of $305.00 per hour for total billings in excess of $85,000.00.  The 54 time entries spanning three months for this work appear to have been copied and pasted as each entry is virtually identical.

129.    The Storch Defendants, who contracted with White Lilly and Farallon to assure the adequacy of representation in the Underlying Actions, never once apprised White Lilly of the Balestriere Defendants' improper billing.

130.    Pursuant to the Engagement Agreement, Storch was entitled to 20% of all such billings, or $17,000.00 for the work on the "summary of authorities."

131.    As but one example of Defendants' overbilling among many, in October 2017, six Balestriere Firm personnel billed a combined total of 94.1 hours in three of the Underlying Actions, for an average of 15.7 billable hours each for the entire month.  Despite billing less than one hour per day on average, the October 2017 invoice records expense charges (which the Balestriere Defendants seek to recover in the Arbitration) for meals or late night transportation 26 separate times in that month alone.[5]

132.    The Balestriere Firm also improperly billed Farallon and White Lilly – at undiscounted rates – for a litigation in which a vendor sued the Balestriere Firm over an unpaid bill.  The Balestriere Firm thus seeks in the Arbitration to force Mr. Bernstein to pay for that firm's representation of itself.

133.    After a Co-Investor entity sought to amend its Complaint against Farallon to add Storch as a defendant, she enlisted the Balestriere Defendants to draft a letter for the Co-Investor to sign in the event of settlement saying, in substance, that she had done nothing wrong.  Although this letter was of no benefit to Farallon or its litigation funder, White Lilly, the Balestriere Defendants billed for the time spent drafting and discussing it over the course of several weeks.

134.    The Balestriere Defendants also billed White Lilly and Farallon for time spent discussing the firm's invoices both internally and with its clients, reviewing its own invoices, auditing its own invoices, and seeking payment of its own invoices.

135.    The Balestriere Firm therefore billed its clients for ministerial tasks and tasks performed when it was adverse to them.  When confronted by Mr. Bernstein about why he and his

---

[5] The chart attached hereto as Appendix A hereto contains examples from a single month in which the Balestriere Firm billed improper expenses that it now seeks to force Mr. Bernstein to pay, as well as the total hours billed in the Underlying Actions by all firm personnel combined on the days the expenses were incurred.

firm were billing such time, Balestriere admitted that he had done it, insisted it was proper, and made clear that he would continue doing it going forward.

136.    The Balestriere Defendants also billed for time spent speaking with news reporters, for Balestriere reading news articles about Cabo San Lucas, for doing research and developing a "dossier" on Mr. Diaz Rivera, and, upon information and belief, for preparing to litigate the instant fee dispute.

137.    At least as of November 2016, White Lilly informed Balestriere that it was unwilling to provide further litigation funding.  Balestriere sought to find another litigation funder who would be willing to finance the cases and billed Farallon and White Lilly for its search for the funder as well.

<u>Defendants Repeatedly Pursue Unwinnable Claims in the Underlying Actions</u>

138.    Based on Defendants' knowingly false advice that Farallon and the Diaz Rivera family had strong claims against their Co-Investors, Farallon brought actions against several Co-Investor entities, and asserted counterclaims against the Co-Investors in actions brought against it.

139.    Plaintiff White Lilly funded this litigation, pursuant to the Capitalization Agreement, also based on Defendant's knowing misrepresentations and omissions.

140.    Unbeknownst to Plaintiffs, Defendants knew or should have known that the Underlying Actions were unwinnable from the start, but nonetheless counseled Farallon and Mr. Diaz Rivera to pursue, and White Lilly to fund, them.

141.    Also unbeknownst to Plaintiffs was the fact that the Balestriere Firm gave day-to-day responsibility for litigating these complex matters to a fourth year associate, and that the Balestriere Defendants used college graduates with no legal training to perform substantive legal work in the Underlying Actions.

142.    Defendants lost every affirmative claim they brought on behalf of Farallon and Mr. Diaz Rivera in the Underlying Actions, often at the pleadings stage, and otherwise negligently mishandled the Underlying Actions in numerous different ways just some of which are detailed below.

143.    The principal claims advanced by Defendants, which they represented to Plaintiffs were Farallon's strongest against the Co-Investors, were that Farallon had entered into an implied-in-fact joint venture agreement with a Co-Investor regarding the Resort, and that the Co-Investors had, by purchasing the Construction Loan and taking over the Resort, breached both the implied agreement and their fiduciary duties owed to Farallon arising from that agreement.

144.    Every judge and arbiter in the Underlying Actions held that there was no joint venture agreement between Farallon and the Co-Investor and no breach of fiduciary duty.

145.    Multiple tribunals held that the TGA set forth the parties' respective rights, obligations and responsibilities in relation to the Resort and could not be supplanted by a fictive joint venture agreement whose terms Defendants were unable even to plead because that agreement simply did not exist.

146.    Although early court rulings made clear the fundamental theory of Farallon's case was fatally flawed, Defendants continued to press the same arguments in court after court, while fully aware that Farallon was likely to be (and was) collaterally estopped from obtaining a different result in any later action.

147.    In a case brought by Farallon against a Co-Investor in the Southern District of New York, Judge Scheindlin granted defendant's motion to dismiss the complaint – without leave to amend because amendment would be futile – in December 2015, less than a year after that suit was filed, holding that:

Plaintiff's claims fail for two separate and independently fatal reasons. *First*, plaintiff has not pled – and cannot plead – the terms of an implied-in-fact joint venture agreement between the parties. *Second*, even if the joint venture agreement had been adequately pled, any preexisting agreement relating to the TGA was terminated by the integration clause in the TGA. Without the alleged joint venture on which to rely, all of plaintiff's claims fail.

148.    In response to this decision, as with virtually every other decision rendered against Farallon and Mr. Diaz Rivera, Balestriere and Storch insisted that the court had simply gotten the law wrong and advised Farallon to appeal. White Lilly deferred to Defendants' professed litigation expertise and continued to provide funding. Each of Defendants' appeals was denied.

149.    In one such appeal, of the dismissal of Farallon's claims in the Southern District action, Defendants argued in part that the trial court improperly applied New York law to Farallon's claims – including its tortious interference claim – when it should have applied Mexican law. Balestriere informed his clients that the arguments on their behalf were thorough and well made.

150.    In affirming the lower court's dismissal of each of Farallon's claims, the Second Circuit held that while New York recognizes a claim for tortious interference Mexico does not. Defendants therefore had argued for the application of a State's law that would guarantee an adverse result for their clients.

151.    In another of the Underlying Actions in which Farallon and Mr. Diaz Rivera asserted counterclaims based on the same theories of joint venture and breach of fiduciary duty, the court (Kornreich, J.) informed Balestriere on February 2, 2016 these arguments and claims had no merit and that she agreed with, and was bound by, Judge Scheindlin's earlier decision dismissing the very same claims and arguments. Defendants continued to litigate this matter for two more years, until February 2, 2018.

152.     Defendants advised Farallon and Mr. Diaz Rivera to prosecute, and White Lilly to fund, four separate appeals, each of which was an exercise in futility that only served to run up fees and line Defendants' pockets.

153.     Farallon also moved, on the basis of Defendants' advice, to vacate Judge Scheindlin's December 2015 order dismissing one of the Underlying Actions due to newly discovered evidence obtained through the ICC Arbitration.

154.     The Court held that none of the new evidence provided the terms of the fictive, implied joint venture agreement on which Farallon's case depended entirely.

155.     Judge Scheindlin denied the motion to vacate stating:

> At oral argument, plaintiff admitted that the allegedly new evidence contained in the witness statements did not include new terms for this implied-in-fact joint venture agreement.  Therefore, plaintiff still runs afoul of both Rule 8 of the Federal Rules of Civil Procedure and the plausibility standard of *Ashcroft v. Iqbal* – it provides no evidence of the "offer, the acceptance, the terms of the agreement, or evidence of the parties' consent to those terms."  It merely asserts that the joint venture exists.

156.     Farallon's motion to vacate also provided no new evidence going to the Court's second, independently sufficient basis for dismissal, that the merger clause in the TGA would have extinguished any earlier joint venture agreement had one existed.

157.     Even had the purported newly discovered evidence established the terms of the joint venture, Farallon's claims would still have been fatally flawed.

<u>The ICC's Excoriation of Defendants' Performance</u>

158.     In the sole action to proceed to an evidentiary hearing, the ICC Arbitration panel ruled in favor of the Co-Investors on each of their claims and against Farallon as to each of its 18 counterclaims.

159.    Mr. Bernstein, on behalf of White Lilly, attended the ICC Arbitration hearings and repeatedly urged Defendants to submit evidence concerning how Farallon had been financially harmed by the Co-Investor's actions.  Defendants refused to do so.

160.    The ICC Arbitration panel held that Defendants had failed entirely to put on a damages case, thus precluding any damages award even had liability been established.

161.    Also in the ICC Arbitration, Balestriere declined the arbitral panel's repeated offers to require the Co-Investors to produce documents supporting their damages claim.  He therefore had no basis for cross examining any witness on damages or attempting to reduce any damages claim on behalf of his clients.

162.    Defendants later argued that the Co-Investors could not prove their damages because they had failed to produce the same documents Balestriere had been offered and refused. The arbitral panel rejected this argument and ruled against Farallon and Mr. Diaz Rivera, including as to damages.

163.    Defendants also failed to produce in discovery, without any legitimate excuse, documents provided to them by Farallon and Mr. Diaz Rivera that could have been helpful to Farallon's case, and the ICC Arbitration panel precluded Defendants from entering these documents into evidence because they had not been produced prior to the arbitration hearing.

164.    In the ICC Arbitration, Balestriere was asked if he intended to press Farallon's alter ego or veil piercing claim, which was critical to Farallon's ability to recover on its counterclaims.

165.    Balestriere initially stated that he was waiving the alter ego claims, but reversed course only after the chair of the arbitral panel noted that the Co-Investors' counsel would be "tickled pink" by his waiver.

166.    Storch was equally if not more unprepared and unhelpful in litigating the Underlying Actions, having all but absented herself from the cases entirely despite her obligation under the Engagement Agreement to "assure the adequacy" of the Balestriere Defendants' representation of Farallon in exchange for her fees.

167.    Equally unprepared were the witnesses Defendants put on to testify in the ICC Arbitration.

168.    For example, Farallon's expert witness on Mexican law testified that a Co-Investor had a fiduciary duty under Mexican law to work with Farallon to thwart WestLB's efforts to collect what the Trust owed under the Construction Loan and related agreements.

169.    The Co-Investors' counsel pointed out in the hearing that any such efforts would have violated the "bad boy" covenants in the relevant loan documents and would therefore have constituted a breach by both Farallon and the Co-Investor of their contractual duties to WestLB, leading to increased interest and penalty payments.

170.    Farallon's expert witness, as prepared by Defendants, thus testified that the Co-Investor owed a fiduciary duty to Farallon to participate in a breach of the loan agreements that would ultimately redound to the financial detriment of both it and Farallon.

171.    The direct testimony of witnesses in the ICC Arbitration was done through written witness statements submitted in advance of the evidentiary hearing.

172.    Balestriere's cross examinations of the Co-Investors' witnesses frequently consisted of him reading into the record (or the witness reading at his request) those portions of the given witness's statement that was most damning to Farallon's case, followed by little or no questioning to call that direct testimony into doubt.

173.    After the evidentiary hearing in the ICC Arbitration had been completed but before a decision has been rendered publicly, the Chair of the arbitral panel, Dr. Tai-Heng Cheng of Quinn Emanuel, Urqhart & Sullivan, LLP, made pro forma disclosure "out of an abundance of caution" that his firm had been engaged by a subsidiary of one of the Co-Investors regarding a "completely unrelated" litigation in an Asian country, and because he was familiar with that country, he had been asked to participate in the representation.

174.    The Balestriere Defendants objected to the Chair taking any part in the engagement and wrote a letter to the arbitral panel accusing the Co-Investor of attempting to bribe the Chair and the Chair of effectively seeking to accept the bribe.

175.    The arbitral panel ruled unanimously against Farallon on both liability and damages, dismissing each of Farallon's 18 counterclaims.

176.    Balestriere blamed this loss on the Co-Investor's purported bribery of Chairman Cheng, even after it was disclosed that Dr. Cheng had declined to be involved in the engagement with the Co-Investor, and that the panel had unanimously reached its decision before Dr. Cheng was offered that engagement.

<u>Defendants Repeated Misrepresentations Regarding the Value of their Work</u>

177.    Despite an uninterrupted string of losses, the Balestriere Defendants insisted, often in abusive, uncivil and threatening terms, that their representation of Farallon and Mr. Diaz Rivera not only should continue but had achieved "highly favorable results" when, in truth, they had not.

178.    Defendants represented that one such "highly favorable result" was that the Balestriere Defendants had extinguished a debt of "more than $52 million" purportedly owed by Mr. Diaz Rivera.

179.    The purported $52 million "liability" actually referred to a claim by a Co-Investor that it should be permitted to pierce the corporate veil and hold Mr. Diaz Rivera personally liable for Farallon's breach of a guaranty agreement relating to the Construction Loan (the "Alter Ego Claim").

180.    The Alter Ego Claim was a throwaway, as even Justice Kornreich made clear in denying the Co-Investors' summary judgment motion, which "tellingly, devote[d] little more than one of the 35 pages in its moving brief to the argument that Farallon's corporate veil should be pierced to hold Diaz Rivera personally liable for Farallon's breach of the Guaranty...."  The court dismissed this claim as legally deficient for reasons not argued by Defendants.

181.    Accordingly, the Balestriere Defendants' crowning achievement in the Underlying Actions was defeating a motion for summary judgment – not based on any arguments they had made but rather based on reasoning provided by the court – on a throwaway claim against Mr. Diaz Rivera personally, in a case where Farallon, as represented by Defendants, ultimately was found liable.

182.    Defendants referred to this "win" in at least seven separate emails sent to Mr. Diaz Rivera and White Lilly, and in numerous other conversations in an effort to convince Mr. Diaz Rivera and White Lilly that they had, in some sense, succeeded in the Underlying Actions when they had not.

183.    Dismissal of the alter ego claim against Mr. Diaz Rivera provided no financial benefit to White Lilly.

184.    Defendants lost every affirmative claim they advised Mr. Diaz Rivera and Farallon to bring, and were equally unsuccessful in defending virtually every claim brought by the Co-Investors against Farallon and Mr. Diaz Rivera.

The Balestriere Firm's Arbitration Demand

185.    On approximately September 6, 2018, the Balestriere Defendants purportedly terminated the Engagement Agreement due to Mr. Diaz Rivera's alleged misconduct eight months after the settlement agreement in Underlying Actions had been executed.

186.    The Balestriere Firm filed the Arbitration Demand on approximately September 21, 2018, which names Mr. Diaz Rivera, Mr. Bernstein, Farallon and Pedregal as respondents, and seeks enhanced damages due to the alleged "misconduct."

187.    The alleged "acts of misconduct" cited in the Arbitration Demand include: (a) "[l]ying about the tax consequences of where funds were received in an attempt to divert settlement funds away from the Firm's trust account;" (b) "[b]reaching an agreement to send funds to the Firm's trust account;" (c) "[l]ying about the status of receipt of a 'Turnage Lot Deposit';" (d) admitting in an email sent by Mr. Diaz Rivera's mother that Pedregal [a/k/a DIPSA] "had no intention to pay the Firm."

188.    To the extent that these alleged acts were committed at all or that they constituted "misconduct," Mr. Bernstein had no part in them.  The Arbitration Demand nonetheless attributes these acts to Mr. Bernstein jointly.

189.    The other alleged "misconduct" asserted in the Arbitration Demand is that respondents failed to pay the disputed fees that are the subject of the Arbitration such that a third-party vendor sued the Balestriere Firm.

190.    The Balestriere Defendants allege in the Arbitration Demand that due to this purported "misconduct," they are entitled to $14.6 million from Mr. Bernstein, comprising Defendants' supposed "success" fees, their undiscounted fees, plus statutory interest at 9%.

191.    While the Arbitration Demand seeks recovery from Mr. Bernstein personally, White Lilly – and not Mr. Bernstein – was the party to the Engagement Agreements the Balestriere Firm itself drafted.

192.    Defendants have been paid or have misappropriated over $4 million in the Underlying Actions, and the Balestriere Firm seeks an additional $14.6 million in the Arbitration, for a total of approximately $18.6 million.

193.    White Lilly has not received any monies as a result of its investment in the Underlying Actions.

## COUNT I
### Declaratory Judgment (against all Defendants)

194.    Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

195.    The Arbitration Demand names Jonathan Bernstein as a defendant in that action and claims that he is personally liable for the Balestriere Firms' fees and success fees.

196.    The Balestriere Defendants seek to hold Mr. Bernstein jointly and severally liable for all fees and costs allegedly incurred in litigating the Underlying Actions on behalf of Farallon and Mr. Diaz Rivera.

197.    Mr. Bernstein, who personally never was a party to the Engagement Agreement (as amended), disputes that he is liable for such fees and costs.

198.    A justiciable case or controversy therefore exists between the parties as to Mr. Bernstein's purported liability for any of the claimed fees or success fees.

199.    White Lilly provided more than the $750,000.00 in funding it had agreed to provide pursuant to the Capitalization Agreement, as amended, thereby satisfying its obligations under that agreement.

200.     An actual case or controversy exists or is likely to exist should the Balestriere Firm

seek from White Lilly the relief it currently seeks from Mr. Bernstein personally in the Arbitration.

201.     Plaintiffs have no adequate remedy at law

202.     Plaintiffs are entitled to judgment declaring that neither White Lilly nor Mr.

Bernstein personally is liable for any of the fees or expenses of any kind sought by the Balestriere

Firm in the Arbitration.

203.     Mr. Bernstein is further entitled to judgment that, to the extent that the Engagement

Agreement (as amended) validly requires arbitration of disputes between the parties thereto, he is

not bound by any such provision requiring arbitration.

204.     Plaintiffs are further entitled to judgment declaring that the Engagement Agreement

that purports to require arbitration is both procedurally and substantively unconscionable and,

accordingly, unenforceable.

### COUNT II
For Fraudulent Inducement (against All Defendants)

205.     Plaintiffs reassert and reallege the allegations contained in each and every foregoing

Paragraph of this Complaint as if fully set forth herein.

206.     Both before and after White Lilly entered into the Engagement Agreement,

Defendants made material representations and omissions of fact to induce White Lilly to fund the

Underlying Actions and Mr. Bernstein to serve as litigation representative.  These include, among

other things, representations that causes of action ultimately asserted by Farallon and Mr. Diaz

Rivera against the Co-Investors were strong claims that would prevail in court to White Lilly's

financial benefit, that Defendants would provide "superior legal representation and counseling,"

that White Lilly would receive millions in settlement proceeds even after courts had dismissed

Farallon's principal claims at the pleadings stage, and that the Balestriere Defendants would retain the Settlement Proceeds in escrow.

207.    These representations were knowingly false when made, and Plaintiffs did not discover the true facts with respect to these representations until after they had acted in reliance on them, nor could Defendants, with reasonable diligence, have discovered the true facts prior to such time.

208.    Defendants were aware that Plaintiffs would utilize and rely upon their misrepresentations and omissions for a particular purpose at the time they were made, including without limitation, in deciding whether to fund or otherwise become involved in the Underlying Actions.

209.    Plaintiffs believed Defendants' misrepresentations to be true at the time they were made.  Defendants' conduct shows the misrepresentations were targeted to Plaintiffs and were intended to cause Plaintiffs' reliance thereon.

210.    Plaintiffs reasonably relied on Defendants' professed litigation expertise, which expertise Plaintiff's did not possess, and Plaintiffs' reliance on Defendants' misrepresentations and omissions was reasonable, resulting in injury to Plaintiffs.

211.    By reason of fraudulent inducement of Plaintiffs by Defendants, Plaintiffs have suffered actual and consequential damages, including without limitation, substantial costs, expenses, attorneys' fees in an amount to be determined at trial, and are further entitled to an appropriate award of punitive damages, in an amount sufficient to deter Defendants from engaging in such willful and malicious wrongdoing in the future.

## COUNT III

For Fraud (against All Defendants)

212.     Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

213.     Defendants misrepresented material facts to Plaintiffs and concealed material facts from them, and otherwise used certain tricks, devices and schemes to conduct and accomplish a fraud against Plaintiffs.

214.     Defendants' misrepresentations and concealment include, among other things, representations that causes of action ultimately asserted by Farallon and Mr. Diaz Rivera against the Co-Investors were strong claims that would prevail in court to White Lilly's financial benefit, that Defendants would provide "superior legal representation and counseling," that White Lilly would receive millions in settlement proceeds even after courts had dismissed Farallon's principal claims at the pleadings stage, and that the Balestriere Defendants would retain the Settlement Proceeds in escrow.

215.     Notwithstanding these representations, Defendants knew the claims ultimately asserted by Farallon and Mr. Diaz Rivera in the Underlying Action would fail, but nonetheless continued to represent otherwise, even after courts had dismissed the claims at the pleadings stage, in order to generate and bill unnecessary fees and expenses.  Defendants likewise knew that the Balestriere Defendants intended to misappropriate (and ultimately did misappropriate) the Settlement Proceeds rather than hold them in escrow as the Balestriere Defendants represented they would.

216.     Defendants also purposefully concealed that the Balestriere Defendants, who staffed their cases with non-lawyers who were tasked with substantive legal work and therefore engaged in the unauthorized practice of law, were incapable of providing minimally adequate

representation, much less "superior legal representation and counseling," and whose legal work had been described by at least one court as "unimpressive."

217.      These and other misrepresentations and concealment of material fact by Defendants were false when made, or were made with reckless disregard for the truth, and Plaintiffs did not discover the true facts until after they had acted in reliance on Defendants' misrepresentations and omissions, including by funding the Underlying Actions.  Nor could Plaintiffs have discovered, with reasonable diligence, the true facts for themselves prior to taking such action.

218.      Plaintiffs reasonably believed Defendants' misrepresentations to be true at the time they were made.  Defendants' conduct shows that their misstatements and omissions were targeted to Plaintiffs and were intended to, and did, result in Plaintiffs' reliance thereon.

219.      By reason of fraudulent conduct of Defendants, Plaintiffs have suffered actual and consequential damages, including without limitation, substantial costs, expenses, and attorneys' fees in an amount to be determined at trial, and are further entitled to an appropriate award of punitive damages, in an amount sufficient to deter Defendants from engaging in such willful and malicious wrongdoing in the future.

## COUNT IV
### For Fraudulent Concealment (Against All Defendants)

220.      Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

221.      Defendants owed duties, including fiduciary duties, to White Lilly to disclose to Plaintiffs material information and facts.

222.      Both before and after White Lilly entered into the Engagement Agreement, Defendants intentionally concealed material information and facts that were otherwise unknown

to Plaintiffs, including concerning Balestriere and the Balestriere Defendants' past frauds and the viability of Farallon's claims in the Underlying Actions, as detailed above.

223.    Defendants' wrongful conduct includes, among other things, that prior to White Lilly entering into the Engagement Agreement, Defendants omitted and failed to disclose material facts that, if disclosed, would have caused White Lilly to decline to fund the litigation.  These include that the Balestriere Defendants had judgments against them of approximately $2 million as a result of the Counsel Financial Action, had lost their application to recover approximately $680,000.00 in the CMA Action, and had been implicated in fraudulent conduct in both of these cases, thereby giving Defendants a nefarious financial motive to convince White Lilly to fund the Underlying Actions, namely to pursue meritless cases and claims  in order to bill unsuspecting clients such as White Lilly to pay off the Balestriere Defendants' debts due to their earlier frauds.

224.    Defendants likewise omitted and failed to disclose that the principal claims Defendants advised Farallon and Mr. Diaz Rivera to assert against the Co-Investors stood no chance of succeeding, with many ultimately being dismissed at the pleadings stage.  Defendants therefore knew that they could not and would not perform the services for which they had been engaged, namely, bringing successful claims against the Co-Investors, and Defendants, therefore, never intended to honor their commitment to bring such claims.

225.    Defendants likewise concealed and omitted that the Balestriere Defendants had sued its clients to recover at a shockingly high rate for such a small firm, and affirmatively misrepresented that they would provide "superior legal representation and counseling"

226.    Defendants intended to deceive Plaintiffs by concealing these material facts and information, including in an effort to continue billing fees to the Underlying Actions after they knew Farallon's affirmative claims could not succeed.

40

227.    Defendants made the above omissions knowing that they were omissions of material facts in order to mislead Plaintiffs.

228.    Defendants made the above material omissions with the intent of inducing Plaintiffs to rely on them and, in the case of White Lilly, to commit to funding the Underlying Actions.

229.    Defendants were aware that Plaintiffs would utilize and rely upon their misrepresentations and omissions at the time they were made in deciding whether to fund or otherwise become involved in the Underlying Actions and sought to induce Plaintiffs' reliance.

230.    Plaintiffs reasonably and justifiably relied on Defendants' misrepresentations and omissions, including the misrepresentations and omissions of Storch (Mr. Bernstein's long-time and trusted litigation advisor) that, among other things, she and her firm would ensure the adequacy of the Balestriere Defendant's representation, in the Underlying Actions.

231.    Had White Lilly known the truth about the Balestriere Defendants, their history of ethically challenged conduct, inferior litigation skills, intention to staff the Underlying Actions with junior lawyers and non-lawyers, and penchant for suing its own clients, among other things, White Lilly would never have agreed to fund the Underlying Actions.

232.    Had White Lilly known from the outset the truth about the strength of the claims the Balestriere Defendants recommended Farallon bring against the Co-Investors, namely, that they were doomed from the start, White Lilly never would have agreed to fund the Underlying Actions.

233.    By reason of fraudulent conduct of  Defendants, Plaintiffs have suffered actual and consequential damages, including without limitation, substantial costs, expenses, attorneys' fees in an amount to be determined at trial, and are further entitled to an appropriate award of punitive

damages, in an amount sufficient to deter Defendants from engaging in such willful and malicious wrongdoing in the future.

## COUNT V
### For Conversion (By White Lilly Against All Defendants)

234.    Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein

235.    Mr. Diaz Rivera, Farallon and certain related parties allowed the transfer of the Settlement Proceeds of approximately $1.4 million to the Balestriere Defendants, at Balestriere's insistence, on the condition that they be held in trust until all relevant parties agreed on how these funds were to be distributed.

236.    As a litigation funder, White Lilly had an immediate and superior ownership and possessory interest in the Settlement Proceeds by virtue of the Capitalization Agreement, which Defendants were aware of and had reviewed prior to its execution.

237.    The Settlement Proceeds were disputed amounts, pursuant to the terms of the Engagement Agreement and under the rules of professional responsibility governing lawyers in New York, including Rule 1.15 (b) (4), which requires that client funds generally, and disputed funds in particular, be kept in a separate account and "shall not be withdrawn until the dispute is finally resolved."

238.    The Balestriere Firm represented to Farallon and White Lilly that the Settlement Proceeds would be held in trust until the Balestriere Defendants, White Lilly and Farallon reached an agreement on how these funds were to be distributed.

239.    Upon information and belief, the Settlement Proceeds were deposited in a separate trust or escrow account upon their receipt by the Balestriere Defendants, and these funds thus were specifically identifiable and held for White Lilly and Farallon's benefit.

240. Without Plaintiffs' permission or knowledge, Defendants wrongfully took possession of the entire $1.4 million in Settlement Proceeds, purportedly to pay fees they claimed they were owed, thereby converting the Settlement Proceeds for their own benefit.

241. Upon information and belief, Storch and the Storch Firm were aware of and consented to the Balestriere Defendant's wrongful taking of the Settlement Proceeds, and Storch received a portion of them.

242. White Lilly has been damaged by Defendants' conversion of the Settlement Proceeds in an amount to be determined at trial.

## COUNT VI
For Breach of Contract (By White Lilly Against All Defendants)

243. Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

244. The Balestriere and Storch Firms, Farallon and White Lilly were parties to the Engagement Agreement, as amended.

245. White Lilly has fully performed its obligations under the Engagement Agreement.

246. Among other things, the Engagement Agreement required Defendants to provide "superior" representation to Farallon and Mr. Diaz Rivera throughout the litigation.

247. The representation Defendants provided was both inferior and repeatedly breached their ethical duties, causing damages to White Lilly.

248. Balestriere, on behalf of his firm, insisted that the Settlement Proceeds be transferred to the Balestriere Defendants' trust account, purportedly because this was required under the Engagement Agreement.

249.    Mr. Diaz Rivera, Farallon and certain related parties transferred the Settlement Proceeds to the Balestriere Defendants on the condition that they be held in trust until all relevant parties agreed on how these funds were to be distributed.

250.    As a litigation funder, White Lilly had an ownership interest in the Settlement Proceeds by virtue of the Capitalization Agreement between White Lilly and Farallon, which interest and agreement Defendants were aware of.

251.    Balestriere, on behalf of his Firm, represented to Farallon and White Lilly that the Settlement Proceeds would be held in trust, pursuant to the terms of the Engagement Agreement, until the Balestriere Defendants, White Lilly and Farallon reached an agreement on how these funds were to be distributed.

252.    Balestriere, on behalf of his Firm, represented to Farallon and White Lilly that he understood that the Settlement Proceeds were disputed funds under the terms of the Engagement Agreement.

253.    Under the terms of the Engagement Agreement, as amended (as well as under the rules of professional conduct governing New York lawyers) the Balestriere Defendants were obligated to maintain the disputed Settlement Proceeds in escrow until any dispute regarding such funds was resolved.

254.    In breach of both the Engagement Agreement and their ethical duties, Defendants misappropriated the entirety of the Settlement Proceeds for themselves, and failed to provide any of the Settlement Proceeds to either Farallon or White Lilly.

255.    Defendants' breaches of the Engagement Agreement by misappropriating the disputed Settlement Proceeds and failing to provide minimally competent legal services have damaged White Lilly in an amount to be determined at trial.

## COUNT VII

### For Breach of Contract (By White Lilly Against the Storch Defendants)

256.    Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

257.    The Storch Defendants and White Lilly were parties to the Engagement Agreement, as amended and, accordingly, were parties to a valid contract.

258.    White Lilly has fully performed its obligations under the Engagement Agreement.

259.    Pursuant to the terms of the Engagement Agreement, Storch and the Storch Firm were obligated to "make reasonable efforts to assure the adequacy of representation" by the Balestriere Defendants in the Underlying Actions, and to keep "reasonably informed" of the Underlying Actions.

260.    The Storch Defendants breached their contractual obligations under the Engagement Agreement by, among other things, failing to make reasonable efforts to assure the adequacy of the Balestriere Defendants' representation in the Underlying Actions, which representation repeatedly fell well below the ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession and led to an unmitigated string of losses for Farallon and, by extension, its litigation funder, White Lilly.

261.    The Storch Defendants further breached their contractual obligations under the Engagement Agreement by failing to stay reasonably informed of the Underlying Action, which was necessary in order for Storch to be in a position to "assure the adequacy" of the Balestriere Defendant's representation of Farallon.

262.    The Storch Defendants further breached their contractual duties by failing to inform White Lilly of the Balestriere Defendant's abusive billing practices detailed (in part) above.

263.    White Lilly has been damaged by the Storch Defendant's breaches in an amount to be determined at trial.

## COUNT VIII
For Attorney Negligence/Legal Malpractice (By White Lilly against all Defendants)

264.    Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

265.    The Balestriere and Storch Firms had an attorney-client relationship with White Lilly pursuant to the Engagement Agreement with respect to the matters set forth herein from approximately November 21, 2014 through approximately September 2018.

266.    The Balestriere and Storch Firms and their principals owed a duty of care to White Lilly by virtue of the Engagement Agreement and the attorney-client relationship created thereby.

267.    White Lilly relied on the advice and counsel of the Balestriere and Storch Defendants throughout the course of the representation.

268.    Both the Balestriere and Storch Defendants' conduct in litigating the Underlying Actions fell below the ordinary and reasonable skill and knowledge commonly possessed by members of the legal profession, and constituted a breach their duty of care in the manner detailed above.

269.    Among other things, the Balestriere Defendants used non-lawyers to conduct substantive legal work on the Underlying Actions, and otherwise staffed these cases with inexperienced junior associates.

270.    Defendants also negligently counseled White Lilly to fund the prosecution of actions and appeals that Defendants knew or should have known were unwinnable.

271.    Defendants further counseled Farallon and the Diaz Rivera family members to pursue, and White Lilly to pay for, unwinnable claims even after adverse court rulings had been

issued against them, by representing to Plaintiffs that such rulings were legally incorrect and would be overturned on appeal.

272.    Defendants further negligently counseled Farallon and the Diaz Rivera family members to pursue, and White Lilly to pay for, appeals that, as a matter of law and fact, could not succeed.

273.    Defendants further negligently prosecuted the ICC Arbitration by, among other things, failing to produce and present material evidence, and failing to present entirely any damages case on behalf of Farallon.

274.    White Lilly have been damaged as a result of Defendants' negligence in an amount to be determined at trial.

### COUNT IX
Breach of Fiduciary Duty (By White Lilly against all Defendants)

275.    Plaintiff reasserts and realleges the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

276.    Defendants had an attorney-client relationship with White Lilly pursuant to the Engagement Agreement with respect to the matters set forth herein from approximately November 21, 2014 through approximately September 2018.

277.    The Balestriere and Storch Firms and their principals owed a fiduciary duty to White Lilly by virtue of the Engagement Agreement and the attorney-client relationship created thereby.

278.    White Lilly relied on the advice and counsel of the Balestriere and Storch Defendants throughout the course of the representation.

279.    Defendants' conduct in litigating the Underlying Actions breached their fiduciary duties to White Lilly, as detailed above, in part.

47

280.     Defendants further breached their fiduciary duties to White Lilly, as well as their ethical duties under New York law, by, among other things, misappropriating and retaining for themselves $1.4 million in concededly disputed Settlement Proceeds.

281.     White Lilly has been damaged as a result of Defendants' breach of fiduciary duties in an amount to be determined at trial.

**COUNT X**
Negligence/Legal Malpractice (Against the Storch Defendants)

282.     Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

283.     Plaintiff Jonathan Bernstein is a real estate lawyer with no direct experience in handling litigation matters.

284.     Mr. Bernstein and his companies, including Storch's client in the Underlying Actions, White Lilly, relied on Storch and the Storch Firm to provide litigation counseling and advice for many years.

285.     As litigation counsel to Mr. Bernstein's companies, the Storch Defendants owed a duty of care in addition to a fiduciary duty to Mr. Bernstein.

286.     The Storch Defendants' conduct fell below the ordinary and reasonable skill and knowledge commonly possessed by members of the legal profession, and constituted a breach of their duty of care in the manner detailed above.

287.     The Storch Defendants breached their respective duties of care in numerous ways, including, among other things, by recommending – in glowing terms – the Balestriere Defendants to represent Farallon in the Underlying Actions ultimately funded by White Lilly when, in fact, the Balestriere Defendants were uniquely unsuited to represent Farallon or, for that matter, any party.

48

288.     The Storch Defendants further breached their duties to White Lilly by effectively, through their persuasion and misguided advice, selecting the Balestriere Defendants to represent Farallon and Mr. Diaz Rivera.

289.     The Storch Defendants and White Lilly (though not Mr. Bernstein) were parties to the Engagement Agreement, as amended and, accordingly, were parties to a valid contract.

290.     Pursuant to the terms of the Engagement Agreement, Storch and the Storch Firm were obligated to "make reasonable efforts to assure the adequacy of representation" by the Balestriere Defendants in the Underlying Actions, and to keep "reasonably informed" of the Underlying Actions.

291.     The Storch Defendants negligently failed to make reasonable efforts to assure the adequacy of the Balestriere Defendants' representation in the Underlying Actions, which representation repeatedly fell well below the ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession and led to an unmitigated string of losses for Farallon and, by extension, its litigation funder, White Lilly.

292.     The Storch Defendants further negligently failed to meet their obligations to White Lilly by failing to stay reasonably informed of the Underlying Action, which was necessary in order for Storch to be in a position to "assure the adequacy" of the Balestriere Defendants' competent representation of Farallon.

293.     Plaintiffs have been damaged by the Storch Defendant's breaches in an amount to be determined at trial.

### COUNT XI
Violation of New York Judiciary Law § 487 (By White Lilly against all Defendants)

294.     Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

295.    Defendants fraudulently induced Plaintiffs, through deceit and collusion, to become involved in and, in the case of White Lilly, fund the Underlying Actions by deceiving Plaintiffs into believing that Farallon and Mr. Diaz Rivera had strong claims against the Co-Investors , and that Farallon and, by extension, White Lilly would both prevail in, and profit from, litigating the Underlying Actions.

296.    Defendants knew, particularly after the initial judgments and court decisions that were adverse to Mr. Diaz Rivera and Farallon, that their causes of action and the evidence supporting them were weak or non-existent, and that Mr. Diaz and Farallon would be estopped from obtaining different outcomes in different fora.  Defendants nonetheless urged White Lilly to continue to Fund the Underlying Actions and meritless appeals by representing that Farallon would ultimately prevail in them.

297.    Defendants nonetheless continued billing and overbilling to the Underlying Actions, including, in the case of the Balestriere Defendants, after those actions had been settled.

298.    Among other things, Defendants willfully delayed and drew out Farallon's actions against the Co-Investors, as financed by White Lilly, which were, from the outset, not meant to assert valid causes of action (unbeknownst to White Lilly), but to enrich Defendants.

299.    The Balestriere Defendants willfully deceived Plaintiffs by representing repeatedly that they would maintain in escrow disputed settlement proceeds in which White Lilly had a financial interest, pending resolution of the dispute.

300.    Defendants' false representations induced Farallon, Mr. Diaz Rivera and certain of his family members to transfer the disputed funds to the Balestriere Defendants' escrow account.

301.    Defendants thereafter misappropriated, converted and retained the disputed funds for their own gain in violation of their ethical and fiduciary duties.

302.     Defendants' conduct was willful and egregious.

303.     Plaintiffs have been damaged by Defendants' deceit and collusion in an amount to be determined at trial.

**COUNT XII**
Unjust Enrichment (By White Lilly against all Defendants)

304.     Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

305.     Because of the false, deceitful and fraudulent actions of Defendants, as set forth above, Plaintiffs unknowingly bestowed substantial benefits on Defendants including, among other things, payment of over $2 million in purported fees and expenses by White Lilly, and through the surreptitious misappropriation by Defendants of an additional $1.4 million of Settlement Proceeds.

306.     Defendants obtained these monies without providing the legal services they purportedly were paid for.

307.     Equity and good conscience require that Defendants forfeit and make restitution of all such benefits they received and unjustly retained or claim they are owed by Plaintiffs, in an amount to be determined at trial.

**COUNT XIII**
Civil Conspiracy (by White Lilly against all Defendants)

308.     Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

309.     By reason of their false, deceitful and fraudulent actions, representations and omissions, as set forth above, Defendants are liable to Plaintiffs for fraud, common law fraud and conversion.

310.    Defendants took part in a common scheme in which they agreed to participate in overt unlawful acts in furtherance of their agreement.  These acts include, but are not limited to, inducing Plaintiffs to fund or otherwise become involved in the Underlying Actions in order to generate and bill fees and expenses incurred for their own gain and at the expense of their clients.

311.    Defendants participated in this plan for the purpose of furthering their scheme, including to generate and bill fees for their own benefit and no other, thereby establishing their civil conspiracy to defraud Plaintiffs and deny them amounts they are due.

312.    By reason of the civil conspiracy, Plaintiffs have suffered actual and consequential damages, including, without limitation, substantial costs, expenses, attorneys' fees in an amount to be determined at trial, and are therefore entitled to an award of actual and punitive damages in amount sufficient to deter Defendants from engaging in such willful and malicious conduct and wrongdoing.

## COUNT XIV
For Negligent Misrepresentation (Against All Defendants)

313.    Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

314.    Defendants negligently made material misrepresentations of fact to Plaintiffs.

315.    Defendants' negligent misrepresentations include, among other things, representations that causes of action ultimately asserted by Farallon and Mr. Diaz Rivera against the Co-Investors were strong claims that would prevail in court to White Lilly's financial benefit, that Defendants would provide "superior legal representation and counseling," that White Lilly would receive millions in settlement proceeds even after courts had dismissed Farallon's principal claims at the pleadings stage, and that the Balestriere Defendants would retain the Settlement Proceeds in escrow.

316.    Notwithstanding these representations, Defendants knew or should have known the claims ultimately asserted by Farallon and Mr. Diaz Rivera in the Underlying Action would fail, but nonetheless continued to represent otherwise, even after courts had dismissed the claims at the pleadings stage, in order to generate and bill unnecessary fees and expenses.  Defendants likewise knew or should have known that the Balestriere Defendants intended to misappropriate (and ultimately did misappropriate) the Settlement Proceeds rather than hold them in escrow as the Balestriere Defendants represented they would.

317.    Defendants also negligently concealed that the Balestriere Defendants, which staffed their cases with non-lawyers who were tasked with substantive legal work and therefore engaged in the unauthorized practice of law, were incapable of providing minimally adequate representation, much less "superior legal representation and counseling," and whose legal work had been described by at least one court as "unimpressive."

318.    These and other misrepresentations and concealment of material fact by Defendants were false when made, were made with reckless disregard for the truth, or were negligently made, and Plaintiffs did not discover the true facts until after they had acted in reliance on Defendants' misrepresentations and omissions, including by funding the Underlying Actions.  Nor could Plaintiffs have discovered, with reasonable diligence, the true facts for themselves prior to taking such action.

319.    Plaintiffs reasonably believed Defendants' misrepresentations to be true at the time they were made and relied upon them, including with respect to White Lilly's decision to provide litigation funding.

320.     By reason of Defendants' negligent misrepresentations, Plaintiffs have suffered actual and consequential damages, including substantial costs, expenses and attorneys' fees and pre- and post-judgment interest, in an amount to be determined at trial.

### COUNT XV
For Estoppel (Against All Defendants)

321.     Plaintiffs reassert and reallege the allegations contained in each and every foregoing Paragraph of this Complaint as if fully set forth herein.

322.     Balestriere and Storch both reviewed the Capitalization Agreement even before it was signed, and both knew that White Lilly, LLC, and not Mr. Bernstein personally, was the litigation funder, pursuant to the Capitalization Agreement.

323.     Defendants sent their invoices to White Lilly throughout the Underlying Actions, not to Mr. Bernstein personally.

324.     Defendants argued successfully in one of the Underlying Actions that White Lilly was merely a litigation funder.

325.     The Engagement Agreement never identified Mr. Bernstein as a client of the Balestriere Firm.

326.     The Balestriere Defendants amended the Engagement Agreement twice, which amendments never identified Mr. Bernstein as a client of the Balestriere Firm.  Rather, the Second Amended Engagement Agreement specifically states that White Lilly is the client referred to in the Engagement Agreement and First Amended Engagement Agreement.

327.     Mr. Bernstein justifiably relied to his detriment on Defendant's representations and omissions.

328.     Defendants should therefore be estopped from seeking any recovery from Mr. Bernstein.

WHEREFORE, Plaintiffs WHITE LILLY, LLC and JONATHAN BERNSTEIN demand

judgment against Defendants as follows as to each claim:

a.  A declaration that White Lilly and Jonathan Bernstein have no liability for any amounts owed to the Balestriere or Storch Firms relating to the Underlying Actions;

b.  A preliminary and permanent injunction staying the Arbitration commenced by Defendants before the American Arbitration Association, and permanently enjoining Defendants from commencing any other or further arbitration in connection with Defendants relationship with Plaintiffs.

c.  A declaration that the Engagement Agreement, as amended, is void ab initio as to White Lilly and Jonathan Bernstein, including, without limitation, because it was procured through fraud and is both procedurally and substantively unconscionable;

d.  A declaration that Defendants are entitled to no further compensation, including any "Success Fee," as defined in the Engagement Agreement, as amended, and must forfeit such fees as a consequence of their unethical and otherwise tortious conduct;

e.  A declaration that Defendants must forfeit all fees paid to them to date, including any portion of any "Recovery" or "Success Fee" as a consequence of their unethical, incompetent and otherwise tortious conduct;

f.  A Declaration that Defendants are estopped from seeking any recovery from Mr. Bernstein;

g.  Compensatory damages in an amount to be determined at trial but not less than $4 million;

h.  Disgorgement and restitution of all fees and expenses paid to Defendants;

i.  Punitive damages in an amount to be determined at trial;

j.  An accounting for all fees and expenses billed to, or paid in connection with, the Underlying Actions, and for any amounts held at any time in trust or escrow for the benefit of Plaintiffs, Farallon or Mr. Diaz Rivera, including the Settlement Proceeds;

k.  Treble damages pursuant to New York Judiciary Law § 487 or otherwise;

l.  Attorneys' fees, costs and disbursements;

m.  Pre- and post-judgment interest; and

n.  Such other and further relief the Court deems just and proper.

December 31, 2018

GALLAGHER LAW PLLC

By:

Brian K. Gallagher (BG-6377)

Samuel M. Leaf (SL-0633)
275 Madison Avenue
Suite 616
New York, New York 10016
Phone: (212) 983-9700
Fax:    (212) 983-9701
bgallagher@gallahgherlaw-pllc.com
sleaf@gallagherlaw-pllc.com

*Attorneys for Plaintiffs Jonathan Bernstein and White Lilly LLC*

APPENDIX A

Expenses Charged by Balestriere Firm in July 2017

| Date | Total Hours Billed | Number of Firm Billers | Meal Expenses | Transportation Expenses |
|------|------|------|------|------|
| 7/1/17 | 0.7 | 1 | $43.83 | |
| 7/2/17 | 0.0 | 0 | $141.39 | |
| 7/3/17 | 1.6 | 1 | $165.93 | |
| 7/4/17 | 0.8 | 1 | $83.68 | |
| 7/5/17 | 8.5 | 4 | $115.56 | |
| 7/6/17 | 4.4 | 3 | $61.42 | |
| 7/7/17 | 11.0 | 5 | $62.97 | |
| 7/8/17 | 0.7 | 1 | $55.20 | |
| 7/9/17 | 1.1 | 1 | $98.75 | |
| 7/10/17 | 7.5 | 3 | $164.43 | |
| 7/11/17 | 3.7 | 3 | $34.44 | $10.38 |
| 7/13/17 | 1.2 | 2 | $96.02 | |
| 7/14/17 | 2.6 | 6 | $156.61 | $12.09 |
| 7/17/17 | 0.7 | 3 | $187.42 | |
| 7/18/17 | 4.1 | 5 | $103.55 | |
| 7/19/17 | 3.9 | 6 | $2.99 | $46.05 |
| 7/20/19 | 3.9 | 5 | $33.50 | $51.80 |
| 7/21/17 | 16.3 | 6 | $121.13 | $8.40 |
| 7/22/217 | 0.0 | 0 | | $8.19 |
| 7/24/17 | 0.2 | 1 | $4.50 | $8.19 |
| 7/26/17 | 34.0 | 9 | $4.25 | |
| 7/27/17 | 43.3 | 10 | $38.21 | |
| 7/28/17 | 55.9 | 11 | $28.02 | |
| 7/29/17 | 1.7 | 1 | $230.00 | |
| **Total** | | | **$2,033.80** | **$148.10** |