J1FPWHIO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

WHITE LILLY, LLC;
JONATHAN BERNSTEIN,

                    Plaintiffs,

              v.                      18 CV 12404 (ALC)

BALESTRIERE PLLC, ET AL.,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      January 15, 2019
                                      1:04 p.m.

Before:

                    HON. ANDREW L. CARTER, JR.,

                                      District Judge

                          APPEARANCES

LAW OFFICE OF SAMUEL M. LEAF
       Attorney for Plaintiffs
BY:  SAMUEL MARTIN LEAF
            AND
GALLAGHER LAW, PLLC
BY:  BRIAN KEITH GALLAGHER


DEBEVOISE & PLIMPTON LLP
       Attorneys for Defendants Balestriere PLLC; Balestriere
Fariello; John Balestriere
BY:  JYOTIN HAMID
          AND
BALESTRIERE, FARIELLO
BY:  JILLIAN LEE McNEIL


WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
     Attorneys for Defendants Adina Storch; The Law Offices of
Adina G. Storch, PLLC
BY:  JOSEPH L. FRANCOEUR

J1FPWHIO

1          (In open court)

2          (Case called)

3          MR. LEAF:  Good afternoon, your Honor.  Sam Leaf for

4     the plaintiffs White Lilly and Mr. Bernstein.

5          THE COURT:  And for the defendants?

6          MR. HAMID:  Good afternoon, your Honor.  Joe Hamid of

7     Debevoise and Plimpton for the Balestrieri parties.

8          MS. McNEIL:  Jillian McNeil from Balestriere, Fariello

9     for the Balistreri parties.

10         MR. FRANCOEUR:  Good afternoon, your Honor.  Joseph

11    Francoeur for Adina Storch and the Storch Law Firm.

12         THE COURT:  Okay.  Good afternoon.  Let me start off

13    by making sure I fully understand what the plaintiffs' position

14    is here in terms of this request for the preliminary

15    injunction.  Is the plaintiffs' belief that White Lilly should

16    not be required to arbitrate, as well, or is it simply that

17    Mr. Bernstein should not be required to arbitrate?

18         MR. LEAF:  Your Honor, White Lilly is not a party to

19    the arbitration as of yet; so we haven't addressed that full

20    on, but we certainly reserve the right to argue that, should

21    they be made -- should White Lilly be made part of the

22    proceeding.  But we certainly are arguing here that the

23    arbitration ought to be enjoined as to Mr. Bernstein.

24         THE COURT:  Okay.  So let me get a little elucidation

25    from you on that.  Why is it that you claim, clearly, that the

J1FPWHIO

engagement agreement that Mr. Bernstein signed doesn't make him

a party to that agreement which has an arbitration clause in

it?

MR. LEAF:  Certainly, your Honor.  In the first

instance, there are three relevant agreements here, the initial

engagement agreement, first amended and second amended.  Those

are the three documents that the defendants, or here plaintiffs

in the arbitration, contend form the jurisdictional basis for

bringing Mr. Bernstein in, obviously.

The first engagement agreement, the initial engagement

agreement does not identify Mr. Bernstein as a party to that

agreement.  Second of all, at any point -- and the standard

here is that if he's going to waive his right to appear in

court and have his claims heard in court, it has to be clear

and explicit that he has done so.

Second of all, with respect to that agreement, your

Honor, the signature block on that initially read John

Bernstein, comma, on behalf of himself, and I won't use the

full name of the entity, but Farallon.  He explicitly crossed

out "on behalf of himself and Farallon," indicating that he was

not agreeing to this on behalf of himself.  He was the

litigation funder from the managing member of the litigation

funder, White Lilly.

Second of all, your Honor -- and if he was crossing

out on behalf of himself personally at that point, who did

J1FPWHIO

1    defendants think he was signing on behalf of?

2              THE COURT:  He crossed off both of those entities.

3    What it is, it just reads John Bernstein.

4              MR. LEAF:  Correct.

5              THE COURT:  He crossed off on behalf of himself --

6              MR. LEAF:  Correct.

7              THE COURT:  -- and on behalf of that entity.

8              MR. LEAF:  Correct, your Honor.

9              THE COURT:  So just go back to that.  So then why does

10   that not make him bound by this arbitration agreement?

11             MR. LEAF:  Well, your Honor, I would argue that --

12             THE COURT:  Or by this agreement?

13             MR. LEAF:  Two things.  One is that it's, at its very

14   best, ambiguous as to whether he is a party here, I think.

15   White Lilly is not mentioned in the agreement nor is

16   Mr. Bernstein.  Okay?  So, you know, that's No. 1.

17             No. 2 is when we get to the second amended engagement

18   agreement -- well, let me back up a little bit.  The first

19   amended engagement agreement was, I believe, in March of 2015.

20   That's what the defendants refer to here as the operative

21   agreement in their papers.  The second amendment to the

22   engagement agreement explicitly clarifies that Mr. Bernstein is

23   not a party to that engagement agreement.  Rather, it was White

24   Lilly all along, and I'll read you the first paragraph of that

25   second amended engagement agreement.  It says:  This letter

J1FPWHIO

1    amends and adds to the existing agreement, the firm -- that's

2    the Balestrieri firm -- has with -- and I'm not going to use

3    the full name of the entity, it should be -- Farallon and White

4    Lilly and collectively referred to herein as the parties, dated

5    March 17, 2015, and attached hereto.

6             So basically, what that says is that White Lilly was a

7    party to what the defendants are referring to as the operative

8    agreement here all along --

9             THE COURT:  Let's go back to the first agreement, to

10   Exhibit B.  Let's go back to that engagement agreement.  Let me

11   hear from you further as to why he's not a party to that

12   agreement, why he didn't agree to arbitration.  Whether he

13   agreed on behalf -- tell me more as to why that's not binding

14   on him.  He signed the agreement, and you're saying he signed

15   it just for the heck of it?  Why is he signing the agreement?

16            MR. LEAF:  Absolutely not, your Honor.  And there's a

17   number of cases that we cite that have similar circumstances to

18   this, where a party is signing as a representative of an

19   entity, and he was signing as a representative of White Lilly.

20            Now, obviously, the first engagement agreement is

21   superseded by the second one.

22            THE COURT:  Why do you say that?  There's nothing in

23   these agreements that say that any other agreement is

24   superseded by the other one.  It says it amends and adds to the

25   agreement, the other existing agreement.  I don't think there

J1FPWHIO

| | |
|---|---|
| 1 | was any language saying that these agreements superseded the |
| 2 | ones that came before them, is there?  Is the word superseded |
| 3 | in there? |
| 4 | MR. LEAF:  I don't believe it is, your Honor.  But |
| 5 | what the defendants refer to as the operative agreement here is |
| 6 | the first amended agreement. |
| 7 | The second amended agreement makes absolutely clear |
| 8 | that Mr. Bernstein all along was signing on behalf of White |
| 9 | Lilly, and that is what he intended, certainly, and the |
| 10 | defendants intent can be gleaned from their own language in |
| 11 | this. |
| 12 | The other language that's in the second agreement is |
| 13 | John Bernstein confirms that he has the right and authority to |
| 14 | bind White Lilly, LLC, to the terms of the amended agreement, |
| 15 | and John Bernstein is, in fact, binding White Lilly to such |
| 16 | terms.  So it's -- White Lilly is a party all along. |
| 17 | THE COURT:  Well, before we get to that, again, I want |
| 18 | to make sure I'm fully understanding what your position is as |
| 19 | to why he is not a party to the agreement, sticking with that |
| 20 | first agreement.  He signed the agreement.  Whether he signed |
| 21 | on behalf -- whether he's really signing on behalf of some |
| 22 | entity or really signing on his own, I'm trying to make sure I |
| 23 | fully understand the distinction you're making, if you're |
| 24 | making one. |
| 25 | Why isn't he a party to that agreement?  So let's say, |

J1FPWHIO

1   hypothetically, let's say he signed on behalf of White Lilly,

2   that's what he was signing on behalf of, and I know there's

3   some other documents in terms of the capitalization agreement

4   where that appears to be the case.  If he's signing on behalf

5   of White Lilly --

6          MR. LEAF:  Correct.

7          THE COURT:  -- and White Lilly, hypothetically

8   speaking, is clearly a party to the agreement, then there's an

9   arbitration clause, a broad arbitration clause, which would

10  mean that White Lilly would be bound by that arbitration

11  clause.

12         MR. LEAF:  Right.

13         THE COURT:  And as the person signing as the

14  representative of White Lilly, why would he not be required to

15  arbitrate on behalf of White Lilly, or is that not the position

16  that you're taking?  Are you taking the position that he should

17  be arbitrating on behalf of White Lilly, but not on his own,

18  not for himself personally?  Are you making that sort of

19  distinction?

20         MR. LEAF:  I'm making the distinction that the only

21  party here right now that's relevant in the arbitration is

22  Mr. Bernstein, and they are seeking $14.6 million from him

23  personally.  Okay?  Mr. Bernstein cannot be forced to arbitrate

24  on behalf of himself if he is not a party to that agreement.

25  That's under the law.

J1FPWHIO

1          THE COURT:  I guess that's what I'm trying to figure

2     out what your position is.  Is it your position that basically

3     Mr. Bernstein is essentially two separate legal entities; he is

4     himself as an individual, and he is himself as a representative

5     of White Lilly or representative of some other corporation?  Is

6     that the distinction that you're making?

7          MR. LEAF:  That is the distinction, and supported by

8     the case law that we've cited, your Honor.

9          THE COURT:  Then what about the provision in all of

10    these agreements that talks about if he is signing as a

11    representative of a corporation or some other entity, what

12    about the portion of the agreement that says "authority"?

13          I don't think either side really addressed this in

14    their briefing, but in the most recent exhibit, it's on page 3,

15    but it occurs in all of these documents.  And it reads as

16    follows: By signing this amended agreement, or this agreement,

17    you acknowledge and confirm that you are bound to the terms of

18    this amended agreement and you are, in fact, bound to such

19    terms.  You also acknowledge that you personally undertake and

20    assume the full performance hereof, including payments and

21    amounts hereunder.

22          What is the purpose of that adverb "personally" there

23    with "undertake" there?

24          MR. LEAF:  Well, your Honor, if White Lilly is a party

25    here and Mr. Bernstein is signing on behalf of White Lilly,

J1FPWHIO

1    which he was, and I think the documents, particularly the

2    second amended agreement made clear that he was, in defendant's

3    own words, then that provision and every other provision of the

4    contract, including the arbitration provision, simply does not

5    apply to him because, as the case law we cited states, that

6    agreement just does not exist as to him personally.

7         THE COURT:  What about this "personally undertake the

8    responsibilities of the agreement"?  What about that?  Even if

9    that were an argument that I were willing to accept, what about

10   this acknowledge that you "personally undertake and assume the

11   full performance hereof --"?

12        MR. LEAF:  And, your Honor --

13        THE COURT:  -- of the terms of the agreement?

14        MR. LEAF:  Your Honor, if Mr. Bernstein -- and this is

15   supported by the case law that we cited.  If Mr. Bernstein is

16   signing that on behalf of White Lilly, he is only signing a

17   contract in his representative capacity, and the terms of that

18   contract, including the arbitration provision, simply do not

19   apply to him.  They do not apply to him because no contract

20   exists between him personally and the law firm.

21        THE COURT:  Even if that were a valid distinction, why

22   wouldn't that be something for the arbitrator to resolve?

23   Neither side -- I know the case was recent.  I don't think

24   either side really addressed the Supreme Court's recent

25   decision from January 8th either.  But why wouldn't that be

J1FPWHIO

1  something for the arbitrator to decide?

2          MR. LEAF:  Well, first of all, your Honor, I did read

3  the Supreme Court decision.  We didn't address it because it

4  really deals with an exception that had been created by the

5  courts over time to the FAA.  Now, it is no longer applicable

6  and never was applicable in this case.

7          Second of all, we have cited a number of cases, your

8  Honor, that stand for the clear proposition that's been the law

9  for decades now, and that is that if the existence of a

10  contract -- the question is the existence of a contract.  If

11  the question is whether or not if the person signed in their

12  representative capacity or as an individual, in other words,

13  whether or not the contract exists as to that person

14  individually, that is under the law an issue for the court, not

15  the arbitrator, and we can --

16          THE COURT:  Okay.  Again, let's get back then to that

17  first agreement, then, that first engagement agreement, the

18  first one chronologically.  Why is it that you claim he's

19  signing it in a representative capacity there as opposed to

20  individually?  Why isn't it possible that he could be signing

21  as both individually and in a representative capacity?

22          MR. LEAF:  Well, your Honor, in that case, you have an

23  ambiguous contract.  Okay.  It's susceptible to two different

24  interpretations.

25          THE COURT:  Why?

1          MR. LEAF:  Well, maybe he's signing on behalf of

2     himself.  Maybe he's signing on behalf of an entity.

3          THE COURT:  Why does it have to be one or the other?

4     Why can't it be both?

5          MR. LEAF:  Okay.  Instead of having two reasonable

6     interpretations, you have three; he signed on behalf of

7     himself, he's signing on behalf of the entity, or he's signing

8     on behalf of both.

9          THE COURT:  Where would this other signing on behalf

10    of the entity come into place, or simply signing on behalf of

11    his own come into play, especially when he deliberately crosses

12    out this section --

13          MR. LEAF:  On behalf of himself.

14          THE COURT:  -- that says on behalf of himself and this

15    other entity?

16          MR. LEAF:  And that was in there in error.  That's not

17    the entity he was signing on behalf of.

18          THE COURT:  But if he's signing it, and he's

19    specifically crossing out any limitations -- there are

20    limitations that are included there on behalf of himself and

21    one other named entity.  It could be that he represents 50

22    different entities.  When he's crossing that out, why isn't

23    that clear, a clear indication that he is signing on behalf of

24    himself and every other entity that he potentially owns or at

25    least on his own?  Why is it not a clear indication that he's

J1FPWHIO

1       at least signing on his own?

2                   MR. LEAF:  Well, I think, your Honor, I go back to the

3       second amended, for one.  That makes clear in the language that

4       the defendants wrote that the entities -- the parties to that

5       agreement were, in fact, White Lilly and the law firm.  Okay?

6       That language could not be clearer.

7                   THE COURT:  I understand why you want to switch that,

8       but getting back to that first agreement again, and I believe

9       there's -- I'm going to find it again, but I believe the

10      similar language is there.  He's signing.  He's crossed out any

11      sort of limitation as to who he's signing on behalf of.

12                  Assuming that he's signing -- it seems to be clear

13      that he's signing on behalf of himself, and if you couple that

14      with that section on authority about personally undertaking the

15      responsibility for fulfilling the terms of the agreement, why

16      wouldn't that be clear?

17                  I understand you have different arguments that the

18      second agreement and these other agreements modified this such

19      that that is no longer the case, but can we --

20                  MR. LEAF:  Yes, your Honor.

21                  THE COURT:  -- deal with that first agreement?  What

22      is your position on the first agreement?  If the first

23      agreement, on its own, if the first agreement is not

24      substantially modified or changed by subsequent agreements,

25      what is your position as to whether or not, under the terms of

J1FPWHIO

1     that agreement, he has agreed to arbitrate this dispute?

2              MR. LEAF:  My position is he personally has not agreed

3     to arbitrate.  Here's why, your Honor.  Bearing in mind that

4     the legal standard is that if an individual is going to waive

5     their right to go into court and agree to an arbitration, that

6     has to be explicit.  Okay?  It has to be clear and not subject

7     to speculation, conjecture.  It has to be explicit.  Okay?  I

8     believe the --

9              THE COURT:  And why isn't that explicit here?  I guess

10    that's what I'm trying to figure out.  Are you taking the

11    position that the arbitration clause is not clear?

12             MR. LEAF:  Well, that's another issue entirely.

13             THE COURT:  Or are you saying simply because of the

14    signature line and the fact that he signed this document and

15    didn't specify that he was signing in his own personal

16    capacity, that it's unclear?  What is your position as to the

17    lack of clarity?  It seems to me that the arbitration clause is

18    clear.

19             MR. LEAF:  Your Honor, the arbitration clause actually

20    is kind of a side issue here.  Okay?  The issue is whether he

21    entered into a contract wherein -- as an individual or as a

22    representative.  If he entered into it as a representative, the

23    arbitration and everything else doesn't exist as to him

24    personally.  That's No. 1.  Okay?

25             No. 2, if you look at the first page of the -- let me

J1FPWHIO

 1   get the first agreement.

 2            THE COURT:  And that authority section is on page 15,

 3   by the way.  That same section, talking about the personally

 4   undertaking and assuming the full performance here of, but go

 5   ahead.

 6            MR. LEAF:  Okay.  The first paragraph defines who the

 7   client is.  It defines it as Farallon, and it defines "you" as

 8   the parties who seek representation in this matter.

 9            Now, bear in mind, your Honor, Mr. Bernstein is a --

10   the managing member of a litigation funder, White Lilly.  He

11   didn't have claims to assert in the litigation.  Okay?  So he

12   wasn't seeking representation.  Okay?  So that's No. 1.

13            No. 2, if you go to -- bearing in mind the definition

14   of "you," if you go to page 14 of that agreement, your Honor,

15   designation of U.S. agent states:  "You hereby designate

16   Jonathan Bernstein as your exclusive authorized client

17   representative in the United States," and it goes on.  Now, if

18   Mr. Bernstein was the client, why would he have to appoint

19   himself his own agent?  It makes no sense.  If he was the

20   client, he wouldn't need to be an agent.

21            THE COURT:  But isn't it the case that parties can

22   agree to arbitration even if they're not the primary parties to

23   a contract?  I think, is that what you're argument is?  That

24   this contract primarily involves these other two entities, but

25   he's certainly affected by this, he's certainly part of this,

1    he's certainly taking part in what's happening here.  Why isn't

2    it sufficient that he signed this contract, he signed this

3    agreement and that constitutes an agreement to arbitrate?

4              Because I know you've made a big deal about the

5    signature line, but is there anything in here suggesting that

6    the only people who can agree to arbitrate this dispute are the

7    primary parties to this dispute --

8              MR. LEAF:  Well, your Honor --

9              THE COURT:  -- the parties to this agreement?

10             MR. LEAF:  Is there anything suggesting in here that a

11   non-party, that if -- let's just take it as White Lilly is the

12   party.  He signed it in a representative capacity and not in

13   his personal capacity.  If that is the case, under the law, he

14   cannot be compelled to arbitrate.

15             There are very few exceptions to that, some of

16   which -- two of which are inapplicable that the defendants have

17   brought up here.  But if he signed that agreement in his

18   representative capacity, that contract does not exist as to him

19   personally.  And it's our contention, and I think the later

20   agreements make very clear, that it was White Lilly that was

21   the party to this.

22             And it simply doesn't make sense, for example, in the

23   language that I just pointed out to you, that Mr. Bernstein

24   would be both the client and appointing himself as an agent of

25   himself.  If he's an individual client, he doesn't need to be

J1FPWHIO

1    an agent of himself.  Clearly, it was an agent of a party to

2    the contract.  Okay?  Mr. Bernstein --

3              THE COURT:  And could an agent of a party to the

4    contract agree to arbitrate?

5              MR. LEAF:  Well, I can tell you this, your Honor, an

6    agent of a disclosed principal -- the agent could certainly

7    agree to arbitrate on behalf of the entity of which he is an

8    agent, certainly.

9              THE COURT:  Well, I'm not asking about whether or not

10   a court could force someone, an agent of a principal or a

11   third-party beneficiary to arbitrate because they've benefited

12   in some way from the contract, but couldn't an agent, a

13   non-party to the agreement, agree to arbitrate?

14             Why isn't that something that can happen, and why

15   wouldn't that be lawful?  Even if he's an agent of White Lilly,

16   why couldn't he also agree to personally arbitrate, and why

17   doesn't this document indicate a desire to do so?

18             MR. LEAF:  Your Honor, if he's signing this on behalf

19   of an agent, and there's one signature block -- and the

20   document is unclear that he is, in fact -- and it is at least

21   unclear that he is, in fact, agreeing personally to arbitrate

22   and personally to be a party to this contract, then he has --

23   the document is insufficient under the law for him to be pulled

24   into arbitration personally.

25             THE COURT:  So then what about that clause about

J1FPWHIO

1    authority that, again, that's in each of these documents that

2    indicates that the people who sign this agreement personally

3    undertake the responsibilities of it?  Why doesn't that do it

4    then?

5              MR. LEAF:  Because, your Honor, if he's signing this

6    document, as he was, as an agent of White Lilly, he is not

7    signing it a second time as himself, and he is not personally

8    agreeing to be bound by any term.  And, therefore, even if it

9    says personally in there, he is the agent.  He is not

10   representing himself, and he is not signing on behalf of

11   himself.  He is representing and signing on behalf of the

12   entity.

13             And under the law, he, as a representative, signing in

14   his representative capacity, cannot be pulled into arbitration

15   except in very, very limited circumstances, and those aren't

16   present here.

17             THE COURT:  Okay.  Go ahead, continue.

18             MR. LEAF:  I think we've hit most of it.

19             Your Honor, I would just point out that, you know,

20   these are their own documents.  These are the documents they

21   rely on to bring their arbitration.  I think the second amended

22   agreement makes clear and states that the first amended

23   agreement was between White Lilly and the Balestrieri firm, and

24   that's the language that I just read to you.  It's the first

25   paragraph of the second amended, and it states explicitly that

J1FPWHIO

1    the amended -- first amended was between White Lilly and the

2    law firm, not Mr. Bernstein.

3          If you go back to the first agreement, that is, at the

4    very least, ambiguous.  That's why we had this whole discussion

5    about who is it that he's signing on behalf of, himself or

6    someone else?  They don't specify in the first agreement that

7    it is Mr. Bernstein signing on behalf of him personally, and he

8    made it clear he wasn't.

9          So if, under the law, if he's going to waive his right

10   to be in court, that has to be clear and not by inference, and

11   that's exactly what you have to do with respect to the first

12   agreement, the initial agreement.  You have to infer that he

13   was signing on behalf of himself, rather than in a

14   representative capacity, and that's simply insufficient under

15   the law.

16         THE COURT:  But aren't you doing the opposite?  Aren't

17   you asking me to infer that he is signing in a representative

18   capacity because the actual signature line just simply says

19   he's signing, and he scratched off both on behalf of himself

20   and in this representative capacity?

21         Aren't you asking me to read more into the contract

22   and to infer that he is signing in a representative capacity?

23   Because that's not what's stated in that first agreement, is

24   it?  Is that stated anywhere in the first agreement?

25         MR. LEAF:  No, your Honor, nor is it stated that he is

J1FPWHIO

signing on behalf of White Lilly.  The agreement is ambiguous.

THE COURT:  It's not ambiguous as to the fact that he signed it.  He signed on behalf of himself, isn't it?

MR. LEAF:  No, he did not.  And I think the first and second amended make clear that he was not signing on behalf of himself.  But regardless, if you have to infer one way or another with respect to the first agreement, then you really haven't met the standard for saying that Mr. Bernstein has waived his right to go into court, he's surrendered his right to go into court.

If he's going to be pulled into an arbitration agreement, it has to be clear that, in fact, he did waive that, and he did agree to arbitrate.  And if anything, that -- in many, many, many respects, the more I read the first agreement and amended agreement, it's -- the less I understand it.  It's ambiguous in so many ways, but it's at least ambiguous as to whether he was signing in his representative capacity or his personal capacity.

That ambiguity is cleared up for all time with respect to the second amended agreement.  That states, in no uncertain terms, and, you know, the second amended, I'll point out, also states in the signature block John Bernstein signing on behalf of White Lilly.  Now, how could he amend an agreement that he entered into personally as a representative of White Lilly?

THE COURT:  What?  Wait.  I don't follow that last

J1FPWHIO

1    argument.

2            MR. LEAF:  If he is signing or asked to sign the

3    second amended agreement on behalf of White Lilly, right, and

4    the contention is the first initial agreement was signed by

5    Mr. Bernstein, why would he be signing on behalf of White Lilly

6    if White Lilly wasn't the client all along?

7            THE COURT:  Maybe because White Lilly wasn't in the

8    first agreement.

9            MR. LEAF:  Nor was Mr. Bernstein, and we're back to

10   the problem.

11           THE COURT:  Mr. Bernstein was.  Mr. Bernstein signed

12   the first agreement.  There's no mention of White Lilly on the

13   signature line of that first agreement; so wouldn't that

14   explain why White Lilly is now being added and amended to the

15   agreement that existed in the first agreement in terms of

16   Mr. Bernstein personally, and now it's being made clear that

17   Mr. Bernstein, in that second agreement, is, in addition to

18   signing on his own capacity, is signing as a representative of

19   White Lilly?

20           MR. LEAF:  Your Honor, I don't believe that's the

21   case.  I think the problem you have with the first initial

22   agreement is that it is at least ambiguous.  Okay?  And as I

23   said before, you know, "you" is defined in this agreement not

24   as Mr. Bernstein, not as White Lilly.  The client is defined as

25   Farallon and the parties seeking representation.

J1FPWHIO

1          Mr. Bernstein wasn't seeking representation.  He had

2     no reason to seek representation.  He had no rights to bring a

3     claim with respect to the underlying actions.  So it's, at the

4     very least, ambiguous.  And you have to infer that

5     Mr. Bernstein is, as I said before, signing in his personal

6     capacity or infer that he's signing in -- on White Lilly's

7     behalf, in a representative capacity.

8          But either way, if you have to make inference and it

9     is not explicitly clear that Mr. Bernstein is waiving his right

10    to go to court, he's binding himself to arbitration, that

11    doesn't meet the legal standard.  That needs to be explicitly

12    clear, not subject to speculation, not subject to inference, as

13    we cite in our papers.  And that's at least what you have to do

14    here with respect to Mr. Bernstein personally.

15          THE COURT:  Okay.

16          MR. LEAF:  And I don't believe, your Honor, that we

17    have an evidentiary record that really rebuts that.  We have a

18    hearsay declaration by an attorney, who can't really speak to

19    the issues that she speaks to in those -- in her declaration.

20          The other thing, your Honor, just with respect to the

21    two exceptions that the defendants referred to, there are five

22    exceptions.  They concede that three of them don't apply.  Just

23    as a prefatory language, the -- I'm sorry, I lost my train of

24    thought.  The typical case where a non-signatory can be in

25    arbitration -- and I'm choosing my words carefully there -- be

J1FPWHIO

1    in arbitration is where a non-signatory to an arbitration

2    agreement is seeking to force a signatory to that agreement,

3    somebody who has already agreed to arbitrate, to, in fact,

4    arbitrate under an agreement that the party seeking arbitration

5    has not signed.

6           There are circumstances where that can be obtained,

7    when it's the inverse.  When it is a signatory, as here,

8    seeking to make a non-signatory go into arbitration when that

9    person has not agreed, the circumstances when that -- in that

10   case, were that to be permitted, are very, very limited and the

11   courts scrutinize the request for that very carefully.

12          The two that they come up with are an agency theory.

13   I think your Honor referred to that a few moments ago.  They

14   don't really argue agency theory in their papers.  They argue a

15   third-party beneficiary exception.  That's not one of the five

16   exceptions, and I would refer the Court to the Thompson case

17   for the proposition that if a lower court goes outside the five

18   boxes, the five exceptions, that's not permissible.  Thompson

19   reversed a lower court that had used a sixth exception for that

20   very reason.

21          To the extent that they say they've made an agency

22   argument, that doesn't apply.  We have an agent of a known

23   principal, a disclosed principal.  In that circumstance, you

24   can't pull the agent in.  That's the law we cited, and so have

25   they.

J1FPWHIO

1          And then, finally, your Honor, on the estoppel

2     argument, the kind of benefit that they've pointed to, you

3     know, Mr. Bernstein had some say in the arbitration -- excuse

4     me, in the litigation, that's an incidence of his being an

5     agent of a disclosed principal.  It's not a benefit, so -- that

6     the courts would point to.

7          The other -- they don't point to any direct benefit to

8     Mr. Bernstein.  They do say, your Honor, that Mr. Bernstein

9     might, as a member of White Lilly, LLC, someday see some

10    remuneration as a consequence of the settlement agreement that

11    was also ultimately reached.  That is not the kind of direct

12    benefit you need in order to get it.  If that were permissible,

13    then any member of any LLC, any executive of any company that

14    had -- as the company entered into an arbitration agreement,

15    any of those who receive remuneration as a result of something

16    the company did could be pulled in to arbitrate.  It's

17    basically piercing the corporate veil without any showing.

18         So, your Honor, I think that the evidentiary record

19    here fully supports the fact that Mr. Bernstein was signing

20    that agreement in his representative capacity.  At the very

21    least, that initial agreement is ambiguous as to whether he was

22    signing it on behalf of White Lilly or on behalf of himself,

23    and if that's the case -- and the second -- the other two

24    documents aren't ambiguous because the second amended agreement

25    makes clear that the first amended agreement was, in fact,

J1FPWHIO

between White Lilly and Balistreri firm.  If that first

agreement is ambiguous, as it is, then it's not enough to pull

Mr. Bernstein into arbitration.

THE COURT:  Okay.

MR. LEAF:  Thank you.

THE COURT:  Let me hear from the defendants.  Who

wants to go first?

MR. HAMID:  Thank you, your Honor.  Joe Hamid at

Debevoise for the Balestrieri parties.

So, obviously, in your discussion with Mr. Leaf, were

keyed in on the key issue here, which is the dispositive

motion, which is, did Mr. Bernstein agree to arbitrate with

defendants?  Mr. Bernstein, of course, has the burden of

demonstrating a likelihood of success on that issue or, on the

alternative standard, sufficiently serious questions going to

the merits of that issue, making fair grounds for litigation.

And he can't meet that burden because the documents he

signed made it crystal clear that he did agree to arbitrate,

without any ambiguity whatsoever, and if the contracts

demonstrate that, and I'll just walk you through why they do in

just a second, that's dispositive of the motion because, as

Judge Cote held in the Custom Metal Crafters case that we cite

in our papers, where, as here, you have a dispute falling

within the scope of the valid arbitration agreement, it

necessarily follows that there cannot be a likelihood of

J1FPWHIO

success on the merits, nor is there even a sufficiently serious

question going to the merits, to make them fair ground for

litigation.

       And the law also holds that, of course, being

compelled to arbitrate when you've agreed to do so, is not any

kind of harm, let alone irreparable harm.

       So let's turn to that dispositive question.  Did

Mr. Bernstein agree to arbitrate?  And let me set the stage by

just emphasizing a few principles that I think are well

accepted.  There is the emphatic national policy in favor of

arbitration embodied in the Federal Arbitration Act and

multiple cases of the Supreme Court and the Second Circuit, and

for that reason, binding precedent says that we hold the

parties to their arbitration agreements, we construe them as

broadly as possible, and we resolve all doubts about scope in

favor of arbitrability.

       The other principle is that this is ultimately an

issue of contract.  So let's look at the two contracts that my

clients signed with Mr. Bernstein, and I think those documents

really are the beginning and the end of this analysis because,

reviewing their clear and unambiguous terms and applying black

letter principle of contract law, there's simply no legitimate

reason to say we didn't arbitrate.

       The first contract we looked at is Exhibit B to the

McNeil declaration.  That's the November 20th, 2014, engagement

J1FPWHIO

letter, the initial engagement letter, and I'll just point out

a couple of things about it.  No. 1, it's addressed, on page 1

to John Bernstein at a Bernstein Corp.com e-mail address, not

any White Lilly address.

In the first sentence it does define Company, capital

C, and Client, capital C, as Farallon, but then it goes on to

define "you" more broadly, to include the parties or -- party

or parties who seek representation in your matter.

Then, of course, if you flip to page 16, that's where

you find the signatures, and I know much has been made of the

fact that Mr. Bernstein crossed out "on behalf of himself," but

as your Honor pointed out, he actually crossed out the whole

phrase "on behalf of himself and Farallon, leaving what is not

remotely ambiguous.  You've got a signature line that says

underneath it "John Bernstein" and then he signs "John

Bernstein."  I don't see any ambiguity about whether or not

John Bernstein signed this signature for John Bernstein.  It's

crystal clear on its face.  He also happened to initial every

page of the document.

He has individual rights and obligations under this

agreement.  We looked at only part of them in your discussion

with Mr. Leaf, but that section on page 14, designation of

agent, actually gives him very significant rights.  It gives

him the right to veto the decisions of other signatories to

this agreement and be the exclusive litigation director and

J1FPWHIO

1    manager of case strategy.  That's a right that he has

2    personally under this agreement.

3           And then, of course, you have the arbitration

4    provision, which is on page 15, which is notably broad in

5    scope.  It's not limited to any subject matter.  It's not

6    limited to disputes with Clients, capital C.  It's not even

7    limited to disputes with "you," the defined term "you."  It's

8    any parties, lower case P, agree to arbitrate their disputes

9    and any claims among or between them.  So that clearly covers

10   any disputes among any of the people who signed this agreement.

11          And then, finally but critically, this document

12   doesn't mention White Lilly anywhere in it.  Those words simply

13   do not appear in the document.  So the idea that this is

14   ambiguous as to whether it may be on behalf of White Lilly

15   doesn't make any sense.  You look at ambiguity within the four

16   corners of the document.  You don't guess or speculate about

17   other things, maybe he's signing on behalf of the man on the

18   moon.  You don't do that.  You look at the four corners of the

19   document.

20          Now, this agreement was amended and restated, and

21   that's Exhibit C to Ms. McNeil's declaration, and I won't go

22   through all of the same provisions.  It's very, very similar,

23   but it's very similar points, addressed to John Bernstein at

24   his Bernstein Corp.com e-mail address, not White Lilly.  "You"

25   defined to go just beyond the, capital C, Client but other

J1FPWHIO

parties seeking representation, the same provision on page 14
that gives Mr. Bernstein individual -- significant individual
rights and obligations under this agreement.

And then now on the signature block, it couldn't be
more clear.  Here, we don't even have any issue about crossing
out entities or entities.  You've just got a signature set up
to be John Bernstein and signed by John Bernstein.

So I think -- and so that's the operative agreement,
it remains the operative agreement.  I think the bold statement
repeated over and over in Mr. Bernstein's litigation papers
that White Lilly signed this contract -- and, again, I forgot
to point out, that contract also doesn't have the words White
Lilly in it anywhere -- that White Lilly signs this contract
and Mr. Bernstein didn't, is frankly just unsustained.

Mr. Bernstein is clearly a party to this agreement.
Whether he's the client or the agent, that's a sideshow.  He's
signed this agreement.  He's a party to the agreement.  He's
certainly, lower case P, party as used in the arbitration
agreement, and he clearly and unambiguously agreed to arbitrate
disputes.

Now, I know Mr. Bernstein tries to create an ambiguity
by pointing to two additional documents, the capitalization
agreement, to which defendants were not parties, and then this
so-called second amended engagement letter, which Mr. Bernstein
expressly declined to sign.

J1FPWHIO

1          But trying to rely -- first of all, before we even get

2     to talking about what's in those documents, the clear black

3     letter principle is that you don't rely on documents outside of

4     the four corners of the contract to create an ambiguity.  Black

5     letter law is that you look to rule 11 outside of the contract

6     only if the contract is ambiguous.  Then you look to outside

7     documents to see if you can resolve that ambiguity.

8          Here, the operative engagement letter, Exhibit C, is

9     not ambiguous at all on this point.  If John Bernstein signed

10    it for John Bernstein, where is the ambiguity?  As I say, you

11    don't go looking outside.  You point to an ambiguity within the

12    contract about it, and it simply is not there.

13         So no reason to be considering outside documents

14    anyway.  By the way, these documents, Exhibit C and Exhibit B,

15    do have entire agreement clauses.  These are fully integrated

16    documents.

17         But even if one were to consider, which one should

18    not, these two documents that Mr. Bernstein relies on, they

19    wouldn't do anything to change the fact that Mr. Bernstein

20    agreed to arbitrate disputes.

21         The capitalization agreements, that sets forth his

22    understanding with Mr. Diaz Rivera.  The defendants, the

23    Balestrieri parties, the Storch parties, are not even parties

24    to that agreement.  And so whatever arrangement he may have

25    with Mr. Diaz Rivera about how he's going to fund part of this

J1FPWHIO

litigation or what entity he's setting up to receive the

benefits of this litigation, that has nothing to do with us and

has nothing to do with construing the clear and unambiguous

terms of our agreement.  The scope of those documents, the

subject matter of those documents are just different.

As to the addendum, what Mr. Leaf was calling the

second amended engagement letter, Mr. Bernstein declined to

sign it.  So he's hard-pressed now to argue that a document he

consciously declined to sign should be accepted by this Court

as undoing his clear and unambiguous commitment under the

operative agreement to arbitrate disputes with the defendants.

In addition, unlike the initial engagement letter and

the operative engagement letter, the amended and restated one,

the proposed amendment does not include an entire agreement

clause.  Rather, it says, right on page 1, that we're

reconfirming our obligations under the March 2015 agreement.

It's not superseding.  It's adding to.  And so just as your

Honor said in one of your questions to Mr. Leaf, if anything,

that document adds White Lilly as an additional party, but it

certainly doesn't take away the fact that the previous

document, the March 2015, is a clear and unambiguous promise by

Mr. Bernstein that he would arbitrate disputes.

There's an independent reason that the motion should

be denied, and your Honor touched on this in some of the

colloquy with Mr. Leaf, and that is that the motion should be

J1FPWHIO

1    denied from the outset because the whole question of

2    arbitrability is actually for the arbitrator, in this

3    circumstance, to decide and, respectfully, not for the Court.

4            This whole thing should be delegated to the arbitrator

5    to decide.  The law is that the question of arbitrability is

6    generally for the courts, not the arbitrator, to determine

7    unless the parties clearly and unmistakably delegate that

8    authority to the arbitrator to make that determination.  And

9    there is directly on point Second Circuit precedent saying that

10   where, as here, you have an arbitration agreement that

11   incorporates the commercial arbitration rules for the American

12   Arbitration Association, that is clear and unmistakable

13   evidence that the parties have chosen to delegate to the

14   arbitrator instead of to the Court the question of determining

15   the arbitrator's jurisdiction, the scope of the arbitration,

16   the whole question of arbitrability.

17           Now, Mr. Leaf has argued, and the papers argue, that

18   that's only about -- that doesn't apply to determining scope as

19   to parties within the arbitration.  That's not so.  That

20   distinction is not correct.  First of all, the Second Circuit

21   case that we're relying on here, Contact, was itself about

22   whether a party was bound by an arbitration provision or not.

23   And that's the case that when you got an adoption of commercial

24   arbitration rules, it's for the arbitrator to make that

25   determination about whether the party is in or out of the

J1FPWHIO

1   arbitration.

2           What the cases that are cited in Mr. Bernstein's brief

3   actually say, and I'm talking about the McKenna Long case and

4   the National Union Fire Insurance case, is if you've got a

5   question about whether someone who isn't even mentioned in the

6   contract, whether that person can be pulled into the

7   arbitration, that's a question for the courts and not the

8   arbitrator.

9           But, obviously, that's not the situation here.

10  Mr. Bernstein is more than mentioned.  He's the only party

11  mentioned.  White Lilly is the party that isn't mentioned.  And

12  so for that reason, as well, this whole issue has been

13  delegated to the arbitrator by the clear and unambiguous

14  language of the contract, and that's an independent reason to

15  deny the motion and, in fact, compel arbitration.

16          I don't think it's necessary for me to go into those

17  exceptions.  I can touch on them very briefly.  There is, in

18  the briefs, as you know, your Honor, this discussion about when

19  a non-signatory can be bound by a signatory's arbitration

20  agreement.  We both made arguments there.  I kind of think of

21  the whole premise of that as being kind of a bizarre

22  counter-factual because Mr. Bernstein is the signatory and

23  White Lilly is the party that's not the signatory.

24          But even if we flipped reality on his head, as

25  Mr. Bernstein's argument seeks to do, and so even if we accept

J1FPWHIO

1    the bizarre premise that White Lilly signed and Mr. Bernstein

2    didn't, and we were trying to see whether Mr. Bernstein could

3    be pulled in within one of these exceptions, the answer would

4    be yes, he can, at least under two of them.

5         One of them is estoppel.  As your Honor held in the

6    Grenawalt versus AT&T Mobility case., a non-signatory is

7    estopped from denying its obligation to arbitrate if that party

8    directly benefits from the contract containing the arbitration

9    agreement, and it certainly does here.  I pointed that out on

10   its face, the provision on page 14, that he gets very

11   significant rights individually under the agreement, but he

12   benefited in other ways as well.

13        In the underlying litigation, he was individually a

14   party to the master settlement agreement that ended up

15   resolving that underlying litigation.  He was represented by

16   the Balestrieri parties and the Storch parties in that

17   litigation in reaching that settlement, and that was work done

18   under what we've called the operative engagement letter.

19        And second, his agency.  Provisional principles of

20   agency law would also bind him as a non-signatory, even if you

21   accepted this bizarre premise that White Lilly is the signatory

22   and Mr. Bernstein is not.

23        So for all of those reasons, your Honor, we think it's

24   very, very clear that Mr. Bernstein has agreed to arbitrate.

25   We think for that reason, the motion for preliminary injunction

J1FPWHIO

1    should be denied, but I would go a step further and say that,

2    for the sake of efficiency and to conserve both judicial and

3    party resources -- I think this is within your authority to do,

4    we've cited case law to that effect -- I think you could also

5    enter an order simply compelling arbitration at this point of

6    the whole matter.

7              Otherwise, of course, we would go through the motions

8    of making a motion to compel arbitration, but I think that's

9    unnecessary.  I mention your Honor's JP Morgan case cited in

10   our papers with that principle.  So unless you have any

11   questions for me, that's all I have.

12             THE COURT:  Okay.  Let me hear from the other defense

13   counsel, if there's anything you wish to add.

14             MR. LEAF:  Your Honor, just a point of order here.

15   Ms. Storch is not a party to the arbitration agreement, the

16   arbitration at all.  It's a little oddly postured here that she

17   would be putting in an opposition in a case that she's not

18   involved in the arbitration.

19             MR. FRANCOEUR:  Your Honor, I plan to address that.

20             THE COURT:  Okay.

21             MR. FRANCOEUR:  Good afternoon.  My name is Joe

22   Francoeur.  I'm from the law firm of Wilson Elser.  I represent

23   Adina Storch and the law firm of Adina Storch.

24             I agree with Mr. Hamid.  I think his points were well

25   taken, well presented, and for the sake of brevity and for the

J1FPWHIO

1    record, I don't need to repeat his arguments.  His arguments

2    were full and complete.  I only have a few discrete points to

3    make, but I will be very, very brief.

4            First of all, to the point -- plaintiffs' point that

5    Storch defendants don't have a stake in this.  That's not

6    accurate at all.  All you have to do is look at the order to

7    show cause itself.  The order to show cause says -- this is the

8    relief it's seeking -- "enjoining the defendants," including

9    the Storch defendants, "during the pendency of this action from

10   arbitrating or otherwise pursuing an arbitration."

11           Well, that's -- of course, we have a stake in this.

12   We, the Storch defendants, are a signatory to the agreements at

13   issue, and we're being -- there's an attempt in the order to

14   block us from arbitrating.  So, of course, we have standing to

15   stand here and be heard on these motions.  So I don't

16   understand that position at all when it's in the -- relief

17   against my client is in the order to show cause itself.

18           A few of the other points.  Again, Mr. Hamid made the

19   points on the agreement language.  It couldn't be more clear.

20   With the Supreme Court's decision this week, I don't know what

21   else it could do or say to say that these contracts need to be

22   honored.

23           The argument that plaintiff made, that the signature

24   is ambiguous, I've never heard that before.  It doesn't make

25   any sense to me, but I'd like to point out that plaintiffs'

J1FPWHIO

1    counsel, time and again, refers to the second amended agreement

2    in 2016 as clarifying all the issues.  That agreement wasn't

3    signed.  So if the signature in the earlier agreement was

4    ambiguous, how about the unsigned agreement?  How is that not

5    ambiguous?  How does the 2016 change anything?

6          If there's any ambiguous argument, okay, look at 2016,

7    but the truth is, and Mr. Hamid made this point, all the 2016

8    did was add to the earlier agreement.  The language was clear.

9    The arbitration provisions were clear.  If there's any dispute

10   between the, lower case P, parties, this has to be subject to

11   arbitration.

12         And the Second Circuit decision, which I was going to

13   talk about, but counsel did, Contact, made this very clear.  If

14   you incorporate the AAA rules, American Arbitration rules, into

15   your agreement, then any disputes on arbitrability are not

16   decided by the court.  They're to be decided in arbitration.

17   So I think this entire action is misplaced.  We're in the wrong

18   venue, and I join counsel's application that the Court, in its

19   discretion, compel arbitration right now because the agreements

20   are clear on their face.  Thank you, your Honor.

21         THE COURT:  Okay.  Anything else from plaintiffs'

22   counsel?

23         MR. LEAF:  Just briefly, your Honor.  First of all,

24   going to the point just made a moment ago that the 2016

25   agreement wasn't signed.  The 2016 agreement is an operative

J1FPWHIO

agreement as to Farallon and with Mr. Diaz Rivera, who did

sign.  But what it contains is an admission as to who the

parties really were to the prior agreement.  You have

ambiguity, in my view, and the ambiguity is clear up in the

second agreement, the 2016 agreement, which says White Lilly,

the funder, is the party all along.

Second of all, the capitalization agreement.  That was

shared with the Balestrieri -- both defendants, prior to it

being signed.  Therefore -- and they've admitted this in their

papers.  Therefore, they were aware that my client, John

Bernstein, viewed the parties to that and to the engagement

agreement as White Lilly and Farallon and the law firms.  Why

didn't they correct that misunderstanding?  If at least the

first agreement was ambiguous, in my view, they should have had

an obligation to correct that and make clear who the client is.

They didn't do that.

Oh.  And, your Honor, there are cases that I think

we've cited, where the issue of -- where the party who signed

the agreement signed in a representative capacity.  The issue

is whether or not there was actually a contract, whether they

had signed personally or as a representative, and the courts

say that's an issue for the court in the first instance because

there is a question as to whether there is even a contract, and

I just wanted to point that out.

And I believe that's all I have, your Honor.

J1FPWHIO

1          MR. FRANCOEUR:  Your Honor, one last point?  White

2     Lilly did not sign the 2016 agreement.  As a matter of fact,

3     White Lilly never signed any agreement.  The argument that

4     should be made here is White Lilly is not a party to anything

5     because they never signed an agreement.  White Lilly never

6     signed an agreement.

7          THE COURT:  What do you mean by that?  There's at

8     least one document --

9          MR. FRANCOEUR:  No.

10          THE COURT:  -- where Bernstein is signing on behalf of

11     White Lilly, correct?

12          MR. FRANCOEUR:  That's a capitalization agreement.

13     That's not between these parties.  That's an unrelated,

14     separate agreement about how they're going to fund their

15     litigation.  White Lilly never signed any one of these three

16     documents.

17          MR. LEAF:  Your Honor, one last point.

18          THE COURT:  Yes.

19          MR. LEAF:  If White Lilly wasn't a party to these

20     agreements, why did White Lilly get every single invoice?  Why

21     was it sent to them?

22          THE COURT:  All right.  Well, that's beyond the scope

23     of what I need to decide ultimately here.  I'll be right back.

24          (Recess)

25          THE COURT:  Okay.  I find that the plaintiffs have not

J1FPWHIO

 1    met their burden of establishing irreparable harm or a

 2    likelihood of success on the merits.  I will deny the

 3    preliminary injunction.

 4            It seems to me that perhaps what we should do at this

 5    point is give the parties a briefing schedule and have the

 6    defendants, if they still wish to file a motion to compel

 7    arbitration, give them a schedule to file that motion and give

 8    the plaintiffs an opportunity to oppose that.

 9            I don't know if the plaintiffs wish to file other

10    motions to enjoin arbitration, but how do the parties wish to

11    proceed?  I know the defendants also expressed a desire to file

12    a motion to dismiss the complaint.  We can give you a motion

13    schedule for that too.

14            If I were to grant a motion to compel arbitration, the

15    Second Circuit has made it clear that it would then be

16    inappropriate for me to dismiss the complaint, that it would be

17    appropriate for me to then stay this action pending the outcome

18    of arbitration.  So how do the parties want to proceed?

19            MR. HAMID:  Well, your Honor, if you're not inclined

20    to give an order compelling arbitration now, we would proceed

21    with a motion simply to compel arbitration.

22            MR. FRANCOEUR:  I agree, and given your comments and

23    the motion to dismiss, it seems to make sense that we would

24    reserve our rights to do that and see how the motion to compel

25    plays out.

J1FPWHIO

1          THE COURT:  Okay.  Plaintiffs?

2          MR. LEAF:  We're fine with setting a briefing

3     schedule, your Honor, and in the interim, we will speak with

4     the other parties.

5          THE COURT:  Okay.  Do the plaintiffs wish to file

6     another motion, a motion to enjoin, or simply oppose the motion

7     to compel arbitration?

8          MR. LEAF:  Your Honor, could we get back to you on

9     that?  We'll talk to the defendants in the interim.

10          THE COURT:  All right.  Sure.  Let's go ahead and get

11     a briefing schedule.  We'll make the schedule the same for both

12     sides.

13          Can we get three weeks for the first motion, Tara?

14          THE DEPUTY CLERK:  February 5th.

15          THE COURT:  And then let's get three weeks for a

16     response.  It would be February 26th.  And then one week for a

17     reply, which would be when?

18          THE DEPUTY CLERK:  March 5th.

19          THE COURT:  Okay.  So that's for all parties.  So the

20     defendants, file your motion to compel arbitration by

21     February 5th.  The plaintiffs will oppose by February 26th.

22     The defendants, file your reply by -- is that March 5th, Tara?

23          THE DEPUTY CLERK:  Yes.

24          THE COURT:  And if the defendants wish to file a

25     motion to enjoin arbitration, they should file their motion by

J1FPWHIO

|     |                                                                      |
|-----|----------------------------------------------------------------------|
| 1   | February 5th, with the defendants opposing by February 26th,         |
| 2   | and any reply by March 5th.                                          |
| 3   |      Anything else from the plaintiffs today? |

1   February 5th, with the defendants opposing by February 26th,

2   and any reply by March 5th.

3           Anything else from the plaintiffs today?

4           MR. LEAF:  No, your Honor.

5           THE COURT:  Anything else from the defendants today?

6           MR. HAMID:  Your Honor?

7           MR. FRANCOEUR:  Go ahead, counsel.  I'm sorry.

8           MR. HAMID:  Just a point of clarification.  I'm sorry

9   if I'm being dense.  What could be an additional motion that

10  plaintiffs would make at this point to enjoin, in light of your

11  Honor's ruling?

12          THE COURT:  I'm just throwing it out there as a

13  possibility.  I wanted to give them the opportunity.  I'm not

14  sure if they wish to file any such motion.  They can.  I mean,

15  obviously, this was in the context of a preliminary injunction

16  that has been denied.  That doesn't mean that, theoretically,

17  the ultimate relief could not be granted at some point, but the

18  preliminary injunction has certainly been denied.

19          MR. HAMID:  Understood.  Thank you.

20          MR. FRANCOEUR:  Your Honor, the Storch defendants have

21  not answered.  I would ask that perhaps the Court could issue a

22  ruling that it would not be compelled to answer until there's a

23  motion on the motion to compel?

24          THE COURT:  It seems to make sense to me.

25          Plaintiffs, what's your position on that?

J1FPWHIO

1          MR. LEAF:  No objection.

2          THE COURT:  Okay.  I'll stay the answer until there is

3  a ruling on the motion to compel.

4          MR. HAMID:  And that would be for all defendants, your

5  Honor?

6          THE COURT:  Correct.

7          MR. HAMID:  Thank you.

8          THE COURT:  Okay.  Anything else we need to discuss?

9          MR. HAMID:  No.

10          MR. FRANCOEUR:  Not from me, your Honor.

11          THE COURT:  Okay.  All right.  We're adjourned.

12          (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25