Jyotin Hamid
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, New York 10022
Telephone:     (212) 909-6000
jhamid@debevoise.com

Jillian L. McNeil
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:     (646) 912-8463
jillian.mcneil@balestrierefariello.com
*Attorneys for the BF Parties*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WHITE LILLY, LLC and JONATHAN BERNSTEIN,**<br><br>                                  Plaintiffs,<br><br>– against –<br><br>**BALESTRIERE PLLC, BALESTRIERE FARIELLO, JOHN BALESTRIERE, THE LAW OFFICES OF ADINA G. STORCH, PLLC, and ADINA STORCH,**<br><br>                                  Defendants. | Case No.: 1:18-cv-12404(ALC)(SN)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF THE BF PARTIES' MOTION TO COMPEL ARBITRATION** |

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................................ 1

BACKGROUND FACTS .................................................................................................................. 1

ARGUMENT ..................................................................................................................................... 4

    I.    ARBITRATION SHOULD BE COMPELLED BECAUSE THE PARTIES HAVE AGREED THAT ANY QUESTION CONCERNING ARBITRABILITY IS FOR THE ARBITRATOR, NOT THE COURT, TO DECIDE .................................................... 4

    II.    MR. BERNSTEIN SHOULD BE COMPELLED TO ARBITRATE HIS CLAIMS BECAUSE HE AGREED TO DO SO ................................................................................ 7

        A.  Mr. Bernstein Validly Agreed to Arbitrate ................................................................. 7

        B.  The Claims In This Case Fall Within the Scope of the Arbitration Agreement .......... 11

    III.   WHITE LILLY SHOULD ALSO BE COMPELLED TO ARBITRATE ITS PURPORTED CLAIMS ................................................................................................ 12

CONCLUSION ................................................................................................................................ 14

# **TABLE OF AUTHORITIES**

**Cases**

*ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*,
　307 F.3d 24 (2d Cir. 2002) .................................................................................................... 11

*Alfa Laval U.S. Treasury, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
　857 F. Supp. 2d 404 (S.D.N.Y. 2012) .................................................................................... 13

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
　170 F.3d 349 (2d Cir. 1999) ............................................................................................ 12, 13

*Contec Corp. v. Remote Solution Co.*,
　398 F.3d 205 (2d Cir. 2005) ................................................................................................ 5, 6

*David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*,
　923 F.2d 245 (2d Cir. 1991) .................................................................................................... 4

*Hartford Accident and Indemnity Co. v. Swiss Reinsurance America Corp.*,
　246 F.3d 219 (2d Cir. 2001) .................................................................................................... 7

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
　139 S. Ct. 524 (2019) ............................................................................................................... 5

*Howsam v. Dean Witter Reynolds, Inc.*,
　537 U.S. 79 (2002) ................................................................................................................... 5

*In re: AMR Corporation, et al., Reorganized Debtors.*,
　No. 11-15463 (SHL), 2018 WL 6523965 (Bankr. S.D.N.Y. Dec. 10, 2018) ........................... 9

*Life Techs. Corp. v. AB Sciex Pte. Ltd.*,
　803 F. Supp. 2d 270 (S.D.N.Y. 2011) .................................................................................... 13

*McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*,
　2015 WL 144190 (S.D.N.Y. Jan. 12, 2015) ....................................................................... 6, 13

*Merrill Lynch Inv. Managers v. Opibase, Ltd.*,
　337 F.3d 125 (2d Cir. 2003) .................................................................................................. 12

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
　473 U.S. 614 (1985) ................................................................................................................. 4

*Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*,
　460 U.S. 1 (1983) ..................................................................................................................... 4

*Nat'l Union Fir. Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC*,
  289 F. Supp. 3d 457, (S.D.N.Y. 2018) ........................................................................................ 6

*Robinson Brog Leinwand Greene Genovese & Gluck P.C. v. John M. O'Quinn & Assocs., L.L.P.*,
  523 F. App'x 761 (2d Cir. 2013) ............................................................................................... 13

*Rochdale Vill., Inc. v. Pub. Serv. Employees Union, Local No. 80*,
  605 F.2d 1290 (2d Cir. 1979) .................................................................................................... 11

*Schneider v. Kingdom of Thailand*,
  688 F.3d 68 (2d Cir. 2012) .......................................................................................................... 5

*Thomson-CSF, S.A. v. American Arbitration Ass'n*,
  64 F.3d 773, 776 (2d Cir. 1995) ........................................................................................... 7, 12

*W.W.W. Assocs., Inc. v. Giancontieri*,
  77 N.Y.2d 157 (1990) ................................................................................................................. 9

*World Omni Fin. Corp. v. Ace Capital Re Inc.*,
  64 F. App'x 809 (2d Cir. 2003) ................................................................................................. 13

**Statutes**

9 U.S.C. § 2 ..................................................................................................................................... 4

Balestriere PLLC, Balestriere Fariello, and John Balestriere (collectively, the "BF Parties") respectfully submit this Memorandum of Law in Support of Their Motion to Compel Arbitration of this case filed by Jonathan Bernstein and White Lilly, LLC ("White Lilly").

## PRELIMINARY STATEMENT

Mr. Bernstein and his shell company, White Lilly, commenced this lawsuit asserting claims arising from the BF Parties' representation of Mr. Bernstein and his co-clients in underlying litigation. But the engagement agreements governing that representation contained a clear, unambiguous agreement that any dispute between the parties would be subject to mandatory arbitration. In fact, the BF Parties commenced an arbitration against Mr. Bernstein and his co-clients last September because of their failure to pay their legal fees, and Mr. Bernstein brought this lawsuit, together with an unsuccessful application for provisional relief, in a transparent attempt to gain a tactical advantage in that pending arbitration. In light of Mr. Bernstein's clear and unambiguous agreement to arbitrate any disputes with the BF Parties, and the binding precedent mandating enforcement of agreements to arbitrate, Plaintiffs should be compelled to bring any purported claims they assert here in the arbitration that has been pending for months and in which Mr. Bernstein is already participating.

## BACKGROUND FACTS

*Mr. Bernstein's Engagement of the BF Parties and Agreement to Arbitrate*

In August 2014, Mr. Bernstein and his friend, Juan Diaz Rivera, sought out the legal services of the BF Parties concerning a dispute with one of the world's largest private companies over the control of a resort, related real estate, and other business in Cabo San Lucas, Mexico. (*See generally* Declaration of Jillian L. McNeil in Support of the BF Parties' Opposition to the Bernstein Parties' Motion for a Preliminary Injunction, Dkt. No. 32, (the "McNeil Decl.").)

1

On November 21, 2014, Mr. Bernstein and his co-clients entered into an agreement for provision of legal services (the "First Engagement Agreement") with the BF Parties and their co-counsel, the Law Offices of Adina G. Storch, PLLC (the "Storch Firm"). (First Engagement Agreement, Ex. A.)[1] On March 17, 2015, Mr. Bernstein and his co-clients entered into an amended and re-stated engagement agreement for provision of legal services with the BF Parties and the Storch Firm (the "Operative Engagement Agreement"). (Operative Engagement Agreement, Ex. B.) The substance of the First Engagement Agreement and the Operative Engagement Agreement is identical, with the only difference being the addition of one signatory. *Compare* Ex. A *with* Ex. B.

Both the First Engagement Agreement and the Operative Engagement Agreement contain an identical mandatory arbitration provision, in which the parties agreed that all disputes or claims between them would be resolved by arbitration administered by the American Arbitration Association ("AAA"):

> If any dispute or claim between the parties shall arise, the parties shall submit to and have such . . . [dispute or claim] settled by arbitration administered by the American Arbitration Association, in New York before one arbitrator, in accordance with its Commercial Arbitration Rules ('Arbitration Rules'), and judgment on the award rendered by the arbitration may be entered in any court having jurisdiction thereof.

(Ex. A, at 15; Ex. B, at 15.)

*The Fee Collection Arbitration and this Court Action*

From March 2015 to April 2018, the BF Parties represented Mr. Bernstein and his co-clients in litigations in multiple jurisdictions, including federal and state courts in New York and

---

[1] Citations to "Ex. __" herein refer to the exhibits attached to the Declaration of Jyotin Hamid ("Hamid Decl.") submitted herewith.

an arbitration before the International Chamber of Commerce. (McNeil Decl. ¶ 7.) Eventually, the BF Parties obtained a favorable settlement for Mr. Bernstein and his co-clients, resulting in a net gain of more than $77 million in cash, real estate, and liability forgiveness. (Letter to American Arbitration Association ("Notice of Claim"), dated September 13, 2018, Ex. C, at 1.)

Thereafter, because Mr. Bernstein and his co-clients failed to pay their legal fees and withdrew from discussions about a reasonable payment plan, on September 13, 2018, Balestriere Fariello was forced to initiate an arbitration (the "Fee Collection Arbitration") before the AAA. (McNeil Decl. ¶ 32; Ex. C.) Mr. Bernstein's counsel has appeared in the arbitration. (McNeil Decl. ¶ 33.) On December 11, 2018, the AAA sent a request for comments to the parties, and asked for any comments to be submitted by December 26, 2018. (*Id.* ¶ 34.) On December 20, 2018, Mr. Bernstein's counsel responded by requesting until January 3, 2019, to submit comments due to "(but not solely) in light of the approaching holidays." (*Id*. ¶ 32; Ex. C.) However, instead of responding to the AAA's request for comments, Mr. Bernstein filed this action on January 2, 2019. (Complaint, Dkt. No. 1.)

As detailed in the BF Parties' pre-motion conference letter, Mr. Bernstein's claims are based on misrepresentations of fact and are so legally insufficient as to be frivolous. (*See* Pre-Motion Conference Letter, Dkt. No. 29.) Mr. Bernstein's court submissions are a transparent attempt to try to embarrass the BF Parties with inaccurate references to irrelevant years-old disputes,[2] and to interfere with the Fee Collection Arbitration.

On January 3, 2019, Plaintiffs filed an application for an order to show cause seeking, first, a temporary restraining order, and, second, a preliminary injunction to enjoin arbitration.

---

[2] Mr. Bernstein misrepresents the facts regarding such years-old disputes, has no knowledge of how they were ultimately resolved, and presents a misleadingly limited record (making it seem as if out of context statements were findings, when the actual findings are completely different). While keeping the focus in this brief on the only issue in this Motion—the arbitrability of the Plaintiffs' claims—the BF Parties do not waive any rights, and specifically reserve the right to seek the appropriate remedies for Mr. Bernstein's misrepresentations and litigation misconduct.

(*See* Order to Show Cause, Dkt. No. 21.) The Court denied the motion for a temporary restraining order out of hand. (*Id.*) On January 15, 2019, the Court denied the motion for a preliminary injunction, holding that Plaintiffs had "not met their burden of establishing irreparable harm or a likelihood of success on the merits." (Transcript of January 15, 2019, Preliminary Injunction Hearing, Ex. D, at 38:25–39:3.) Following the Court's denial of the motion, Mr. Bernstein submitted letters to the AAA stating that he would participate in the Fee Collection Arbitration to defend himself against the claims properly brought there. (Letter to the American Arbitration Association, dated January 18, 2019, Ex. E.)

## **ARGUMENT**

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA establishes an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). Courts should therefore "construe arbitration clauses as broadly as possible," *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 250 (2d Cir. 1991), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25 (1983).

### I. ARBITRATION SHOULD BE COMPELLED BECAUSE THE PARTIES HAVE AGREED THAT ANY QUESTION CONCERNING ARBITRABILITY IS FOR THE ARBITRATOR, NOT THE COURT, TO DECIDE

As a threshold matter, any objection to the arbitrability of the claims in this case should be resolved by the arbitrator, not this Court, and the motion to compel should be granted for that reason alone.

The question of arbitrability is an issue for judicial determination, unless, as is the case here, "the parties clearly and unmistakably provide otherwise." *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). As the Supreme Court very recently held, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). "In those circumstances, a court possesses no power to decide the arbitrability issue." *Id*.

Where, as here, the parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, such "incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005). More specifically, binding Second Circuit precedent holds that an arbitration provision referencing the AAA's Commercial Arbitration Rules constitutes "*clear and unmistakable evidence*" that the parties intended to delegate the issue of arbitrability to the arbitrator, not the courts. *Id* (emphasis in original). That is because Rule 7(a) of the AAA's Commercial Arbitration Rules delegates the issue of arbitrability to the arbitrator.[3]

The applicable arbitration provision in this case incorporates the AAA's Commercial Arbitration Rules. (Ex. A, at 15; Ex. B, at 15.) As such, the clause constitutes "clear and unmistakable evidence" that the parties intended to delegate the issue of arbitrability to the arbitrator, and, under binding Second Circuit precedent, this Court should enforce that intent and compel arbitration. *Contec Corp.*, 398 F.3d at 205.

In Plaintiffs' unsuccessful motion for provisional relief, they argued erroneously that the rule articulated in *Contec Corp.* applies only to disputes about what claims are subject to

---

[3] Commercial Arbitration Rules and Mediation Procedures, American Arbitration Association, (https://www.adr.org/sites/default/files/Commercial%20Rules.pdf) (last visited February 4, 2019.)

5

arbitration, not to disputes about what parties are subject to arbitration, and therefore that the Court, not the arbitrator, should resolve Mr. Bernstein's contention that he is not a party to the engagement agreements in this case. The argument is contrary to law. In *Contec Corp.* itself, the Second Circuit considered the question of whether a non-signatory was bound by an arbitration provision, and the Second Circuit held that the courts should not reach such a question and that it should instead be resolved by the arbitrator because the arbitration provision at issue, by referencing the AAA's Commercial Arbitration Rules, delegated authority to the arbitrator to decide the question. *Id.*, at 209–10.

Likewise, district court cases Plaintiffs cited to support their argument are also inapposite. The cases hold that the question of arbitrability over a particular non-signatory party should be decided by the court, notwithstanding a delegation to the arbitrator to determine issues of arbitrability, if the contract containing the arbitration provision does not "mention or reference" the non-signatory. *See McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, 2015 WL 144190, at *5 (S.D.N.Y. Jan. 12, 2015) (finding "no clear and unmistakable evidence of an agreement to arbitrate arbitrability" with respect to a non-signatory not mentioned or referenced in the contract containing the arbitration provision); *see also Nat'l Union Fir. Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC*, 289 F. Supp. 3d 457, 465–466 (S.D.N.Y. 2018) (same). These cases do not support Mr. Bernstein's attempt to escape his agreement to arbitrate because he was clearly "mentioned or referenced" in the contracts; indeed, he unmistakably signed them in his individual capacity, as this Court already found. (Ex. D, at 12:7–13; 13:13–18.)

## II. MR. BERNSTEIN SHOULD BE COMPELLED TO ARBITRATE HIS CLAIMS BECAUSE HE AGREED TO DO SO

A court should grant a motion to compel arbitration if (1) there exists a valid agreement to arbitrate and (2) the particular disputes sought to be arbitrated fall within the scope of such agreement. *See Hartford Accident and Indemnity Co. v. Swiss Reinsurance America Corp.*, 246 F.3d 219, 226 (2d Cir. 2001). Both requirements are clearly met in this case.

### A. Mr. Bernstein Validly Agreed to Arbitrate

There can be no serious doubt that Mr. Bernstein validly agreed to arbitrate. The two engagement agreements he signed both contain a clear, unambiguous, and valid agreement that all disputes or claims between the parties would be subject to mandatory arbitration before the AAA. An obligation to arbitrate attaches to "one who has personally signed the written arbitration provision." *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (internal quotations and citations omitted).

Plaintiffs' unsuccessful motion for provisional relief argued that Mr. Bernstein was not a signatory to the agreements and that White Lilly was. This argument is frivolous under a plain reading of the contracts, which demonstrates that (1) Mr. Bernstein clearly signed them and (2) White Lilly is not even mentioned in them.

The First Engagement Agreement is addressed to, among others, Jon Bernstein, at a "bernsteincorp.com" email address. (Ex. A, at 1.) Although the signature block was initially drafted to have Mr. Bernstein sign on behalf of himself and one of his co-clients called "Farallon," Mr. Bernstein revised the language by hand such that below the signature line are only the printed words "Jon Bernstein," and Mr. Bernstein signed his name above those printed words. (*Id.* at 16.) White Lilly is not mentioned anywhere in the First Engagement Agreement. (*See id.*)

Like the First Engagement Agreement, the Operative Engagement Agreement is addressed to, among others, Jon Bernstein, at a "bernsteincorp.com" email address. (Ex. B, at 1.) In the signature block for Mr. Bernstein, only the printed words "Jon Bernstein" appear below the signature line, and Mr. Bernstein signed his name above those printed words. (*Id.* at 16.) White Lilly is again not mentioned anywhere in the Operative Engagement Agreement. (*See id.*)

Both the First Engagement Agreement and the Operative Engagement Agreement identify Mr. Bernstein as the "exclusive authorized client representative" and grant him sole decision-making authority to direct litigation strategy and case management:

> Jonathan Bernstein [is] exclusive authorized client representative in the United States with sole client decision-making authority over strategic matters relating to this contemplated litigation, insofar as client direction is required . . . . [T]he Firm and the Storch Firm may rely on Mr. Bernstein's authority and Mr. Bernstein's authority alone in making client decisions relating to litigation strategy and case management . . . . Nothing shall preclude the Firm or the Storch Firm from seeking the input of and/or guidance from other client representatives, though Mr. Bernstein's final authority nonetheless remains.

(Ex. A, at 14; Ex. B, at 14.) In both the First Engagement Agreement and the Operative Engagement Agreement, Mr. Bernstein and his co-clients agreed to an "authority" provision, in which each signatory (including Mr. Bernstein) acknowledged that he, she or it was personally bound by the terms of the contracts, including the mandatory arbitration provision. Specifically, Mr. Bernstein agreed that:

> [b]y signing this Agreement, you acknowledge and confirm that you are bound to the terms of this Agreement and you are, in fact, bound to such terms. You also acknowledge that you personally undertake and assume the full performance hereof, including payments of amounts hereunder.

(Ex. A, at 15; Ex. B, at 15.)

Plaintiffs' unsuccessful motion for provisional relief argued erroneously that there was some "ambiguity" about whether Mr. Bernstein agreed to arbitrate. This argument was based on a separate agreement between White Lilly and Farallon, to which the BF Parties are not parties, and a proposed addendum to the engagement agreements that Mr. Bernstein declined to sign (the "Proposed Addendum"). Plaintiffs' attempt to manufacture "ambiguity" where there is none fails for at least four reasons.

*First*, as detailed above in Argument Section I, even if there were ambiguity, which there is not, it would be for the arbitrator, not this Court, to resolve.

*Second*, it is black letter law that parol evidence is not admissible to create an ambiguity where the agreement is "complete and clear and unambiguous upon its face." *In re: AMR Corporation, et al., Reorganized Debtors.*, No. 11-15463 (SHL), 2018 WL 6523965, at *8 (Bankr. S.D.N.Y. Dec. 10, 2018) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990)). Plaintiffs, therefore, may not rely on the agreement between White Lilly and Farallon or the Proposed Addendum that Mr. Bernstein declined to sign to try to manufacture some ambiguity in the engagement agreements which, on their face, are clear and unambiguous. During the preliminary injunction argument, the Court considered the question of whether the First Engagement Agreement was ambiguous with regards to Mr. Bernstein's status as a signatory and party. The Court answered in the negative, finding that "[i]t's not ambiguous as to the fact that [Bernstein] signed it." (Ex. D, at 19:2–3.) Mr. Bernstein is plainly a party to the First Engagement Agreement—and the virtually identical Operative Engagement Agreement—and he may not introduce parol evidence to try to create an ambiguity in the engagement agreements when none exists.

*Third*, even if it were considered (which it should not be), the separate agreement between White Lilly and Farallon, called the Capitalization Agreement, has no bearing on whether Mr. Bernstein agreed to arbitrate disputes with the BF Parties. The BF Parties are not parties to the Capitalization Agreement, the Capitalization Agreement addresses a different subject matter than the engagement agreements between Mr. Bernstein and the BF Parties, and the Capitalization Agreement was entered into before the First Engagement Agreement. (Capitalization Agreement, Ex. F.) The Capitalization Agreement sets forth an agreement with Farallon under which Mr. Bernstein set up a shell company, White Lilly, which would be Mr. Bernstein's vehicle for receiving the benefits of the litigation that he and Mr. Diaz Rivera were then contemplating retaining the BF Parties to handle and for funding some portion of the cost of that litigation. It does not—and does not even purport to—address Mr. Bernstein's, White Lilly's or Farallon's rights and obligations vis-à-vis the BF Parties, who are not even parties to the agreement, and who did not see a final agreement until years later.

*Fourth*, the Proposed Addendum to the engagement agreements, which Mr. Bernstein declined to sign, does not change that Mr. Bernstein agreed to arbitrate any dispute he may have with the BF Parties. (Proposed Addendum, Ex. G.) The Proposed Addendum expressly incorporates and re-affirms the Operative Engagement Agreement, noting that "[y]ou accept all terms in the previous engagement agreement dated March 17, 2015, attached hereto, unless such terms are specifically changed in this Amended Agreement." (*Id.*, at 1.) Accordingly, even if Mr. Bernstein were correct that White Lilly became a signatory to the engagement agreements by virtue of the Proposed Addendum which he declined to sign, that would merely add White Lilly as a signatory; it would not relieve Mr. Bernstein of his obligations under the existing engagement agreements that he signed individually. In any event, the Proposed Addendum

contains the *identical* arbitration provision contained in the two signed engagement agreements. (*Compare id.*, at 3 *with* Ex. A, at 15 and Ex. B, at 15.)

### B. The Claims In This Case Fall Within the Scope of the Arbitration Agreement

The arbitration provision at issue here is very broad on its face, and is not limited to any particular subject matter. When the parties to an agreement "have agreed to submit to arbitration disputes 'of any nature or character,' or simply 'any and all disputes,' all questions . . . will be properly consigned to the arbitrator." *ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 34 (2d Cir. 2002) (quoting *Rochdale Vill., Inc. v. Pub. Serv. Employees Union, Local No. 80*, 605 F.2d 1290, 1295 (2d Cir. 1979)).

The arbitration provision at issue here directs that "[i]f *__any__ dispute or claim between the parties shall arise*, the parties shall submit" that dispute to arbitration. (Ex. A, at 15; Ex. B, at 15) (emphasis added.) This is even more broad than the type of arbitration provision considered by the Second Circuit in *Rochdale Vill., Inc.* 605 F.2d at 1295 (finding dispute arising under contract arbitrable after determining that the agreement requiring arbitration of "any and all disputes hereunder" was broad but "slightly" limited to all disputes arising under the agreement). There is no limitation as to the types of claims Mr. Bernstein and the BF Parties agreed to arbitrate, so that even disputes between the parties that are collateral to the agreements must be arbitrated here. In any event, each of the six causes of action set forth in the Complaint against the BF Parties plainly arises out of the legal representation governed by the engagement agreements containing the mandatory arbitration provision. (*See* Complaint, Dkt. No. 1, ¶¶ 194–233, 313–328.) Thus, even if the scope of the arbitration provision were limited to disputes arising under the engagement agreements (which it is not), the claims would still be subject to arbitration.

### III. WHITE LILLY SHOULD ALSO BE COMPELLED TO ARBITRATE ITS PURPORTED CLAIMS

White Lilly is a shell entity created by Mr. Bernstein as his vehicle for receiving the benefits of the litigation that he and his co-clients retained the BF Parties to handle and for funding some portion of the cost of that litigation. (Ex. F.) The Capitalization Agreement on which Plaintiffs relied in their unsuccessful motion for provisional relief defines White Lilly as "a single-member limited liability company, wholly owned and managed by Jonathan Bernstein," with "no assets other than [its] interest in this Agreement." (*Id*. ¶¶ 8(a), 9(f).) White Lilly contends that it was a client covered by the engagement agreements with the BF Parties and that it has a host of claims arising from the legal representation governed by those agreements. (*See* Complaint, Dkt. No. 1, ¶¶ 194–233, 313–328.)

Although White Lilly is not a signatory to the engagement agreements, the Second Circuit recognizes five theories "upon which [it] is willing to enforce an arbitration agreement against a non-signatory." *Merrill Lynch Inv. Managers v. Opibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (alteration in the original.) These theories include, "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Thomson-CSF,* 64 F.3d at 778. The estoppel theory applies here.[4]

Under the doctrine of direct-benefit estoppel, "[a] party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999). A non-signatory directly benefits from an agreement containing an arbitration clause if it enables that party to receive a tangible benefit, particularly one with financial value. *See, e.g., Robinson*

---

[4] If the Court accepts Plaintiffs' argument that the unsigned Proposed Addendum makes White Lilly a signatory to the engagement agreements—which it should not—then a second theory also applies: incorporation by reference. This is because the addendum specifically incorporates the Operative Engagement Agreement, which contains the applicable mandatory arbitration clause. (Ex. G, at 1.)

*Brog Leinwand Greene Genovese & Gluck P.C. v. John M. O'Quinn & Assocs., L.L.P.,* 523 F. App'x 761, 762–63 (2d Cir. 2013) (summary order) (non-signatory estopped from avoiding arbitration after receiving benefit in the form of legal fees); *Am. Bureau of Shipping* 170 F.3d 351–53 (2d Cir. 1999) (non-signatory estopped from avoiding arbitration after receiving benefit in the form of cheaper insurance rates and ability to fly under nation's flag in international yachting competition); *Alfa Laval U.S. Treasury, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 857 F. Supp. 2d 404, 414 (S.D.N.Y. 2012) (non-signatory estopped from avoiding arbitration after receiving benefit in the form of issuance of insurance policies); *Life Techs. Corp. v. AB Sciex Pte. Ltd.,* 803 F. Supp. 2d 270, 277–79 (S.D.N.Y. 2011) (non-signatory estopped from avoiding arbitration after receiving benefit in the form of use of trademarks).

Here, White Lilly directly benefited from the engagement agreements in several ways. White Lilly received a direct benefit from the engagement agreements because it received legal services under them. For example, White Lilly was a party to the settlement agreement negotiated by the BF Parties in the underlying actions. (*See* McNeil Decl. ¶ 18.)

In addition, by bringing fifteen causes of action arising directly from the engagement agreements, White Lilly admits to having directly benefited from the engagement agreements, and it is thus bound by the arbitration provision contained therein. A non-signatory to an agreement may admit to having directly benefited from an agreement containing an arbitration clause—and thus admit to being bound by that arbitration clause—by suing as a third-party beneficiary of that agreement. *See, e.g. McKenna Long & Aldridge, LLP,* 2015 WL 144190, at *9 (citing *World Omni Fin. Corp. v. Ace Capital Re Inc.*, 64 F. App'x 809, 812-13 (2d Cir. 2003) (summary order) (non-signatory to reinsurance policy that apparently sued as a third-party

13

beneficiary of that policy estopped from denying a duty to arbitration based on arbitration clause in the policy agreement).

Here, White Lilly went one step further and sued directly as a party to the engagement agreements, not just as a third-party beneficiary. (*See, e.g.*, Complaint ¶ 206 (suing for fraudulent inducement which White Lilly claims caused it to enter into the engagement agreements); *id.* ¶ 22 (suing for fraudulent concealment which White Lilly claims caused it to enter into the engagement agreements); *id.* ¶¶ 243–263 (suing for breach of contract, stating that White Lilly was a "part[y] to the Engagement Agreement"); and *id.* ¶¶ 264–274 (suing for legal malpractice under the engagement agreements).)

Because White Lilly seeks to benefit from the engagement agreements by bringing claims arising thereunder, it cannot deny it is bound by the unambiguous arbitration provision contained therein.

## **CONCLUSION**

For the foregoing reasons, the BF Parties respectfully request that this Court grant their motion to compel arbitration of all claims asserted in this case.

Dated:        New York, New York
              February 5, 2019

                                        By: */s/ Jyotin Hamid*
                                            Jyotin Hamid
                                            **DEBEVOISE & PLIMPTON LLP**
                                            919 Third Avenue
                                            New York, New York 10022
                                            Telephone: (212) 909-6000
                                            jhamid@debevoise.com

                                            -and-

                                            Jillian L. McNeil
                                            **BALESTRIERE FARIELLO**
                                            225 Broadway, 29th Floor
                                            New York, New York 10007
                                            Telephone:     (646) 912-8463
                                            jillian.mcneil@balestrierefariello.com
                                            *Attorneys for the BF Parties*