# Exhibit C



MATTHEW W. SCHMIDT
BALESTRIERE FARIELLO
225 Broadway, 29th Floor
New York, New York 10007
T: +1-212-374-5421
F: +1-212-208-2613
matthew.schmidt@balestrierefariello.com
www.balestrierefariello.com

September 13, 2018

**VIA HAND DELIVERY**
India Johnson
American Arbitration Association
150 East 42nd Street, Floor 17
New York, New York 10017

> Re: Demand for Arbitration in *Balestriere Fariello v. Juan Diaz Rivera, Jonathan A. Bernstein, Desarrollos Inmobiliarios Del Pedregal, S.A. De C.V., and Desarrolladora Farallon, S. de. R.L. de C.V.*

Ms. Johnson:

I represent Claimant Balestriere Fariello (the "Firm") and submit this Demand for Arbitration pursuant to Rule 4 of the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

Solely due to the Firm's representation, Respondents—former clients of the Firm—extinguished more than $52 million in liability and achieved a settlement valued at nearly $25 million, which represents a net gain of more than $77 million from the Firm's services. The Firm achieved this result after nearly 16,000 hours of service to the Respondents in almost four years of multinational litigation. But Respondents, who first fell behind in their payment obligations more than two and a half years ago, refuse to compensate the Firm for this work, and still owe more than $14.5 million in legal fees to the Firm.

After months of attempts to reach an amicable resolution, the Firm brings this arbitration against Juan Diaz Rivera ("Diaz Rivera"); his family real estate development company Desarrollos Inmobiliarios Del Pedregal, S.A. De C.V. ("DIPSA"); a subsidiary of that company called Desarrolladora Farallon, S. de. R.L. de C.V. ("Farallon"); and Diaz Rivera's joint venture partner and former Firm client Jonathan A. Bernstein ("Bernstein," together with Diaz Rivera, DIPSA, and Farallon "Respondents" or the "Clients"). The Firm notices this claim pursuant to the engagement agreement (the "Engagement Agreement" attached hereto as Exhibit A) which was signed by the Clients and the Firm (together the "Parties").



## A. TABLE OF CONTENTS

A. TABLE OF CONTENTS.................................................................................................. 2

B. INTRODUCTION.......................................................................................................... 3

C. THE PARTIES .............................................................................................................. 7

D. UNDERLYING DISPUTE AND REPRESENTATION................................................... 9

    1. ▮▮▮'s Retaliation.................................................................................. 11

    2. Respondents Retain the Firm, Which Begins Taking Action Against ▮▮▮ .... 11

    3. The Firm's Hard Work Pays Off for the Clients With a Highly Favorable Settlement .......................................................................................................... 12

E. THE FIRM'S SUCCESS AND AMOUNTS OWED BY RESPONDENTS ................... 13

    1. The Clients Owe the Firm a Success Fee of $8,592,809.33 ...................................... 14

    2. The Clients Additionally Owe the Firm Hourly Fees and Expenses of $5,293,729.55........................................................................................................ 17

    3. Even if the Clients Had Not Committed Misconduct, They Would Still Owe Discounted Hourly Fees and Expenses of $742,873.00 In Addition to the Success Fee........................................................................................................................ 14

F. CLAIMS BROUGHT AGAINST RESPONDENTS ....................................................... 18

G. RELIEF SOUGHT FROM RESPONDENTS ................................................................ 19

H. THE RELEVANT AGREEMENTS ............................................................................... 19

I. CONSTITUTION OF THE ARBITRAL TRIBUNAL ..................................................... 19

J. PLACE OF ARBITRATION AND APPLICABLE RULES OF LAW ........................... 20



## B. INTRODUCTION

The Clients, the scion of a highly successful Mexican real estate family, two of his family's holding companies, and his joint venture partner, owe the Firm more than $14.5 million in legal fees under the Engagement Agreement that they entered into with the Firm.

The Clients hired the Firm on a so-called "blended" basis, where the Firm agreed to provide its services at heavily discounted hourly rates in return for a Success Fee if and only if the Firm obtained a recovery for the Clients. The Firm frequently enters into these arrangements, but also frequently charges clients its standard hourly rates.

But even with this discount, and even though the Clients have significant means, the Clients have been in arrears on their hourly fee obligations for years, forcing the Firm—a successful, but relatively small and new commercial litigation boutique—to advance costs while the Clients became increasingly behind in their obligations. The Clients never once disputed even one of the three dozen monthly invoices they received.

The Clients hired the Firm for a dispute with ▮▮▮▮▮▮▮, and its subsidiaries (collectively "▮▮▮▮") over ▮▮▮▮'s takeover of the Resort at Pedregal (the "Resort")—a luxury resort in Cabo San Lucas, at the very southern tip of Baja California, Mexico. The Diaz Riveras were one of the first pioneers to develop Cabo San Lucas after successfully developing real estate in Mexico City, and Respondent DIPSA majority owned the property that would become the Resort through its subsidiary Respondent Farallon, which Respondent Diaz Rivera controlled and operated. ▮▮▮▮ asserted claims against Diaz Rivera and Farallon for more than $52 million, claiming that Diaz Rivera had himself unlawfully taken over the Resort, embezzled funds, and had triggered a default of the Resort's construction loan.

The Clients were introduced to the Firm through Bernstein, a long-time family friend of the Diaz Riveras. Bernstein—a successful real estate developer in his own right, and former Senior Partner and Head of the Real Estate Group at Pryor Cashman LLP in New York—agreed to help fund the litigation against ▮▮▮▮ and provide additional strategic advice in exchange for a portion of any recovery. As part of this arrangement, Bernstein personally engaged the Firm alongside Diaz Rivera, DIPSA, and Farallon, making himself personally jointly and severally liable for all legal fees. Due to Bernstein's extensive experience with U.S. litigation, the Clients agreed that he would have sole client decision-making authority over all strategic matters. However, Firm lawyers informed all Clients regarding all strategic matters, and Diaz Rivera made all key decisions jointly with Bernstein.

3

REDACTED



### Clients Falls Behind in Their Obligations

The state of Clients' failure to make timely payments is illustrated by the following chart:



As the chart shows, the Clients fell somewhat behind on their obligations early in the representation, but largely kept pace with invoices until spring 2016, when the Firm represented the Clients in an international arbitration. At this time, the Clients' arrears grew substantially, but settlement with ▮▮▮ increasingly became a possibility.

At the time of settlement with ▮▮▮ in January 2018 (the "Settlement"), the Clients had paid the Firm only $2,328,798: $505,298 by Diaz Rivera (on behalf of himself, DIPSA, and Farallon) and $1,823,500 by Bernstein. By that time, the Clients still owed the Firm approximately $2 million in discounted fees and in expenses; this is separate and apart from any Success Fee the Firm would be due from the contemplated substantial settlement. In the more than 40 months of legal representation leading up to that Settlement, the Firm advanced over $1,249,263.15 in out-of-pocket expenses alone, meaning that Diaz Rivera effectively paid nothing in legal fees (for work that, at the Firm's standard rates, would have cost in total approximately $8 million).

4

REDACTED



### Clients Aware of All Financial Obligations

The Clients were fully aware of the extent of fees outstanding and due to the Firm at all stages of representation. The Clients incurred these fees by litigating five hard-fought actions—in federal court, in state court, in an international arbitration, and while working with co-counsel in Mexico—plus four separate appeals against the world's largest private company, whose counsel often noted that their client had a virtually unlimited litigation budget. The Clients were closely apprised of status of all pending litigation at all times, and during the representation exchanged more than 10,000 emails and engaged in more than 150 telephone calls with the Firm. The Firm also provided nearly 40 monthly invoices, none of which the Clients disputed. When requested, the Firm also provided estimates for future expenses: in aggregate, the Firm came in more than more than 12% under the lowest range of its estimates, and more than 41% under the high range of its estimates.

### Patience on Fees As Settlement Became Highly Probable

The Firm tolerated the Clients' woeful payment history because the Clients always committed to paying the Firm and because, as the Clients' debt to the Firm grew, settlement with ▮▮▮▮ became more and more likely (and could serve as a means by which the Clients said that they could fulfill their payment obligations to the Firm). After the highly favorable Settlement, however, the Clients suddenly refused to pay. Under the Settlement, the Clients immediately received $2,372,067 in cash; real estate valued at $11 million; a commitment by ▮▮▮▮ to pay at least $3.5 million (but potentially much, much more) no later than January 2021; and forgiveness of a $7,678,816.80 judgment. Under the Engagement Agreement, the Firm is entitled to 35% of this $24,550,883.80 recovery, in the form of a Success Fee of $8,592,809.33. This Success Fee is owed in addition to any hourly fees the Firm is due, including, as noted below, substantial further fees due to the Clients' misconduct as provided for in the Engagement Agreement.

### Prosecution of Client-Directed Strategy

Not only did the Firm obtain a settlement valued at nearly $25 million—in addition to an earlier dismissal of $52 million in liability against Respondent Diaz Rivera personally—but it did so by carrying out the exact litigation strategy that the Clients had specifically requested and repeatedly discussed with the Firm. Given ▮▮▮▮'s far greater resources and limitations of the agreements governing the dispute, Bernstein directed the Firm to aggressively pursue a "scorched earth" litigation strategy, whereby the Firm would bring actions in as many venues as permissible in order to wear ▮▮▮▮ down. The Firm did so. This strategy required counsel that could

5

REDACTED



hold its own against a far more resourced adversary, was highly efficient, and could credibly signal its tenacity to ████. The Firm was ultimately so successful in its execution (against an AmLaw 100 law firm), that one judge even used Bernstein's own words and described the Firm's work in one opinion as a "scorched-earth litigation rampage." The Firm did all this even as the Clients continually promised that they would meet their obligations, but repeatedly failed to do so.

**Misconduct Penalty**

Under the Engagement Agreement, in addition to any unpaid discounted hourly fees and Success Fee, if the Client engaged in "Misconduct" as defined in the Engagement Agreement, they agreed to forfeit the Firm's substantial discount on fees. The acts of Misconduct include, but are not limited to, lying multiple times regarding the tax consequences of where funds were received; lying how funds would be distributed; allowing the Firm to be sued for the Clients' non-payment to a third-party vendor; and breaching multiple promises to make payments to the Firm. Both Bernstein and Diaz Rivera together engaged in acts of Misconduct.

**Clients Refuse to Pay Despite Lack of Complaints or Dispute Regarding Their Commitments**

Without specifying anything wrong that the Firm has done, and not having been willing to fund the litigation with ████ further before Settlement, the Clients have not paid because, it seems, they are now seemingly unhappy that they owe the Firm as much as they do. But this is still the deal they entered into, and the authority in this State is clear. In 2014, the New York Court of Appeals reaffirmed the strong fee rights that a law firm has, including when paid on a contingency fee basis, and particularly with sophisticated clients like the Clients here.

In *In re Lawrence*, 24 N.Y.3d 320, 337–41 (2014), the widow of a major real estate developer in an extended estate dispute had agreed, after twenty-one years of representation, and $18 million paid in hourly fees, to switch to a 40% contingency fee on all further work. *Id.* at 328. Five months later, the case unexpectedly settled for more than $100 million after the estate's executor was revealed to have engaged in "egregious self-dealing" resulting in a $44 million contingency fee on top of prior hourly fees. *Id.* at 329, 336–37. The Appellate Division reduced the fee to $2.9 million, what the law firm would have charged at hourly fees, finding the "sheer amount" of the $44 million fee unconscionable. *In re Lawrence*, 106 A.D.3d 607, 609 (1st Dep't 2013), *rev'd*, 24 N.Y.3d 320 (2014); *In re Lawrence*, 2013 WL 6143276, at *1 (N.Y. Sur. Ct., N.Y. Cnty. Nov. 11, 2013).

6

REDACTED



The Court of Appeals reversed and awarded the full $44 million to the law firm, specifically criticizing the Appellate Division's "dangerous business" of "hindsight analysis" and basing unconscionability decisions of whether a fee "seems too high to be fair." *Lawrence*, 24 N.Y.3d at 340. The Court also recognized that the client was a "competent and shrewd woman who made a business judgment that was reasonable at the time, but which turned out in retrospect to be disadvantageous, or at least less advantageous than it might have been." *Id.* at 341. The Court further recognized that it is the very "nature of a contingency fee that a lawyer, through skill or luck (or some combination thereof), may achieve a very favorable result in short order; conversely, the lawyer may put in many years of work for no or a modest reward." *Id.* at 340–41; *id.* at 339 ("the power to invalidate fee agreements with hindsight should be *exercised only with great caution . . .* the *contingency system cannot work* if lawyers do not sometimes get very lucrative fees, for that is what makes them willing to take the risk." *Id.* (emphasis added) (quoting *Lawrence v. Miller*, 11 N.Y.3d 588, 597 (2008)); *see also Paul, Weiss, Rifkind, Wharton & Garrison v. Koons*, 4 Misc. 3d 447, 451–52 (Sup. Ct. N.Y. Cnty. 2004) (Acosta, J.) (granting summary judgment in favor of plaintiff law firm and rejecting as "asking th[e] court to make a policy determination" defendant's arguments that fees were improper due to time spent where defendant had "never objected to" but "encouraged" the "tactics which generated such hefty bills").

The Clients cannot now complain—after receiving a highly favorable result due to the Firm putting significant amounts of its own time and money at risk over the course of years—that they simply do not wish to pay what they agreed to, especially when they cannot deny the tremendous success the Firm has earned for them.

## C. THE PARTIES

The names of the parties to this arbitration are as follows:

### *Juan Diaz Rivera*

Diaz Rivera is an individual who was represented by the Firm in the underlying dispute. Diaz Rivera is the Sole Manager of Farallon and DIPSA, and is responsible for all decisions made by the companies. Diaz Rivera's address is Camino De la Plaza 285, local 107-A, Condominios Plaza San Lucas, Fraccionamiento El Pedregal, Cabo San Lucas, Baja California Sur, México, C.P. 23453; his telephone number is +52 1 (624) 143-0202; his fax number is +52 1 (624) 143-3041; and his email address is juan@pedregal.com.

Diaz Rivera is currently or has recently been represented by numerous attorneys, including Alfonso Lopez Melih of Lopez Melih, Facha y Estrada, S.C., whose email address is alopezmelih@lfe.mx; Christopher Payne of Ballard Spahr LLP, whose

7



email address is payne@ballardspahr.com; Francisco Sanchez of Sanchez y Garcia Asociados S.C., whose email address is fsanchez@sanchezygarcia.com; Fernando Garibay Bagnis of Bagnis & Bagnis S.C., whose email address is garibayf@prodigy.net.mx; and Clark Libenson of Allen Matkins Leck Gamble Mallory & Natsis LLP, whose email address is clibenson@allenmatkins.com.

Juan Diaz Rivera's financial net worth is in excess of $100 million and he is a partial owner of DIPSA, a Mexican corporation that manages the Diaz Rivera family's many real estate holdings. The Diaz Rivera family has owned real estate in Cabo San Lucas for generations, well before the Mexican tourism boom of the 1970s. His family is one of those responsible for developing Cabo San Lucas into the attractive tourism location it is today.

*Desarrollos Inmobiliarios Del Pedregal, S.A. De C.V.*

DIPSA is a Mexican limited liability company that was represented by the Firm in the underlying dispute. DIPSA is majority controlled by Diaz Rivera and his family. DIPSA's address is Camino De la Plaza 285, local 107-A, Condominios Plaza San Lucas, Fraccionamiento El Pedregal, Cabo San Lucas, Baja California Sur, México, C.P. 23453; its telephone number is +52 1 (624) 143-0202; and its fax number is +52 1 (624) 143-3041. The Firm is not aware of a relevant representative for DIPSA. Throughout the Clients' engagement of the Firm, all invoices sent to DIPSA, Diaz Rivera, or Farallon have been directed to DIPSA, and DIPSA has made all payments on behalf of DIPSA, Diaz Rivera, or Farallon.

*Desarrolladora Farallon, S. de. R.L. de C.V.*

Farallon is a Mexican limited liability company that was represented by the Firm in the underlying dispute. Farallon is majority controlled by Diaz Rivera and his family, and is a subsidiary of DIPSA. Farallon's address is Camino De la Plaza 285, local 107-A, Condominios Plaza San Lucas, Fraccionamiento El Pedregal, Cabo San Lucas, Baja California Sur, México, C.P. 23453; its telephone number is +52 1 (624) 143-0202; and its fax number is +52 1 (624) 143-3041. The Firm is not aware of a relevant representative for Farallon.

*Jonathan A. Bernstein*

Bernstein is an individual who was represented by the Firm in the underlying dispute. Bernstein provided financing to Farallon in exchange for a portion of any recovery. Bernstein's address is 222 Lakeview Avenue, Suite 510, West Palm Beach, Florida 33401; his telephone number is 212-699-4100; his fax number is 561-249-7397;

8



and his email address is jon@bernsteincorp.com. Bernstein is represented by Charles "Rusty" Melges, whose email address is rusty@bernsteincorp.com.

Bernstein, a successful businessman with a financial net worth in excess of $100 million, is the CEO and owner of Jonathan Bernstein Consulting Corporation. Bernstein has "structured and executed over $20 billion of sales, acquisitions and joint ventures as well has over $10 billion in capital and debt restructuring for private companies, REITs and other public companies." In 2012, Bernstein sold a company he was a co-founder of for $180 million. Bernstein has homes in New York, Florida, and Cabo San Lucas in Mexico. According to the website of the Jonathan Bernstein Consulting Corporation, Bernstein currently employs four full-time in-house attorneys, including a litigator formerly associated with Willkie Farr & Gallagher LLP.

*Balestriere Fariello*

The Firm is a professional limited liability company and the Claimant in this arbitration. In the actions that underlie this dispute, the Firm represented Diaz Rivera, Farallon, and Bernstein in six actions and four appeals. The Firm's address is 225 Broadway, 29th Floor, New York, New York 10007; its telephone number is (212) 374-5421; its fax number is (212) 208-2613; and its email address is matthew.schmidt@balestrierefariello.com. The information for the Firm's representative is the same.

Balestriere Fariello was founded in 2005 and is a trials and investigations firm that currently employs six full-time attorneys and seven of counsel attorneys, as well as other non-lawyer professionals. The Firm offers outstanding service and is often willing to engage in risk sharing with potential clients in the form of hybrid fee arrangements. Judges in both the Southern and Eastern Districts of New York have awarded the Firm the fees it has sought in complex matters. Its adversaries are generally AmLaw 100 firms, and it has represented clients from all over the United States and the world in all manners of complex litigation, in particular long running, multi-jurisdictional disputes.

## D. UNDERLYING DISPUTE AND REPRESENTATION

The Clients sought out the Firm in the summer of 2014 and formally engaged the Firm in November 2014. The representation concerned a dispute between the Clients and the investment arm of ████, the world's largest agricultural company, over the Resort, a luxury resort in Cabo San Lucas, majority owned by Respondent DIPSA through its subsidiary Farallon, which Diaz Rivera controlled and operated.

9

REDACTED

**BALESTRIERE
FARIELLO**

The Diaz Rivera family took the first steps to develop the Resort in 2001, when it formed Farallon in order to manage the Resort's development. Over the next several years, Farallon and Diaz Rivera took further steps to develop the Resort.

Respondents' dealing with ▬ first began in 2006, when Diaz Rivera and his family developed El Rincon de Pedregal ("El Rincon"), a development of single-family homes and a luxury spa, with the Diaz Rivera family contributing $5 million in real estate and ▬ contributing $5 million in cash. ▬ then expressed interest in becoming the lead outside investor in the Resort, and ▬ and Farallon agreed that ▬ would invest $15 million in the project, with Farallon investing land valued at $18.5 million. Farallon and ▬ took out a $65 million construction loan to further fund the Resort's development.

Early in the project's development, the Resort's governing land trust (the "Trust"), which at the time was jointly controlled by Farallon and ▬, entered into an agreement to sell fractional property interests to two members of Diaz Rivera's family (respectively the "Leticia Fractional," after Diaz Rivera's mother, Leticia; and the "Manuel Fractional," after Diaz Rivera's uncle, Manuel), for which the Trust collected deposits. The Trust also purchased, with a promise to pay later, the Diaz Rivera family home, a mansion known as Casa C.

The Farallon–▬ relationship took a downward turn in 2008, in part due to the financial crisis. At that time, the Resort's lender entered receivership halfway through the Resort's construction. Due to the difficulty in securing new credit, Farallon and ▬ each (through related entities) agreed to make additional partner loans, of $800,000 and $73 million, respectively (and which ▬ later refused to repay). Shortly thereafter, ▬ refused to approve salary and sales commissions due to members of the Resort's staff, including to Diaz Rivera himself. In June 2011, Diaz Rivera filed suit in Mexico for the $120,000 in salary and commissions owed to him.

The relationship between Farallon and ▬ continued to deteriorate until it fell apart in early 2013. Then, in what ▬ later characterized as a "takeover" of the Resort, Diaz Rivera and his family, called a meeting of the Resort's operating entity, Hoteles del Cabo, S. de R.L. de C.V. ("Hoteles"). Hoteles thereafter appointed Diaz Rivera's uncle as sole manager. Diaz Rivera then directed the Resort's operator to direct approximately $15 million of Resort revenue to an account which ▬ lacked access, something Diaz Rivera said was necessary in order to make required tax payments. In a later suit brought by ▬, the Hon. Shirley Werner Kornreich of Supreme Court, New York County, Commercial Division, described Diaz Rivera's actions as "a textbook example of conversion," and wrote that there was "no question of fact that [Diaz Rivera] converted the $15 million [from ▬] for approximately 18 months."

REDACTED

**BALESTRIERE FARIELLO**

1. ████'s *Retaliation*

████ struck back against the Diaz Riveras, its joint venture partners, starting in February 2014, by purchasing, over Farallon's objections, the $65 million construction loan. ████ used that loan to foreclose on Farallon's interests in the Resort, which the Diaz Riveras still majority owned. ████ then removed Farallon and the Diaz Rivera family from management of and physical access to the Resort. In May 2014, ████ continued its retaliation by bringing suit against Farallon and Diaz Rivera in Supreme Court, New York County (later captioned ████ ████████████████████; the "Guaranty Action"), which was assigned to Judge Kornreich.

In the Guaranty Action and all other relevant actions, ████'s U.S. counsel was Katten Muchin Rosenman LLP, a firm with more than $500 million in annual revenue and more than 200 litigators across its 14 offices, with more than 40 in its New York office alone.

In the Guaranty Action, ████—now in its role as lender—alleged that Farallon's alleged takeover had breached its bad boy guaranty underlying the construction loan, making it liable for the full amount outstanding under the construction loan (roughly $52 million at the time). ████ also alleged that Diaz Rivera was personally liable for this amount as the alter ego of Farallon.

2. *Respondents Retain the Firm, Which Begins Taking Action Against* ████

In summer 2014, Diaz Rivera and Bernstein approached the Firm regarding representation. While the Clients were still negotiating the terms of engagement with the Firm, the Firm agreed to perform initial work in August 2014.

In November 2014, Diaz Rivera and Bernstein entered into essentially a joint venture agreement which they called the Capitalization Agreement, whereby they agreed to jointly retain the Firm for Farallon and Diaz Rivera's dispute with ████, splitting both the costs of litigation as well as the fruits of any recovery. The Clients engaged the Firm that same month, and the Firm billed the Clients for the work performed before engagement (which the Clients paid).

Once engaged, the Firm quickly went on the offensive against ████, as Respondents instructed. In January 2015, the Firm filed ████████████ ████████████████████████████████, in the Southern District of New York (the "SDNY Action"), which was assigned to the Hon. Shira Scheindlin. There, Farallon alleged, among other things, that ████ (including certain current and former

11

REDACTED

**BALESTRIERE FARIELLO**

employees) had violated the fiduciary duties it owed pursuant to the joint venture existing between ██████ and Farallon through ██████'s use of the Resort's construction loan to force Farallon out of the project.

After Judge Scheindlin indicated at the April 6, 2015, initial conference in the SDNY Action that the Complaint the Firm filed likely asserted a host of adequate claims against various ██████ entities—the first real litigation victory for Farallon anyway—██████ withdrew its fully-briefed motion to dismiss, and the Firm began an aggressive discovery schedule, ultimately exchanging more than 900,000 pages of documents with ██████'s counsel in under four months. Sixteen days after the initial conference in the SDNY Action, ██████ commenced an arbitration against the Clients, ████████████████████████████████████████████████████████████████████, before the International Chamber of Commerce (the "ICC Action"), pursuant to an arbitration agreement between ██████ and Farallon, primarily seeking approximately $12 million in damages arising out of Diaz Rivera's "takeover" of the Resort in 2013.

While still engaged in aggressive discovery, the Firm continued its aggressive push against ██████, first on May 29, 2015, when it brought a new action against ██████ before Judge Kornreich, ████████████████████████████████████████████████████████████████ (the "Lender Liability Action"), seeking damages arising out of ██████'s acquisition of the Resort's construction loan. The next week, the Firm brought counterclaims against ██████ in the ICC Action, asserting a series of partnership claims based on the applicable Mexican law, and seeking $95 million arising out of ██████'s own takeover of the Resort.

3. *The Firm's Hard Work Pays Off for the Clients With a Highly Favorable Settlement*

As time went on, the Firm's creative and aggressive approach paid off handsomely. In November 2016, putatively in response to a press statement concerning a new ICC arbitration in Mexico, ██████ sought to amend its complaint in the Guaranty Action to stop what it characterized as the "tireless litigation engine" that it was facing. (Guaranty Action. Dkt. No. 128 at 2.) To this end, ██████ sought to add Bernstein to the Guaranty Action, and assert against Bernstein, Storch, Farallon, and Diaz Rivera claims for tortious interference, abuse of process, malicious prosecution, and champerty.

All of ██████'s new claims were based on the theory that the Clients' series of litigations had not been for a proper purpose, but "simply to perpetuate litigation" against ██████ in order to "greenmail" it into offering the Clients a favorable settlement. (*Id.*, Dkt. No. 128 at 30.) ██████ further argued that the Clients' litigations with ██████ were commenced to "perpetuate litigation with the ultimate goal of

12

REDACTED

**BALESTRIERE FARIELLO**

achieving a commercial advantage, not compensation for legal wrongs." (*Id.*, Dkt. No. 154 at 1.)

While the parties were briefing ███'s motion to amend and dueling motions for summary judgment, ███ approached Diaz Rivera to start settlement discussions. The Firm also began urging the Clients to notice a new ICC arbitration in Mexico, both to take advantage of momentum, and to bring the fight to what the Firm believed would be a favorable venue for a second arbitration, in which arbitrability would be decided by the newly formed ICC arbitration panel. As the Firm advised the Clients, such an action, especially in connection with what the Firm expected to be a denial of ███'s motion to amend, could significantly increase the value of settlement.

Diaz Rivera declined to follow the Firm's advice, but did reach a settlement in principle with ███ on July 19, 2017—a settlement reached with substantial involvement from the Firm, including its presence at the only in-person meeting between all parties, which took place in New York in June 2017. Two days later, Judge Kornreich firmly denied all of ███'s new litigation funding claims on grounds of futility. Judge Kornreich, ignoring Judge Scheindlin's earlier observation that the claims Farallon brought as pleaded had merit, characterized the Clients' dispute with ███ as "a scorched-earth litigation rampage based on rather flimsy arguments that have all been rejected," (using the very term Bernstein had endorsed to characterize his direction to the Firm). (*Id.*, Dkt. No. 169 at 20–21.) Judge Kornreich further wrote that "while the appalling and unjustified nature of [Diaz] Rivera's conduct [taking over Hoteles] is undeniable, his litigation tactics cannot be said to be so far outside the norms of aggressive prosecution as to be frivolously dilatory." (*Id.*, Dkt. No. 169 at 21 n.16.)

Over the next six months, the Firm negotiated with ███'s attorneys, including coordinating with the Clients and their Mexican counsel, concerning the Settlement. The form of the final Settlement, including exhibits and sub-agreements, consisted of more than 700 pages of agreements between 17 persons.

### E. THE FIRM'S SUCCESS AND AMOUNTS OWED BY RESPONDENTS

The Clients currently owe the Firm $14,629,411.88.

Of those owed funds, $742,873.00 represents currently unpaid discounted hourly fees and expenses; $8,592,809.33 represents the Firm's Success Fee; and $5,293,729.55 represents the penalty for the Client's Misconduct. The Clients also owe statutory pre-judgment interest of all amounts dating from September 6, 2018, which is the date that the Firm was forced to withdraw from representation due to the Clients' actions.

13



**BALESTRIERE**
**FARIELLO**

### 1. *Even Without a Success Fee or Misconduct Penalty, the Clients Still Owe Discounted Hourly Fees and Expenses of $742,873.00*

After accounting for all payments received over four years, the Clients still owe discounted hourly fees and expenses of $742,873.00. This reflects the total discounted fees and expenses that were invoiced to the Clients, and which the Clients never disputed. *See Lawrence,* 24 N.Y.3d at 343 ("clients are obligated to review attorney's invoices on a timely basis, rather than wait until the representation ends before raising objections"); *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff,* 638 F. Supp. 714, 720 (S.D.N.Y. 1986) (where a client fails to articulate an objection, it is "construed into an acquiescence in its justness").

### 2. *The Clients Owe the Firm a Success Fee of $8,592,809.33*

Additionally, the Clients owe the Firm a **$8,592,809.33** Success Fee, reflecting 35% of the Recovery, as defined in the Engagement Agreement.

Under the Engagement Agreement, the Firm is entitled to receive a Success Fee of 35% any Recovery.[1] (Ex. A at 3.) "Recovery" is defined as "a cash recovery or anything of value, or any other service or thing of value of any kind, from any source." (*Id.* (emphasis in original).) Recovery specifically includes, but is not limited to:

a) any transfer, purchase, or purchase rights of any assets, licensing agreements, or any business transactions or goodwill which have any value of any kind;

b) restitution from any source, including a government source, if our Firm has, prior to the payment of restitution, had any contact of any kind with the source or government body including, but not limited to, any communications or negotiations with the source; or

c) reduction of any amount of any debt, taxes, liens, or any financing obligations of any kind[.]

---

[1] The Firm's Success Fee follows a sliding scale based on the progress of the representation, reaching a maximum of 35% once the representation reaches the "trial stage." (Ex. A at 3.) The trial stage is reached once the Firm has "taken any steps of any kind actually preparing for trial or arbitration and either (1) upon the completion of general discovery . . . or (2) if the case is scheduled for a specific trial date or arbitration date." (*Id.*) At a minimum, the representation reached the trial stage on March 7, 2016, when the Firm tried a nine-day arbitration in the ICC Arbitration.

14



(Ex. A at 3–4.)

The Clients have received a Recovery in the form of $2,372,067 in cash payments; $11,000,000 in real estate; the right to receive a minimum of $3.5 million from the sale of the Resort by January 2021;[2] and forgiveness of a judgment of $7,678,816.80.

The following chart illustrates the Recovery, as well as other benefits that the Clients received from the Firm's representations, comparing the Client's position before retaining the Firm and after the global settlement with ▮▮▮▮.

| Clients' Position Before Retaining the Firm | Clients' Position After Settlement Agreement |
|---|---|
| • Clients had no financial interest in Resort | • Clients entitled to receive up to 3% of proceeds from sale of Resort, expected to be a minimum of $3.5 million and estimated to be worth $5.3 million, and potentially far more |
| • Clients owned half of El Rincon, but had been locked out of its operations | • Clients own El Rincon in full and can exploit it: Diaz Rivera has discussed ideas of developing ocean front condominiums on the property, which could earn his family tens of millions of dollars |
| • Clients had no interest in Casa C, a real estate development valued at approximately $4.9 million | • Clients own Casa C in full |
| • No path for DIPSA to recover principal and accrued interest in loan to Resort | • DIPSA received full $1.5 million in principal and accrued interest as of date of the Settlement Agreement |
| • Diaz Rivera and Farallon sued in Supreme Court, New York County, Commercial Division for more than $52 million arising from breach of contract and conversion | • Suit dismissed and Clients received releases as to all claims |

---

[2] Under the terms of the Settlement Agreement entered into by the Firm, the Clients will receive a percentage of the Resort's sale price based on a sliding scale approximately from 1.5% to 3% if ▮▮▮▮ sells the Resort within three years of the settlement, and a flat $3.5 million if the Resort is not sold within that time. While an early sale yielding a payment of under $3.5 million is possible, it would require ▮▮▮▮ to sell the Resort far below current low-end estimates of the property's value. As the structure of the payment reflects, all parties currently expect that the Resort will either sell for a higher amount, likely a substantially higher amount, or ▮▮▮▮ will choose to wait for an acceptable buyer.

15

REDACTED



| Clients' Position Before Retaining the Firm | Clients' Position After Settlement Agreement |
|---|---|
| • Diaz Rivera was owed $120,000 in salary and commissions | • Diaz Rivera received full amount of owed salary and commissions |
| • Diaz Rivera's mother owed $325,000 in refund on undeveloped fractional property | • Diaz Rivera's mother refunded full $325,000 |
| • Diaz Rivera's uncle owed $395,000 in refund on undeveloped fractional property | • Diaz Rivera's uncle's estate refunded full $395,000 |

Specifically, the Clients received four categories of Recovery due to the Firm's efforts, each entitling the Firm to a Success Fee of 35% of such Recovery.

First, the Clients have received cash Recovery totaling $2,372,067. This is comprised of $1,532,067 in repayment of DIPSA's loan to the Resort; $720,000 to Diaz Rivera's mother and uncle in refunds on fractional property deposits; and $120,000 in owed salary and commissions to Diaz Rivera personally. The Firm's 35% Success Fee of this $2,372,067 is **$830,223.45**.

Second, the Clients received real estate valued at $11 million. This includes the Casa C development, valued at $5 million; and a 50% interest in the El Rincon development (granting DIPSA full ownership in El Rincon), an interest valued at $6 million. The Firm's 35% Success Fee of this $11 million is **$3,850,000**.

Third, the Clients are entitled to receive a minimum of $3.5 million on the third anniversary of the settlement agreement with ▮▮▮▮ (January 25, 2021), of which the Firm's 35% Success Fee is a minimum of **$1,225,000**. If the Resort is sold before January 25, 2021, the Clients are entitled to a sliding scale of up to 3% of the sale proceeds, an entitlement valued at approximately $5.3 million, and potentially far more. If the Clients receive such an amount above $3.5 million, the Firm will seek the remainder of its then-vested Success Fee at a further date.

Fourth, as part of the Settlement, the Clients received forgiveness of a judgment worth $7,678,816.80. This judgment was entered on February 23, 2017, in Supreme Court, New York County, for $7,091,306.88. Between the date of entry and the January 25, 2018, Settlement, post-judgment interest of 9% pursuant to Sections 5003 and 5004 of the CPLR accrued in the amount of $587,509.92. The Firm's 35% Success Fee on this $7,678,816.80 is **$2,687,585.88**.

In the alternative, the Firm is permitted under the Engagement Agreement, at its sole election and at any time, to elect to receive in lieu of the Success Fee a single cash

REDACTED



payment in the amount of the total undiscounted fees for the duration of the representation; an amount that totals $8,496,204.50. (Ex. A at 5.) At its sole discretion, the Firm may instead elect to receive this amount. For the avoidance of doubt, the Firm seeks its Success Fee on whatever calculation results in a greater Success Fee payment to the Firm.

### 3. *The Clients Additionally Owe a Misconduct Penalty of $5,293,729.55*

In addition to the $8,592,809.33 Success Fee, the Clients also owe the Firm $5,293,729.55 in hourly fees as a penalty of Misconduct.

Under the Engagement Agreement, the Clients agreed to forfeit their right to the Firm's discounted hourly rates, and instead pay the Firm's standard hourly rates if, at any time, the Firm withdrew due to the representation due to the Client's Misconduct. The Firm included this necessary provision in the Engagement Agreement to protect the Firm when taking on a massive assignment, which included many defense side aspects, on a largely contingency fee basis. (*See* Ex. A at 12.) "Misconduct" is defined broadly as any "misrepresentation or material omission," "illegal or unethical conduct," or engagement in any other conduct that "in the opinion of the Firm . . . endangers the reputation of the Firm." (*Id.*)

The Clients committed Misconduct, forcing the Firm to withdraw from its representation on September 6, 2018, for conduct including, but not limited to:

- Lying regarding the tax consequences of where funds were received in attempt to divert settlement funds away from the Firm's trust account as required by the Engagement Agreement;

- Breaching an agreement to send funds to the Firm's trust account, and instead converting those funds;

- Lying about the status of receipt of what is called "the Turnage Lot deposit," in an attempt to assuage the Firm's continuing concerns regarding payment;

- Admitting in an email sent by Leticia Diaz Rivera that DIPSA had no intention to pay the Firm, and acknowledging an apparent agreement between Diaz Rivera and Bernstein to deprive the Firm of its fee interest;

17



- Causing the Firm to be sued by a discovery vendor due to the Client's refusal to pay incurred expenses to that vendor;[3] and

- Repeatedly breaching multiple promises to make payment, both to the Firm and to vendors (which the Firm then paid).

The Clients' behavior constitutes Misconduct under each of the disjunctive prongs. First, it constitutes a misrepresentation, as the Clients had previously repeatedly agreed (including originally in the Engagement Agreement) that they would pay the Firm the amounts due and coordinate in such payments. Second, it constitutes unethical and unlawful conduct, as the Clients breached multiple valid contracts and even, as Diaz Rivera had done before, converted funds. Third, in the opinion of the Firm, it is conduct that endangers the reputation of the Firm: the Firm works with all kinds of third party vendors and maintaining good relationships with them is essential not only to obtaining the best services for the Firm's clients, but also to obtaining good payment terms. By refusing to pay a third-party vendor and allowing the Firm to be sued, and straining relationships with other vendors due to late payments, the Clients put all of this at risk.

Accordingly, the Clients are obligated to pay the Firm its full, undiscounted hourly rates, amounting to $9,745,467.65 in hourly fees as a Misconduct penalty, in addition to other unpaid discounted hourly fees and expenses, and the Success Fee.

### F. CLAIMS BROUGHT AGAINST RESPONDENTS

(1) **Account Stated.** The Firm presented detailed monthly invoices to Clients, ultimately setting forth an outstanding balance of $14,629,411.88, pursuant to their existing relationship between the Firm and the Clients. The Clients never disputed these invoices. Accordingly, the Clients have recognized this amount due to the Firm, and are liable to the Firm for no less than $14,629,411.88.

(2) **Breach of Contract.** The Firm and the Clients entered into the Engagement Agreement, pursuant to which the Clients agreed to pay the Firm's fees, amounting to $14,629,411.88. The Firm performed all of its obligations under the Engagement Agreement through its provision of extensive legal services over nearly four years. The Clients breached the Engagement Agreement by failing to

---

[3] The Firm had never previously failed to pay any vendor. Even in that action, the Firm achieved great success on behalf of the Clients, who were obliged by the Engagement Agreement's indemnification provision to pay any recovery achieved by the discovery vendor. Despite owing $166,000, plus interest, for a total of $200,331.10 the Firm was able to settle the dispute for only $85,000, thereby saving the Clients more than $115,331.10.



pay the Firm as agreed, damaging the Firm in the amount of no less than $14,629,411.88.

(3) **Quantum Meruit.** The Firm provided legal services to the Clients in good faith, which — by executing the Engagement Agreement — the Clients recognized has a reasonable market value of at least $14,629,411.88. This amount may be much higher, in that the Clients received a value of $77 million, 40% of which is almost $31 million. The Clients accepted and benefited from these services, agreed to what a Success Fee would be, and the Firm reasonably expected to receive the fees that the Clients had agreed to pay to the Firm. Accordingly, the Clients are liable to the Firm in the amount of no less than $14,629,411.88.

(4) **Promissory Estoppel.** The Clients made clear and unambiguous promises to the Firm to pay the Firm the value of its legal services, and the Firm relied on those promises by providing more than 16,000 hours of legal services, eventually obtaining a Settlement for the Clients. Accordingly, the Clients have injured the Firm in the amount of no less than $14,629,411.881.

## G. <u>RELIEF SOUGHT FROM RESPONDENTS</u>

For the reasons set forth in this Notice of Claim and to be developed in future submissions, the Firm requests the Tribunal issue a final determination that Respondents are jointly and severally liable for account stated, breach of contract, quantum meruit, and promissory estoppel, and therefore must pay the Firm the agreed-to amount of $14,604,059.81 as well as any statutory interest and required attorneys' fees and costs.

## H. <u>THE RELEVANT AGREEMENTS</u>

The relevant agreements are the Engagement Agreement, including the relevant amendments, dated November 26, 2014; May 19, 2015; and February 24, 2016, attached hereto.

## I. <u>CONSTITUTION OF THE ARBITRAL TRIBUNAL</u>

The Firm requests that, pursuant to page 15 of the Engagement Agreement, the dispute by resolved by one arbitrator and the arbitrator chosen pursuant to Rule 12 of the AAA Commercial Arbitration Rules. Furthermore, the Firm requests that the arbitration take place in accordance with the AAA Commercial Arbitration Rules.

19



### J. **PLACE OF ARBITRATION AND APPLICABLE RULES OF LAW**

Pursuant to page 15 of the Engagement Agreement, the place of arbitration shall be New York, New York, and the arbitration shall be conducted under the substantive laws of the State of New York.

Respectfully submitted,

Matthew W. Schmidt

Encl:   Engagement Agreement

cc:     Fernando Garibay Bagnis, Esq. (via email: garibayf@prodigy.net.mx)
        Jonathan A. Bernstein, Esq. (via email: jon@bernsteincorp.com)
        Juan Diaz Rivera (via email: juan@pedregal.com)
        Leticia Diaz Rivera (via email: leticia@pedregal.com)
        Clark Libenson, Esq. (via email: clibenson@allenmatkins.com)
        Charles Melges, Esq. (via email: rusty@bernsteincorp.com)
        Alfonso Lopez Melih, Esq. (via email: alopezmelih@lfe.mx)
        Christopher Payne, Esq. (via email: payne@ballardspahr.com)
        Francisco Sanchez, Esq. (via email: fsanchez@sanchezygarcia.com)