# Exhibit A



International Centre
Thomas Ventrone, Esq.
ICDR Vice President
120 Broadway, 21st Floor
New York, NY 10271
Telephone: (212)484-4181
Fax: (212)246-7274

July 23, 2021

**Via Email Only**

Sophia L. Berg
Balestriere Fariello
225 Broadway
29th Floor
New York, NY 10007

Matthew W. Schmidt, Esq.
Balestriere Fariello
225 Broadway
29th Floor
New York, NY 10007

Jyotin Hamid, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Emily Schlafmitz
Balestriere Fariello
225 Broadway
29th Floor
New York, NY 10007

Brian K. Gallagher, Esq.
Gallagher Law PLLC
275 Madison Avenue
Suite 616
New York, NY 10016

Samuel M. Leaf
Gallagher Law PLLC
275 Madison Avenue
Suite 616
New York, NY 10016

Lloyd S. Clareman, Esq.
Lloyd S. Clareman, PC
121 East 61st Street
2nd Floor
New York, NY 10065

Taryn Decker

Gallagher Law PLLC
275 Madison Avenue
Suite 616
New York, NY 10016

Joseph L. Francoeur, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
150 East 42nd Steet
New York, NY 10017-5639

Michelle Vizzi, Esq.
Wilson Elser Moskowitz Edelman & Dicker, LLP
150 East 42nd Street
New York, NY 10017-5639


Case Number: 01-18-0003-5131

Balestriere Fariello
-vs-
Jonathan Bernstein;
White Lilly, LLC
-vs-
Adina G. Storch, PLLC and
Adina Storch



Dear Counsel,

By direction of the Tribunal we herewith transmit to you the duly executed Final Award in the above matter. Please do not submit any further communication directly to the Tribunal. All communication shall be directed to the ICDR only copying the other parties.

At this time we have verified with the Tribunal that it has submitted all requests for compensation and expenses in this matter. Accordingly, we have conducted a final reconciliation of the finances and will provide each party with a Final Statement under separate cover shortly. If a party has any unused compensation deposits, we will issue a refund check. If a party has an outstanding balance, that party will continue to receive cyclical invoices until the balance is paid. Any outstanding balances are due immediately.

Note that the financial reconciliation reflects costs as they were incurred during the course of the proceeding. Any apportionment of these costs by the Tribunal are addressed in the Final Award and will be stated as one party's obligation to reimburse the other party for costs incurred. Any outstanding balances the parties may have with the ICDR for the costs incurred during the arbitration proceedings remain due and payable to the ICDR even after the Final Award is issued, and regardless of the Tribunal's apportionment of these costs between the parties in the Final Award.

Pursuant to the AAA/ICDR's current policy, the ICDR's electronic case file will be destroyed 18 months after the date of this letter, with the exception of certain types of documents the ICDR will maintain indefinitely.

Thank you for having used the services of the ICDR, a worldwide leader in dispute resolution.

Sincerely,

/s/

Rafael Carlos del Rosal Carmona, LL.M.
Director
Direct Dial: (212)484-4180
Email: RafaelCarmona@adr.org
Fax: (212)246-7274


Encl.: Final Award


Cc:   (via email)
The Arbitrator

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
### International Arbitration Tribunal

BALESTRIERE FARIELLO,

Claimant,

-vs-

**ARBITRATION NO. 01-18-0003-5131**

JONATHAN A. BERNSTEIN,

Respondent.

WHITE LILLY LLC and JONATHAN A.
BERNSTEIN

Claimants,

-vs-

BALESTRIERE FARIELLO,
BALESTRIERE PLLC, JOHN
BALESTRIERE, THE LAW OFFICES OF
ADINA G. STORCH, and ADINA
STORCH

Respondents

# TABLE OF CONTENTS

**Page**

I.     Introduction and Summary of Ruling ................................................................. 1

II.    Summary of Facts ............................................................................................. 4

III.   Analysis of BF's Claims ................................................................................... 8

     A.     Is Bernstein Personally Obligated to Pay Under the Engagement Letter? ............ 8

     B.     Is Bernstein Liable on an Account Stated? ........................................................ 20

          1.      Discounted Fees ....................................................................................... 21

          2.      Success Fee (Whether Taken as an Undiscounted Fee or Otherwise)...... 27

     C.     Did Balestriere Improperly Take Money from the Firm's Trust Account?.... 30

     D.     What Amount of Fee Forfeiture is Appropriate for Balestriere's Inappropriate Taking of Funds from the Client Escrow Account, and Is Bernstein also Entitled to Treble Damages and the Return of the $222,5000 in Fees he Paid for the ICC Proceeding? ........................................................................................................... 39

          1.      Fee Forfeiture ........................................................................................... 39

          2.      Treble Damages ....................................................................................... 41

          3.      ICC Fees .................................................................................................. 42

     E.     Is Bernstein Liable for Breach of Contract? ..................................................... 42

          1.      Bernstein Breached the Engagement Letter by Failing to Pay Discounted Fees ......................................................................................... 42

          2.      Bernstein Breached the Mandatory Arbitration Provision of the Engagement Letter ................................................................................... 43

     F.     Is Bernstein Liable in Quantum Meruit? .......................................................... 45

IV.   Analysis of Bernstein's Malpractice Defense/Counterclaims ........................... 45

V.    Analysis of Bernstein's Tort Counterclaims...................................................... 49

VI.   Analysis of Bernstein's Claims for Negligent Misrepresentation and Breach of Fiduciary Duty Against Storch ......................................................................... 51

VII.   Analysis of Whether Storch Forfeited Her Share of Any Success Fee............................. 55

VIII.   Analysis of Storch's Claim for Indemnity Against BF .................................... 61

IX.   Analysis of BF's Claim for Attorneys' Fees and the Arbitrator's Computation of Interest.............................................................................................................. 62

X.    Conclusion ..................................................................................................... 64

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the parties and dated March 17, 2015, and having been duly sworn and having duly heard the proofs of the parties, do hereby, AWARD, as follows:

## I.    Introduction and Summary of Ruling

This arbitration was commenced by the law firm Balestriere Fariello ("BF") against Jonathan Bernstein ("Bernstein"), Juan Diaz Rivera ("Rivera"), his real estate development firm, Desarrollos Inmobiliarios Del Pedregal, S.A. De C.V. ("DIPSA"), and a subsidiary of that company, Desarrolladora Farallon, S. de. R.L. de C.V. ("Farallon") for unpaid legal fees. BF asserts claims for an account stated, breach of contract and quantum meruit.[1] Claimant's Amended Claim was filed on March 29, 2019.

Claimant subsequently dismissed all parties from the arbitration except Bernstein, and the Arbitrator on September 16, 2019, consolidated this arbitration with another arbitration brought by Bernstein and his company, White Lilly LLC ("White Lilly"), against BF, John Balestriere ("Balestriere"), Balestriere PLLC, and The Law Offices of Adina G. Storch and Adina Storch (collectively, "Storch").[2] The parties have not mentioned Balestriere PLLC in any of their briefs, nor have they entered into evidence any proofs against this entity. Therefore, the Arbitrator treats this entity as having been dropped from this case.

The dispute arises out of the engagement of BF and Storch to bring litigation against Cargill, Inc. and several of its subsidiaries or related companies ("collectively referred to as

---

[1] The claim originally also contained a count for promissory estoppel, but Claimant appears to have dropped that count, having not argued it in either its Pre-Hearing or Post-Hearing briefs.
[2] *See* Pre-Hearing Order No. 2.

"Cargill" unless otherwise noted) in connection with the development of a resort in Mexico that had encountered financial problems. The operative engagement letter, dated March 17, 2015, and executed by Bernstein, Rivera, and Farallon, on the one hand, and BF and Storch, on the other,[3] contains an arbitration clause providing, "If any dispute or claim between the parties shall arise, the parties shall submit to and have such settled by arbitration administered by the American Arbitration Association, in New York before one arbitrator, in accordance with its Commercial Arbitration rules...."[4] The engagement letter further provides, "This agreement shall be governed by and construed in accordance with the laws of the State of New York...."[5]

Claimant BF seeks the following relief against Bernstein:

- $9,154,139.32 in unpaid legal fees and costs, consisting of $714,547.82 in unpaid discounted fees and costs, plus $8,439,591.50 representing a "success fee" equal to the amount of Claimant's undiscounted fees.[6]

- Interest on this amount at New York's statutory 9% simple interest rate, accruing since April 11, 2018, the date of the final invoice, at a rate of $2,257.19 per day.[7]

- $389,001.04 for damages incurred as a result of Mr. Bernstein's improper federal court action filed in breach of the engagement agreement's arbitration clause.[8]

- Interest on this amount at New York's statutory 9% simple interest rate, accruing since March 5, 2019, the date on which Mr. Bernstein stipulated to the stay of his federal court action,[9] at a rate of $95.92 per day.[10]

- The firm's fees and expenses incurred in connection with this collection action, in an amount to be determined, pursuant to a "prevailing party" fee-shifting provision of the engagement agreement.[11]

---

[3] Ex. 15.
[4] Ex. 15 at 6370.
[5] *Id.*
[6] Exs. 204-209, 211-239, Tr. 259:1-260-6 (Balestriere).
[7] CPLR § 5004. [Calculation: 9,154,139.32 x .09 = 823,872.5388 / 365 = 2,257.1850.
[8] Exs. 6309-12; Tr. 257:6-19 (Balestriere).
[9] Ex. 64.
[10] CPLR § 5004. [Calculation: 389,001.04 x .09 = 35,010.0936 / 365 = 95.9180.
[11] See Ex. 15, at 6363 ("if there is a dispute regarding fees, then the non-prevailing party shall pay the prevailing party's attorney's fees and court costs incurred in resolving the fee dispute").

Bernstein and White Lilly, the remaining Respondents after the above-noted dismissal of Rivera and Farallon, seek to have all of BF's and Storch's legal fees forfeited on account of Balestriere's unethical conduct in taking funds from his firm's escrow account despite representations that he would not.

They further assert defenses and counterclaims of malpractice, breach of fiduciary duty, fraud, conversion, negligent misrepresentations, unjust enrichment, violation of Judiciary Law §487, and punitive damages. On their counterclaims, they seek damages and a declaration as follows:

- Compensatory damages in the amount of $3,228,919, consisting of $1,823,500 in legal fees paid to BF, and $1,405,419, allegedly stolen from the escrow account, plus an additional $222,500 in ICC arbitration fees paid directly by Bernstein.[12]

- Interest on the $1,823,500 in legal fees paid, calculated from January 1, 2016, the midpoint of Bernstein's fee payments (which were made between December 2014 and May 2017); and interest on the $1,405,419 taken from escrow from April 1, 2018, the date the funds were taken.

- Punitive damages against Balestriere and BF in the amount the Arbitrator deems just.

- A declaration that Storch is jointly and severally liable for the conduct of Balestriere and BF as well as being liable for her own wrongdoing.

For reasons which will appear below, the Arbitrator awards BF the undiscounted fees which have not yet been paid to it in the amount of $714,547.82 plus interest in the amount of $211,427.85 for a total of $925,975.67; its fees for having to defend against Bernstein's federal court action, attempting to enjoin this arbitration, in the amount of $48,595.43, plus interest in the amount of $10,446.56 for a total of $59,041.99.

The Arbitrator, however, denies BF's request for a success fee or undiscounted fees because of Balestriere's conduct in connection with taking funds from its client escrow account.

---

[12] Ex. 8937, at 6.

With respect to Storch, the Arbitrator does not find that she participated in or bears any ethical responsibility in connection with the taking of funds from BF's client escrow account, but because the engagement letter creates joint liability on her part for any actions of BF, and because she had not effectively withdrawn from the representation of Bernstein as of the time of the taking of funds from the escrow account, the Arbitrator holds that she also has no right to a success fee. The Arbitrator also denies BF's request for attorneys' fees in connection with this arbitration and declares that he lacks jurisdiction to determine Storch's claim for indemnification against BF.

The Arbitrator denies Bernstein's defense and counterclaim for malpractice; dismisses his tort defenses/counterclaims as duplicative of his malpractice claim; denies his claim for reimbursement of $222,500 that he paid for ICC fee and his request for punitive damages; and denies his separate claims against Storch for negligent misrepresentation and breach of fiduciary duty arising out of her conduct that occurred before she executed the engagement letter with Bernstein.

## II.  Summary of Facts

The Arbitrator sets forth below, in a very general fashion, a chronology of the facts underlying this dispute. The Arbitrator believes these facts are undisputed and recites them merely for the purpose of explaining the background of the dispute. If there is any inaccuracy in the way the Arbitrator has summarized any of these facts, such inaccuracies do not affect his Award in any way. To the extent any of the below facts, or others not cited below, are key facts on which the Arbitrator bases his Award, he discusses them with more particularity in the Analysis section of this Award:

- In approximately 2006 Rivera and his companies first dealt with Cargill when he developed El Rincon de Pedregal, a single-family luxury home complex on the Baja peninsula in Mexico.

4

- Cargill then expressed interest in becoming the lead outside investor in the Resort at Pedregal (the "Resort") that Rivera was developing. Farallon agreed that Cargill would invest $15M with Farallon investing land valued at $18.5M. Farallon and Cargill took out a $65M construction loan.

- Cargill and Farallon set up a land trust for the purpose of developing the property. In connection with this Farallon and a related Farallon entity entered into a Trust Governance Agreement ("TGA") with a Cargill-related entity called Mexvalo. The TGA defined the duties of the parties with respect to the Resort and contained an integration clause and an arbitration clause.

- In 2008 the Cargill Farallon relationship took a downward turn, in part due to the financial crisis. At that time, the Resort's lender entered receivership halfway through the Resort's construction. Due to the difficulty in securing new credit, Farallon and Cargill each (through related entities) agreed to make additional partner loans. Shortly thereafter, Cargill refused to approve salary and sales commissions due to members of the Resort's staff, including to Rivera himself. In June 2011, Rivera filed suit in Mexico for the $120,000 in salary and commissions owed to him.

- In early 2013, the relationship between Farallon and Cargill continued to deteriorate until it fell apart. Then, in what Cargill later characterized as a "takeover" of the Resort, Rivera and his family called a meeting of the Resort's operating entity, and then directed the Resort's operator to direct approximately $15 million of Resort revenue to an account to which Cargill lacked access. Rivera said this was necessary in order to make required tax payments.

- In February of 2014, Cargill struck back against Rivera and Farallon by purchasing, over Farallon's objections, the $65 million construction loan. Cargill used that loan to foreclose on Farallon's interests in the Resort. Cargill then removed Farallon and the Rivera family from management of and physical access to the Resort.

- In May 2014, Cargill brought suit against Farallon and Rivera in Supreme Court, New York County (the "Guaranty Action"), which was assigned to Judge Kornreich.

- In the Guaranty Action, Cargill—now in its role as lender—alleged that Farallon's takeover had breached a so-called "bad boy guaranty" underlying the construction loan, making it liable for the full amount outstanding under the construction loan (roughly $52 million at the time). Cargill also alleged that Rivera was personally liable for this amount as the alter ego of Farallon.

- In the same general time frame, Bernstein, who had become friendly with Rivera in Mexico, approached him to suggest that he could be of assistance in obtaining legal representation for him in the U.S. Bernstein then approached Storch, who had represented him in real estate matters in the past. She informed him that she was leaving private practice to become the General Counsel of a real estate firm, but said she could recommend several firms to him, one of which was BF, and that she could assist in giving advice to Bernstein.

- Storch had been a law school classmate of Balestriere. In connection with the referral she mentioned that she had heard that Balestriere had had some financial difficulties and suggested that Bernstein ask him about that when he met him.

- On November 5, 2014, Bernstein and Rivera entered into a Capitalization Agreement indicating their intention to pursue litigation in the U.S. against certain Cargill entities. Pursuant to the agreement, each agreed to contribute funds to finance the litigation and agreed upon how the proceeds of any litigation would be split.

- On November 20, 2014, Rivera on behalf of Farallon and Bernstein executed an engagement letter with BF and Storch.

- Thereafter, on December 9, 2014, a meeting was held between Balestriere, Storch, Rivera, and Bernstein to analyze the legal and strategic aspects of the potential litigation.

- In January 2015, BF filed a case in the Southern District of New York (the "SDNY Action"), which was assigned to the Hon. Shira Scheindlin. There, Farallon alleged, among other things, that Cargill improperly used the Resort's construction loan to force Farallon out of the project. Farallon alleged that this conduct violated fiduciary duties which Cargill owed it pursuant to an implied joint venture between the parties.

- On March 17, 2015, the parties executed an amended engagement letter, the operative engagement letter, which Rivera signed individually in addition to signing on behalf of Farallon.

- In April 2015, after an initial conference in the SDNY Action, the Cargill entity, Mexvalo, commenced an arbitration against Farallon before the International Chamber of Commerce (the "ICC Arbitration"), pursuant to an arbitration agreement between Cargill and Farallon. The arbitration primarily sought approximately $12 million in damages arising out of Rivera's "takeover" of the Resort in 2013.

- On May 29, 2015, BF brought a new action against Cargill before Judge Kornreich, (the "Lender Liability Action"), seeking damages arising out of Cargill's acquisition of the Resort's construction loan.

- The next week, BF brought counterclaims against Cargill in the ICC Action, asserting a series of partnership claims based on the applicable Mexican law, and seeking $95 million arising out of Cargill's own takeover of the Resort.

- In August 2015, Judge Kornreich's law secretary informed BF that its clients' claims "will not fly."

- In September 2015, Judge Scheindlin, despite a previous statement that she thought BF likely asserted adequate claims, expressed severe doubt about the viability of the implied fiduciary duty claims in light of the TGA, which defined all of the duties of

6

the parties with respect to each other and the Resort, and which contained an integration clause and an arbitration clause.

- In December 2015, Judge Scheindlin dismissed the federal action.

- In February 2016, Justice Kornreich dismissed the lender liability action.

- In August 2016, the ICC awarded $7 million against Farallon.

- In November the Second Circuit affirmed Scheindlin's judgment and in December denied the motion to vacate the ICC award.

- In July 2017, Justice Kornreich granted summary judgment against Rivera in the Guaranty Action for conversion of the $15 million in Resort funds.

- Thus, at this point BF had lost three court actions (the Guaranty Action, the SDNY action, and the Lender Liability Action) and the ICC arbitration, as well as various appeals from these proceedings.

- In January of 2018 a Master Settlement Agreement was entered into among various Cargill entities, various Farallon entities, Rivera and related family members, and Bernstein. Pursuant to the settlement Cargill sent a payment to Rivera in Mexico. Thereafter, Rivera wired approximately $1.4 million to BF's client trust fund after receiving what he thought were assurances from Balestriere that these funds would not be touched

- In March of 2018, Balestriere took the $1.4 million in funds from BF's client trust fund and used it partially to pay legal fees owed to BF by Rivera and Bernstein.

- On September 20, 2018, BF filed it statement of claim in this arbitration and on March 29, 2019, filed its amended statement of claim.

Having set forth the general factual background, the Arbitrator will now discuss BF's account stated, contract and quantum meruit claims against Bernstein. The Arbitrator will include in this discussion Balestriere's taking funds from BF's client trust account and the resultant forfeiture of fees. The Arbitrator will then discuss Bernstein's malpractice and other tort claims that he asserts as both defenses and counterclaims.

As the first step in discussing the account stated, contract and quantum meruit claims, the Arbitrator will discuss the capacity in which Bernstein signed the engagement letter and whether

7

he can be treated as a client in his individual capacity who is personally responsible for BF's and Storch's fees.

## III. Analysis of BF's Claims

### A. Is Bernstein Personally Obligated to Pay Under the Engagement Letter?

The parties have raised questions as to whether Bernstein signed the operative engagement letter as an agent of Farallon, an agent of White Lily, or personally. The Arbitrator will first consider the factors that seem to establish that Bernstein signed personally, and after that will consider Bernstein's contention that the contract is ambiguous and should be construed against the drafter.

Under New York law, when a person signs a contract in his own name, and without qualifying that his signature is in a representative capacity, he is personally liable and may not introduce parol evidence to escape liability, even if he claims he was signing in a representative capacity and even if he is known to be an agent of another. *See, e.g., Meyer v. Redmond*, 205 N.Y. 478, 482 (1912) ("a person, contracting as agent, will be personally liable, whether he is known to be an agent or not, in all cases where he makes the contract in his own name") (internal quotation omitted) (emphasis added); *Thomas Gordon Malting Co. v. Bartels Brewing Co.*, 206 N.Y. 528, 537 (1912) ("Where a party signs a contract in his own name, even though he is acting for another, he is personally bound thereby. If the other party to the contract elects to hold the signer thereof, parol evidence is not admissible to release him from the obligation which he has voluntarily assumed") (internal citations omitted) (emphasis added).

The rule has been specifically applied to attorney engagement agreements. *See, e.g., Mintz & Gold LLP v. Daibes*, 125 A.D.3d 488 (1st Dep't 2015). As the First Department held:

> Plaintiff made a prima facie showing of entitlement to judgment as a matter of law by demonstrating that it entered into a retainer agreement with defendant and sent him regular invoices pursuant to that agreement, to which he did not object . .

.. In opposition, defendant failed to raise a triable issue of material fact. Although
defendant claims he signed the retainer agreement only in his capacity as agent
and principal for nonparties…, the agreement is addressed to defendant
individually, and he signed it individually, not on behalf of the LLCs.
Accordingly, he can be held liable for the legal fees.

*Id.* at 489 (internal citations omitted).

In interpreting the contract, one should also read the agreement as a whole, giving effect

to all provisions, and reading them, not in isolation, but in the context of the entire agreement. *JA*

*Apparel Corp. v. Abboud,* 568 F.3d 390, 397 (2d Cir. 2009) ("the court is to consider [a

contract's] 'particular words' not in isolation 'but in the light of the obligation as a whole'")

(quoting *Kass v. Kass,* 91 N.Y.2d 554, 566 (1998)); *Small Business Bodyguard Inc. v. House of*

*Moxie, Inc.,* 2015 WL 1290897, at *3 (S.D.N.Y. March 20, 2015) (the court is to "[e]xamine the

entire contract and consider the relation of the parties and the circumstances under which it was

executed, interpreting particular words . . . not as if isolated from the context, but in the light of

the obligation as a whole").

Applying the above principles, the Arbitrator will look first at the initial engagement

letter entered into on November 20, 2014,[13] next at the comments made in connection with the

execution of that engagement letter, then at the first amended engagement letter, dated March 17,

2015,[14] the operative engagement letter, and last at the words and actions of the parties after the

execution of the operative engagement letter.

The first engagement letter was signed by Balestriere and Storch, on the one hand, and by

Rivera and Bernstein, on the other. The signature box for Rivera had been set up so that Rivera

would be signing in the following capacity: "John Diaz Rivera on behalf of himself and

Desarrolladora Farallon, S. de R.L. de C.V." **Rivera** crossed out the words "himself and," so

---

[13] Ex. 13.
[14] Ex. 15.

9

that it looked as follows: "John Diaz Rivera on behalf of ~~himself and~~ Desarrolladora Farallon, S. de R.L. de C.V." The result was that Rivera was signing only on behalf of Farallon, and not on behalf of himself.

The signature for Bernstein had been set up so that he would be signing in the following capacity: "Jon Bernstein, on Behalf of himself and Desarrolladora Farallon, S. de R.L. de C.V." Unlike Rivera, **Bernstein** crossed out everything after his name so that it looked as follows: "Jon Bernstein~~, on Behalf of himself and Desarrolladora Farallon, S. de R.L. de C.V.~~" The result was that he simply signed as "Jon Bernstein."

Under the previously cited authorities, when a person signs in his own name, without qualification, he will be held personally liable, even if he was an agent and he may not introduce parol evidence to escape liability. It is undisputed that Bernstein was a sophisticated lawyer, previously a partner in the firm of Pryor Cashman and subsequently the head of a real estate development company. Presumably, he would have understood the effect of his unqualified signature.

The other language in the engagement letter, although not a model of clarity, also supports an interpretation that he was signing the engagement letter in his personal capacity. The salutation is: "Dear Jon and Juan" followed by a colon. Following this salutation, the first sentence of the contract states, "This letter confirms the discussions we have had regarding the representation of Desarrolladora Farallon, S. de R.L. de C.V ('you,' the 'Company' or the 'Client') ('you,' 'your,' 'yours,' 'his,' 'her,' 'its,' or similar pronouns means the party or parties who seeks representation)." The use of double parentheses is initially confusing. The references inside the first parenthesis to "you," the "Company," or the "Client" refer to Farallon, but the

10

second parenthetical, on its face, expressly broadens the definition of "you" to go beyond Farallon and include the other "party or parties" who seek representation.

Moreover, the "Authority" provision of the contract[15] states, "By signing this Agreement, you acknowledge and confirm that you are bound to the terms of this Agreement and you are in fact bound to such terms. You also acknowledge that you **personally** undertake and assume the full performance hereof, including payments of amounts hereunder." (emphasis added). It would not make sense to refer to "personally" undertaking an obligation if the only client were Farallon, a company, not an individual.

Bernstein's argument that "you" as used in the contract means only Farallon would require the Arbitrator to disregard provisions of the agreement, in violation of basic canons of contract interpretation. *See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 206 (2d Cir. 2005) (a contract interpretation "that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible") (internal quotation omitted); *Manley v. AmBase Corp.,* 337 F.3d 237, 250 (2d Cir. 2003) (courts must avoid contract "interpretations that render contract provisions meaningless or superfluous")

First, a reading that "you" means only Farallon would require the Arbitrator to ignore the second parenthetical in the first sentence and conclude that it has no meaning. Broadening the definition of "you" beyond that provided in the first parenthetical is both the express and the sole purpose of the second parenthetical. There would be no purpose to the second parenthetical if the "you" were limited to Farallon. Second, Bernstein's interpretation would render all the signature blocks except for Rivera's signature on behalf of Farallon superfluous. Third, Mr. Bernstein's

---

[15] Ex. 15 at 15.

interpretation would render superfluous the "personal" undertaking to make payment contained in the Authority provision.

Moreover, at the time that Bernstein signed the first engagement letter, Rachel Davidson, a lawyer at his real estate company explained in an email Bernstein's reason for this handwritten change: "Jon is handwriting the change that **he is signing on behalf of himself. He is not a signatory for Farallon** so we did not think he should sign on their behalf." (emphasis added).[16] Neither Bernstein, nor Rivera, who was also copied on the email exchange, disputed or questioned what Ms. Davidson wrote about the capacity in which Bernstein signed.[17]

In March 2015, the engagement agreement was amended and restated, though all operative provisions remained identical.[18] The reason for the restatement was to add a second signature block for Rivera to sign individually, in addition to his signature on behalf of Farallon, since by that time he had been sued individually by Cargill.[19] This addition of a second signature block for Rivera personally, made without modifying any other language, including the definition of "you," makes plain that "you" cannot mean only Farallon, but rather refers to all the signatories of the agreement. The signature block for Bernstein was prepared to have just his name below the signature line in accordance with the handwritten changes Bernstein himself had made to the earlier version, and he signed above that without any qualification as to the capacity in which he was signing.[20]

In addition to the comments of Rachel Davidson regarding the capacity in which he signed the first engagement letter and the unqualified manner in which he signed the amended

---

[16] Ex. 13 at 2028.
[17] *Id. See also* Balestriere Tr. 112:14-113:4; Bernstein Tr. 909:21-910:18.
[18] Exs. 13, 15.
[19] *Compare* Ex. 13, at 2045 with Ex. 15, at 6371. *See also* Balestriere Tr. 115:18-118:6.
[20] Ex. 15, at 6372.

engagement letter, Bersnstein's subsequent words and actions further support resolving any ambiguity in favor of a finding that he is individually bound.

First, when Cargill attempted to join Bernstein as an individual defendant in the New York state court action, the firm represented him in fending off that attempt without any discussion of any need for a separate or new engagement agreement.[21] This contrasts with the above-noted changes to the signature blocks that were necessary when Rivera had to be represented in his personal capacity.

Second, Mr. Bernstein confirmed his understanding that he had an obligation to pay the firm's legal fees by in fact paying approximately $2 million. Why would he pay $2 million in legal fees if he did not believe he had an obligation to do so? Although he had a separate agreement with Rivera, the Capitalization Agreement, to jointly fund the litigation that BF was bringing, that Capitalization Agreement obligated him to pay only up to $750,000,[22] and it is nowhere mentioned in or made a part of the operative engagement letter.

Third, Mr. Bernstein continued to discuss possible payment plans to pay more to BF even after the Cargill settlement. In those discussions, he never questioned that he was a client who owed unpaid fees to the firm as indicated by the following quotes: "How much do you want from me?"[23]; "[a]ny way you can sharpen your pencil a bit on the final payment?"[24]; "it's not as if we do not understand your points and your arguments. Rather, the problem is the inability to meet your requests."[25]; "what portion of this comes from me and what from him."[26] Why would he offer to pay additional fees after the settlement if he did not think he had an obligation to do so?

---

[21] Balestriere Tr. 186:19- 187:20.
[22] Ex 17, at ¶ 3(a).
[23] Ex. 74, at 6804.
[24] Ex. 75, at 9768.
[25] Ex. 76, at 6863.
[26] Ex. 77, at 6741.

13

Fourth, Bernstein thought of Balestriere as his personal attorney. For example, when he faced a potential claim in Florida in January 2016, he introduced Balestriere to his Florida employment lawyer as "my general litigation attorney."[27]

Finally, out of the voluminous record in this case, Mr. Bernstein has identified no evidence indicating that he ever questioned that he was a client prior to the filing of this collection action.

In addition to all of the above, and although Bernstein's lawyers have argued that Bernstein signed as an agent of Farallon, Mr. Bernstein himself rejected that argument at the hearing,[28] testifying, "Mr. Clareman couldn't say that I signed on behalf of Farallon. . . . How could I sign on behalf of Farallon? I specifically crossed that out,. . . I never, ever thought I signed on behalf of Farallon."[29]

Instead, he testified that he signed on behalf of White Lilly. But that makes no sense. White Lilly was a company he used to sign the separate Capitalization Agreement with Rivera, but neither White Lily nor the Capitalization Agreement are mentioned anywhere in the engagement letter. There is no basis in law or common sense that an agreement between different parties that is nowhere mentioned in the engagement letter should somehow change the identity of the parties to—or the proper interpretation of—the engagement letter. As the New York Court of Appeals has held, extrinsic evidence should never "be considered in order to create an ambiguity." *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) (emphasis in original).

---

[27] Ex. 6400.
[28] *Compare* Bernstein 8/23/19 Summary Disposition Motion, at 1, 3, 5; Bernstein Pre-Hearing Brief, at 3, with Bernstein Tr. 925:16- 927:22.
[29] Bernstein Tr. 925:16-927:22.

Furthermore, if Bernstein signed on behalf of White Lilly, that would create ethical problems. In the engagement letter, Farallon designated Bernstein, as it's "exclusive authorized client representative in the United States with sole client decision-making authority over strategic matters relating to this contemplated litigation ...." This designation was separate from the capacity in which he signed the engagement letter and was made, among other reasons, because Rivera was in Mexico and not as experienced with litigation as Bernstein.

As noted, White Lilly was a party to the separate Capitalization Agreement with Farallon and was set up in that agreement as a "litigation funder." The first Whereas clause[30] in the Capitalization Agreement specifies that "the Parties have agreed to capitalize the Litigation on the terms and conditions in this Agreement" and later provisions provide for the method of dividing the proceeds of the litigation.[31] If Bernstein was entitled to direct the litigation and if he was acting as an agent of White Lilly, BF could not permissibly have given a litigation funder like White Lilly authority to make decisions on strategic matters. See Rule 1.8(f)(2) ("A lawyer shall not accept compensation for representing a client from one other than the client unless: . . . there is no interference with the lawyer's independent professional judgment or with the lawyer-client relationship. . . ."); Rule 5.4(c) ("A lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal service for another to direct or regulate the lawyer's professional judgment in rendering such legal services."). Balestriere testified that he would not have allowed Bernstein to have decision-making authority if he were not a client because "it is a big no-no that a litigation funder really . . . even appear to interfere in the attorney-client relationship."[32]

---

[30] Ex. 17 at 2.
[31] Ex. 17 at 3.
[32] Balestriere Tr. 140:7-141:6.

Having considered the above arguments that seem to establish that Bernstein signed personally, the Arbitrator will now consider the arguments of Bernstein's counsel that the operative engagement letter, dated March 17, 2015, is ambiguous and should be construed against the drafter.

Bernstein's counsel first argues that the only role Bernstein assumed pursuant to the engagement letter was that of Farallon's "exclusive authorized client representative in the United States with sole client decision-making authority over strategic matters relating to this contemplated litigation…."[33] Counsel argues that Bernstein crossed out the words "on behalf of himself" because he was not signing personally[34] and that he crossed out "on behalf of Farallon" because, although he was the designated representative to make litigation decisions on behalf of Farallon, he was not authorized to sign the engagement letter on Farallon's behalf. Only Rivera was.[35]

Counsel then argues that the engagement letter was confusing and that the BF attorneys and Storch recognized this fact. In her comments on the November 8th draft of the initial engagement letter,[36] Storch wrote to Balestriere regarding the "Designation of U.S. Agent" section: "THIS IS HIGHLY PROBLEMATIC. WHAT IF JUAN TELLS US TO DO ONE THING AND JON ANOTHER. We need to more carefully define who is the client here, and to whom our duties run."[37] The Arbitrator notes, however, that on the final version of the engagement letter a phrase and a sentence were inserted at the point where Storch made the above comment, which had the effect of clarifying somewhat Bernstein's authority.[38]

---

[33] Post-Hearing Brief of White Lilly and Jonathan A. Bernstein ("Bernstein Post-Hearing Brief") at 8; Ex. 15 at 14.
[34] Bernstein Tr. 1179-80; Bernstein Post-Hearing Brief at 10.
[35] Bernstein Post-Hearing Brief at 11.
[36] Ex. 7123.
[37] Ex. 7123 at 5290.
[38] Ex 15 at 14.

The issue of "who Jon Bernstein signed on behalf of" arose again in early February 2015.[39] At that time, BF associate Jillian McNeil emailed Balestriere and Marc Natale of BF to say "[w]e need to figure out who Jon Bernstein signed on behalf of ...." Natale wrote back the next day and supplied Bernstein's name and company information, putting "**White Lilly, LLC**" in bold letters. Balestriere then responded to both by saying "I think we should have a new letter, same terms, with ... Jon B signing on behalf of White Lilly."

But Balestriere never did that. Instead, he wrote to Natale and McNeil on March 13, 2015, commenting on what would become the March 17, 2015, engagement letter, and stating with respect to the signature line for Bernstein that there was "no need to reference on whose behalf as that's what he did before."[40] His reasons for not changing the signature line to make White Lilly the signatory and instead leaving the signature line as it was before were never brought out in testimony. He may have thought it was ambiguous and best to leave it that way, or maybe he thought it was clear because of the way Bernstein signed the first engagement letter and Rachel Davidson's clarification that he was signing it personally, or perhaps he thought there were good reasons why White Lily could not be a party (e.g. the ethical problems, noted above, related to having an agent of a litigation funder give litigation directions to an attorney). Without further testimony, the failure to change the signature line does not prove that the agreement was ambiguous.

In December 2017, an associate at BF, Matthew Schmidt, also expressed some confusion as he was drafting potential claims against Bernstein and Rivera:

> I have some engagement letter questions for the notice of claim, since the entities seem a little confused and I want to make sure I'm not missing something, including some other agreement that I don't have.

---

[39] Ex. 7308.
[40] Ex. 7357.

Strictly speaking, the only client in the original letter (i.e., the entity defined as "you") is Farallon. Juan and Jon also signed personally, but there's no real language here beyond the salutation linking them to most of the provisions.

***

Is there some other agreement that I should be working off of here, or is there some nuance that I'm missing. These agreements seems [sic] different from how we've been proceeding.[41]

It should be noted, though, that Schmidt was not even employed by BF when the engagement letter was signed and, therefore, his comment is from someone who had no direct knowledge of the facts and circumstances surrounding Bernstein's signature. His questions could also be only a preliminary reaction based on incomplete information. He was never called as a witness at trial to explain his comments although he was on the witness list.

Based on the foregoing, Bernstein's counsel argues that the engagement letters are ambiguous and that the burden of ambiguity in an engagement letter falls squarely on the lawyers. In this regard, the New York Court of Appeals has said:

> The importance of an attorney's clear agreement with a client as to the essential terms of representation cannot be overstated. The client should be fully informed of all relevant facts and the basis of the fee charges, especially in contingent fee arrangements (Code of Professional Responsibility, EC 2-19, EC 2-20; *see generally,* Wolfram, Modern Legal Ethics § 9.4). While, in the law generally, equivocal contracts will be construed against the drafters, courts as a matter of public policy give particular scrutiny to fee arrangements between attorneys and clients, casting the burden on attorneys who have drafted the retainer agreements to show that the contracts are fair, reasonable, and fully known and understood by their clients *(Jacobson v Sassower,* 66 NY2d 991, 993; *Gair v Peck,* 6 NY2d 97, 106, *cert denied* 361 US 374; *see also,* 1 Speiser, Attorneys' Fees §§ 2:3, 2:9).

***

> In order to avoid the consequences suffered here both by the client and by the lawyer, it is essential that the terms of representation--particularly in matters as fundamental, foreseeable and commonplace as those before us today-- be set

---

[41] Ex. 8815.

down with clarity. And the onus is upon the lawyers who draft such agreements to do so.

*Shaw v. Manufacturers Hanover Tr. Co.*, 68 N.Y.2d 172, 176-179, 499 N.E.2d 864 (1986) (emphasis added).

The Arbitrator agrees that the operative engagement letter is not a model of clarity, but on the particular facts of this case can it be deemed ambiguous such that it should be construed against BF? The Arbitrator thinks not. A key factor is that Bernstein is a sophisticated lawyer, who knew what he was doing, not an ingenue susceptible to being misled.

As noted, he crossed out the language in the original letter of November 20, 2014, so that it left only his signature without any qualification that he was signing in a limited capacity or as an agent for someone else. This was after Rachel Davidson of his office had written to state expressly that he was signing on his own behalf and not on behalf of Farallon and in the face of a clause stating that by signing the engagement letter he was personally undertaking all the obligations contained in the letter. He then signed the subsequent engagement letter of March 17, 2015, by simply signing his name without any qualification whatsoever, and, thereafter, paid bills, professed an inability to pay more, and acted in all respects as though he were a client.

Tellingly, as previously noted, there is no indication in any of the voluminous documents in this case that he claimed he was not a client until this arbitration was commenced. And then, even though his attorneys had attempted to construct an argument that he signed only as a representative of Farallon, he testified that he did not sign on behalf of Farallon but instead on behalf of White Lilly. This testimony is simply not credible in light of the fact that White Lilly was not a party to the engagement letter and is not mentioned anywhere in it, not to mention the previously stated ethical problems of having Bernstein make strategic decisions regarding the arbitration while acting as the agent of a litigation funder.

19

For the above reasons, the Arbitrator finds that BF has proven by a preponderance of the evidence that Bernstein signed the operative engagement letter, dated March 17, 2015, in his personal capacity as a client of BF. He further finds that White Lilly did not sign the engagement agreement and, therefore, is not entitled to assert any claims under the agreement.

**B.    Is Bernstein Liable on an Account Stated?**

A law firm client who receives invoices and fails to object to them promptly is obligated to pay them as an account stated. See *Mintz & Gold LLP*, 125 A.D.3d at 490 (law firm entitled to judgment as a matter of law on account stated claim where it sent invoices to client and client failed to object until collection action was commenced); *Lapidus & Assocs., LLP v. Elizabeth St., Inc.*, 92 A.D.3d 405, 405 (1st Dep't 2012) (law firm entitled to summary judgment on account stated claim where "record demonstrates that [clients] failed to dispute that [law firm] sent them the subject invoices and that no objections were lodged thereto until after this action had been commenced. . ."); *Shaw v. Silver*, 95 A.D.3d 416, 416 (1st Dep't 2012) (affirming judgment for lawyer and holding that "where an account is rendered showing a balance, the party receiving it must, within a reasonable time, examine it and object, if he disputes its correctness.") (internal quotation marks omitted); *Liddle, O'Connor, Finkelstein & Robinson v. Koppelman*, 215 A.D.2d 204, 204 (1st Dep't 1995) (law firm established account stated where law firm sent "monthly bills setting forth the services performed and the balance due," and client failed to make "timely objections" to bills); *O'Connell & Aronowitz v. Gullo*, 229 A.D.2d 637, 638 (3d Dep't 1996) ("An attorney can recover under [account stated] with proof that a bill, even if unitemized, was issued to a client and held by the client without objection for an unreasonable period of time. . . ."); accord *Thelen LLP v. Omni Contr. Co.*, 79 A.D.3d 605, 606 (1st Dep't 2010); *Cohen Tauber Spievak & Wagner, LLP*, 33 A.D.3d 562, 562–63 (1st Dep't 2006) ; *Morrison Cohen Singer & Weinstein, LLP v. Waters*, 13 A.D.3d 51, 51 (1st Dep't 2004); *Moses*

*& Singer, LLP v. S & S Machinery Corp.*, 251 A.D.2d 271, 271 (1st Dep't 1998);

*Shea & Gould v. Burr*, 194 A.D.2d 369, 369 (1st Dep't 1993); *Paul, Weiss, Rifkind, Wharton & Garrison v. Koons*, 4 Misc. 3d 447, 452 (Sup. Ct. N.Y. Cnty. 2004).

Partial payment of invoices or a professed inability to pay can also support a claim for an account stated. See *Morrison Cohen Singer & Weinstein*, 13 A.D.3d at 52 ("The rule to which we have adhered and which we now reiterate is that either retention of bills without objection or partial payment may give rise to an account stated."); *Carey v. Mui-Hin Lau*, 140 F. Supp.2d 291, 298 (S.D.N.Y. 2001) (a client sets an account stated when he makes an "acknowledgment of inability to pay") (citing *Moses & Singer, LLP*, 251 A.D.2d at 271).

## 1. Discounted Fees

The question, thus, becomes whether Bernstein objected to specific invoices received or made partial payments or acknowledged an inability to pay. It is undisputed that Bernstein received each of the invoices on which the firm's claims are based.[42] Each invoice included detailed time entries for each timekeeper who worked on the matter in the period covered by the invoice, an itemization of expenses, copies of any significant vendor bills, a summary showing the amount accrued at discounted rates for each timekeeper.[43]

These invoices were only for discounted fees, not for any additional success fee or undiscounted fee that might become applicable upon a "recovery" as defined in the engagement letter. Although the invoices also showed the amount of undiscounted fees, these amounts could not be billed yet because there had not been any "recovery." Presumably, the undiscounted amounts were included just to show the amount of savings received as a result of the fees being discounted. If undiscounted fees could not have been billed yet, there could not have been, by

---

[42] Exs. 204-209, 211-239; Balestriere Tr. 213:22-24; Bernstein Tr. 1186:10-16.

[43] Exs. 204-209, 211-239; Balestriere Tr. 214:3-220:3.

definition, an "account stated" based on a failure to pay these fees, as opposed to the discounted fees.

On one occasion early in the representation, in April 2015, Ms. Davidson in Bernstein's real estate office identified a calculation error on invoices. But within one day the firm acknowledged the error, addressed it, and issued corrected invoices.[44] Accordingly, this is not currently in dispute.

In his pre-hearing brief Bernstein identified four occasions on which he or Rivera disputed invoices, but none of these were instances where they disputed the correctness of an invoice or that the amounts shown on the invoice were owed:

- On 4/24/15 Rivera sends an email, not contesting any invoice or charge, but rather questioning whether time on weekly calls and internal discussions was valuable; Balestriere responds substantively; issue never raised again; Bernstein does not participate in exchange.[45]

- On 6/15/15: Rivera sends an email, not contesting any invoice or charge, but rather asking for an estimate going forward and noting high burn rate; Balestriere responds substantively; Mr. Bernstein does not participate in exchange.[46]

- On 8/11/15 Rivera sends an email, not contesting any invoice or charge, but rather asking for an estimate going forward; Balestriere responds substantively; Bernstein does not participate in exchange.[47]

- On 10/7/15 Bernstein sends an email in response to an invoice saying, "this is getting penal," but does not contest the invoice or any charge on it; Balestriere responds substantively explaining why litigation is expensive; Bernstein responds by writing: "It's litigation, I get that. You guys have been great. I'm not suggesting we slow down."[48]

In his post-hearing brief, Bernstein does not mention the above instances and seems to have dropped his argument that these communications constitute "disputes" about invoices. In

---

[44] Exs. 43, 44; Balestriere Tr. 224:4-225:5; Bernstein Tr. 1193:21- 1195:12.
[45] Ex. 7402.
[46] Ex. 7481.
[47] Ex. 7541.
[48] Ex. 7664.

his post-hearing brief, however, Bernstein does point out later instances in which he complained about the "fiasco" into which Storch and Balestriere's advice had plunged him and Rivera[49] and repeatedly complained about the hourly fees. He objected to being billed for Matthew Schmidt's time, or anyone else's time, other than Balestriere's alone, in connection with the settlement that was being negotiated. On December 4, 2017, Bernstein wrote to Balestriere, in an email with the subject line "Bills,"

> You and I have agreed Matt isn't to participate in the settlement, yet here he is, together with lots of other people. I thought we agreed no one on your team but you. We will handle all docs. I don't need or want Matt involved, or anyone else.[50]

Bernstein explained in his testimony at the hearing that once a settlement in principle was reached with Cargill in mid-2017, he did not need, or want, any further assistance from litigators. He testified that he and his in-house real estate attorneys were competent to draft and review settlement documents, and he saw no value in paying BF lawyers to review a proposed contract. He says he reluctantly agreed that Balestriere himself—but only Balestriere—could stay involved,[51] because BF had a potential financial interest in the settlement. However, Balestriere ignored that instruction. So Bernstein complained every time he saw time charges for lawyers other than Balestriere, or non-lawyers, on the bills.

Thus, Bernstein complained on August 21, 2017, saying "at this point I don't feel we need mast [Matt] or Julian [Jillian] reviewing docs. You and I are just fine." Balestriere wrote back, "Understood and no worries."[52] On September 14, 2017, Bernstein reiterated, "Again, I want to save money. Please I do not need either Matt or Jillian billing in connection with the

---

[49] Ex. 8410.
[50] Ex. 8791.
[51] Bernstein Tr. 1132-36, 1364-65.
[52] Ex 8628.

23

settlement." Again, Balestriere wrote back, "I completely understand."[53] On September 16, 2017, Bernstein wrote, "I feel the need to repeat at this point we simply do not need anyone else from your office. You and I can easily handle all discussions and documentation. Having Matt on the call last night was a luxury we do not need." Balestriere wrote back defending his deviation from Bernstein's instructions but adding "I get your point...."[54] Again, on November 8, 2017, Bernstein wrote, "But again, Matt should not be involved. I've tried to do this gently but I need now to be blunt: neither Juan nor I find his involvement in the settlement helpful. I've asked you repeatedly not to include him."[55] On November 21, 2017, Bernstein yet again demanded of Balestriere, "Please stop including Matt. He has no role here." In the same email chain he wrote "We don't need to pay Matt's hourly rate to get you on the line."[56]

Bernstein says that hundreds of thousands of dollars in time charges were incurred by the Balestriere firm *after* a settlement in principle was reached, and after Bernstein had directed the Balestriere firm, except for Balestriere himself, to stand down. Bernstein argues that he was restrained and polite about Balestriere's disregard of his instructions, but that does not transform his complaints into acquiescence.

Bernstein, however, does not relate the general complaints about too many people attending meetings to specific objections regarding specific invoices. He also admits that he mostly failed to review the invoices he received or have anyone else do so.[57]

Bernstein also ignores the law regarding partial payment of invoices or professed inability to pay and does not counter BF's allegations that he did both. *See, e.g.,* 3/14/16 email:

---

[53] Ex. 8632.
[54] Ex 8637.
[55] Ex. 8679.
[56] Ex 8705.
[57] Bernstein Tr. 1186:10-1188:17.

24

"I will get you money at my earliest opportunity;"[58] 7/25/16 email: "I will do my best" and "[w]ill pay as soon as I can");[59] 5/11/17 email: "No issue [making payment] just need to move some things around."[60] Even in 2018, after the Cargill settlement, Mr. Bernstein never questioned his obligation to pay and instead cited cash flow problems and made various payment-plan proposals.[61] The foregoing payments and assertions of inability to pay support a claim of account stated.

But Bernstein asserts that even if he had acquiesced by silence in every bill Balestriere sent, that should not bar him from challenging them now, because he had no idea that the "discounted rates" were fraudulent (that they were not discounted from rates that were truly standard rates) or that the strength of the case and its prospects had been misrepresented to him, or that Balestriere engaged in billing abuses, including billing his morning coffee and his bar tabs at night and even while on vacation.[62] He cites, *LLT Intern., Inc. v. MCI Telecommunications Corp.,* 69 F.Supp. 510, 517 (S.D.N.Y. 1999) (*quoting Kuczynski v. Miller,* 91 Civ. 6680, 1992 WL 309602, Aug. 21, 1992, (S.D.N.Y.) at *4) for the proposition that "[i]t is well established that 'fraud, misrepresentation or other equitable considerations' can 'prevent recovery under a theory of account stated.'"

Balestriere responds that the law Bernstein cites demonstrates that an invoice recipient attempting to rely on this fraud exception must prove that, unlike here, the invoices themselves were fraudulent, or that the sender concealed from the recipient material facts about the invoices. See *LLT Intern. Inc. v. MCI Telecommunications Corp.,* 69 F. Supp.2d 510, 517 (S.D.N.Y.

---

[58] Ex. 1379.
[59] Ex. 2355, at 4472.
[60] Ex. 500, at 6386.
[61] *See, e.g.,* Exs. 58, 74-77.
[62] *See* Tasher Report at pp. 77-80 and Ex. 10064 for a compendium of BF expense abuses.

1999). Balestiere asserts that even Bernstein does not claim the invoices themselves were fraudulent. He further notes Bernstein's lawyers chose not to ask any witness (neither Balestriere, nor Natale, nor Storch, nor even Bernstein) any questions about any invoice. They also chose not to call Mr. Schmidt, Ms. McNeil, nor any of the other half dozen firm employees on their witness list to ask any of them questions about invoices.

The burden of proof is on Bernstein to establish that the invoices were fraudulent. The Arbitrator agrees that the definition of standard rates in the engagement letter left much to be desired (*i.e.,* it was basically undefined) and that BF was not using as standard rates for its attorneys the rates that it normally charged a majority of its clients. In so doing it was pushing the envelope, but by the same token, much of BF's work was on a contingency or on blended rates, so it is difficult to say what its "standard" was. BF seems to have been defining "standard" as the rate it would try to charge clients in undiscounted or non-contingency matters. The arbitrator also agrees that there are instances where inappropriate expenses may have been charged to Bernstein by Balestriere on days when he was doing very little work on the case. This may be true, and if so, was a very questionable practice. Nonetheless, as noted, Bernstein chose not to call Mr. Schmidt, Ms. McNeil, nor any of the other half dozen firm employees on their witness list to ask any of them questions about invoices. Therefore, the Arbitrator concludes that Bernstein has failed to establish by a preponderance of the evidence that the invoices submitted were actually fraudulent.[63]

For all the above reasons (including Bernstein's failure to object to specific invoices, his failure to even read most of the invoices, his making partial payments on the invoices, his

---

[63] Bernstein in his Post-Hearing Brief devotes only one paragraph, and one bullet point elsewhere that largely repeats what was in the paragraph, to discussing the issues of allegedly improper rates and expenses. Bern. Post-Hearing Brief at 64, 53-4.

professing an inability to pay more on the invoices, and his failure to establish that the invoices were fraudulent), the arbitrator finds that Claimants have established an account stated against Bernstein for the discounted fees he was billed.

## 2.    Success Fee (Whether Taken as an Undiscounted Fee or Otherwise)

What has been said thus far only relates to discounted fees and not to any amounts that were allegedly owed as a "success fee." It is fair to say that at the time settlement discussions began with Cargill in earnest in 2017, all parties understood that the amount of the success fee was disputed and would have to be negotiated. After all, Balestriere had lost all four cases at that point in time. Mr. Verde, counsel for Cargill testified at the hearing that Balestriere had achieved nothing that Cargill had not been willing to give to Rivera and Bernstein before any litigation had begun, and, thus, that Balestriere had, in essence, achieved no success. Regardless of whether that is believed, however, it is certain that the parties disputed the amount of the success fee.

Balestriere acknowledged in an email to Bernstein dated September 26, 2017, that the success fee was an open issue: "You have asked me to be very reasonable on the success fee and I've always said I would be, and I will be."[64]  He acknowledged it again in one of the March 12, 2018, emails in which he exhorted Rivera and Bernstein to send the settlement proceeds to be held in his escrow account: "we are not modifying the engagement agreement until the three of us sit down to do so and come to an agreement on how it should be modified, if that is even necessary. I have always said I will be reasonable and my conduct for years now bears that out."[65] This was not a situation, as Balestriere's expert Professor Simon suggested, where a client "would like to try to negotiate a discount, or expresses a general wish to modify the fee

---

[64] Ex. 11255.
[65] Ex. 8862.

arrangement."[66] Here, the lawyer expressly acknowledged that the "success fee" would have to be negotiated and stated that he would "be reasonable" in attempting to achieve an acceptable resolution of a fee as to which there self-evidently was no present agreement.

Balestriere not only knew that there was a dispute over the success fee that had to be negotiated; he also knew that if the negotiations failed, an arbitration would follow. On March 12, while asking for the $1.4 million escrow payment he said: "I expect we will sit down and work out everything but the agreement also contemplates mediation and arbitration if needed."[67] These are not the words of someone whose position is that his entitlement is clear, there is no disagreement, and he is merely being asked to provide a discount that he has no reason or obligation to provide.

The dispute over the success fee was anticipated in the March 17, 2015, engagement letter.[68] This letter has two provisions. One deals with "Money in Trust," which reads in pertinent part as follows:

> Money in Trust. You will be required to pay the Firm money to hold in trust against which fees and/ or expenses would be charged, and as a security deposit for payment of any delinquent monthly, hourly, or out of pocket fees, if applicable….
>
> Any money held in trust and not used for fees and/or expenses will, of course, be promptly returned to you after our services have ended. You agree that if you are late in making any monthly payments, or the Firm has incurred hourly or any other fees or expenses and our work on the matter is completed, the Firm shall be permitted to take the current monthly fee payment or any other fees or expenses due from these funds held in trust.[69]

---

[66] Simon Expert Report, ¶27.
[67] Ex. 8862.
[68] Ex. 15.
[69] *Id.* at 8.

This is the provision that allows BF to take any undisputed, discounted fees to pay its bills and which permits it to claim an account stated when there have been no objections to the bills.

The other provision entitled "Payment," reads in pertinent part as follows:

Payment. The Firm shall receive the actual payment for any Recovery or portion of the Recovery into the Firm's trust account. The Success Fee regarding which there is no dispute shall then be paid to the Firm and/ or the Storch Firm in accordance with their joint fee arrangement. Then, expenses advanced by the Firm, if any, will be deducted from the remainder of the Recovery and paid to the Firm. Finally, the remainder will be paid to you. However, if there is any dispute regarding fees, only the amount in controversy shall be maintained in trust, in an escrow account with interest accruing to the benefit of the prevailing party. If there is any dispute regarding fees, then the non-prevailing party shall pay the prevailing party's attorney's fees and court costs incurred in resolving the fee dispute.[70]

The above section, on its face, anticipates a dispute regarding any success fee and potential litigation regarding the same.

In sum, unlike the case with respect to the discounted fees, (1) there was no holding of bills relating to success fees without disputing them or without paying them;[71] (2) there were no partial payments or professed inability to pay them; (3) there was a vigorous dispute as to what amount was owed; and (4) the engagement letter actually anticipated such disputes with respect to success fees. For all these reasons, the Arbitrator finds that Balestriere has failed to establish an account stated as to any success fee.

Before turning to Balestriere's count for breach of contract (as opposed to his account stated claim), the Arbitrator will take a slight detour to examine the conduct of Balestriere in taking money from the firm's trust account in light of the disputed nature of the success fee and the above-quoted provisions of the engagement letter.

---

[70] Id.
[71] Although the bills for the discounted fees also showed the amount of the undiscounted fees, this was just to show the amount of savings allegedly achieved by the use of discounted fees. Bernstein was not being billed for the undiscounted fees or expected to pay them at that time.

## C. Did Balestriere Improperly Take Money from the Firm's Trust Account?

The sequence of events leading up to Balestriere's taking funds from the trust account

(with some omissions discussed later) was essentially as follows:

- On March 12, 2018, Balestriere received an email from Tere Ojeda, a business colleague of Rivera, enclosing the signed contract entitled "Agreement to Transfer Settlement Funds" that provided for settlement proceeds to be held in the Balestriere trust account.[72] In the email, Ojeda said: **"Consistent with the conversations you have had with Juan Diaz Rivera regarding the use of these funds, the enclosed document is signed with the understanding that funds will remain in escrow in your trust account until you, Mr. Jon Bernstein/Juan Diaz Rivera as partners agree on their use and destination."**[73]

- In response to Ms. Ojeda's email, Balestriere emailed back: "Regarding your point below Juan and I discussed and the protections afforded to all by the engagement agreement obviously applies here."[74]

- Rivera then emailed Balestriere to say: **"It's essential to my family that funds from this are not touched and remain in your trust account until we have a three way agreement on how they are applied. Jon [Bernstein] assured us this was his understanding as well."** [75]

- In response, Balestriere wrote to Diaz Rivera that:

  **"[the] engagement agreement specifically contemplates us having a discussion regarding distribution of not just moneys but real estate.... I expect we will sit down and work out everything but the agreement also contemplates mediation and arbitration if needed. I agree on scheduling the meeting ASAP."**[76]

- As the above exchange was occurring, Bernstein echoed Rivera's instructions with an email to Balestriere and Diaz Rivera stating: **"Absolutely. Nothing gets touched until we all agree."**[77]

- Balestriere responded to Bernstein's email by stating:

  "Emails crossed. **I state the obvious when I write that I'm not going to violate my lawyer duties to anyone here by playing games with any funds, real estate or**

---

[72] Exs. 10009, 10010.
[73] Ex. 8864.
[74] Id.
[75] Id.
[76] Ex. 8862.
[77] Ex. 8864.

**anything else. Such obligations go beyond the engagement agreement or any one relationship with any client."**[78]

- In another email to Diaz Rivera that day, Balestriere said:

  **"... I commit again in writing to meet all my obligations to you and Jon, as your lawyer and under the engagement agreement. I'm not picking and choosing: I will meet all of them.**

  Let's get this first stage done and then sit down to discuss how we move forward."[79]

- On the wire instructions of March 21, 2018, which was the transfer of approximately $1.4 million, the following language was included in the instructions themselves, in the section entitled "Originator to Beneficiary Information" and in the section entitled "Bank to Bank Information":

  o line 1: "Escrow deposit in Trust Account."

  o line 2: **"Disburse based on mutual agreement."**[80]

- On the same day the March 21, 2018, wire was sent, Rivera sent a copy of the wire instructions to Balestriere and Bernstein as an attachment to an email in which he stated, "See enclosed. When will we meet to discuss these funds?"[81]

- When asked at the hearing how he squared this email with his testimony that Rivera expected these funds to be applied to Balestriere's fees as opposed to holding them in his trust account pending a discussion about how they were to be divided, Balestriere's answer was, "It's an unfair question."[82]

Bernstein's ethics expert, Professor Yaroshefsky described Balestriere's conduct as

follows:

"...he basically leads his client to believe, put the money in trust, I'm going to leave it there, we're definitely going to leave it there, I would never violate my obligation, doesn't tell the client that he intends to take out the funds that he believes he is owed. **That certainly constitutes deceit under our ethics rules, under Rule 8.4, and he's also making false statements of fact to a client under Rule 4.1.**"[83]

She also testified:

---

[78] Ex. 8864.
[79] Ex. 8865.
[80] Ex. 8877.
[81] Ex. 8876.
[82] Bernstein Tr. at 870.
[83] Yaroshefsky Tr. at 2183-84.

"Lawyers owe clients a very high level of candor and complete transparency, especially when it comes to escrow funds and how they're received and how they're maintained or withdrawn, so **certainly it is my view here that there was deceit.**

\*\*\*

Lawyers get disbarred for engaging in that kind of conduct."[84]

The Arbitrator agrees. Even the book of Balestriere's expert, Professor Simon, warns against taking money from a client's escrow account. In the book, Professor Simon states that Rule 1.15 prohibiting escrow theft is the "most strictly enforced rule in New York's Rules of Professional Conduct, as to which "even minor unintentional infractions...are met with swift and often harsh discipline," and warns that lawyers must not be tempted to take escrow funds just because they subjectively believe that they are entitled to do so, because "that is an ethical mistake."[85]

Despite the above language from his book, Professor Simon opined that Balestriere had not only the right but the obligation to engage in self-help and take the money.[86] In the Arbitrator's opinion, he arrived at this conclusion by improperly conflating the "Money in Trust" and "Payment" provisions of the engagement letter. Thus, he argued that the "Money in Trust" provision, which by its terms concerns *only* funds that are purposefully paid by the client into the trust account for the express purpose of being drawn down to pay hourly fees, gave license to Balestriere to draw down any other funds that got into his escrow account by other means, including settlement proceeds that are expressly governed by a different provision, namely the "Payment" provision. That latter provision explicitly states that only settlement proceeds as to which there is no dispute may be withdrawn to pay fees. There is a substantial difference

---

[84] Yaroshefsky Tr. at 2312.
[85] Simon's New York Rules of Professional Conduct Annotated, 2017 Ed., at pp. 880, 902.
[86] Simon Tr. 518-19.

between funds that the client *intends* to be drawn on by the attorney to pay fees; and settlement proceeds that the client intends and expressly states are being provided subject to those funds remaining in escrow until all concerned agree on how to divide them. In the Arbitrator's opinion Professor Simon' opinion did not take account of this significant distinction.

Professor Simon also claimed against clear evidence to the contrary, that it was not his "understanding" that Rivera intended that the $1.4 million in settlement proceeds remain in Balestriere's trust account pending agreement among Bernstein, Rivera and Balestriere regarding their division.[87] Both Rivera and Bernstein, explicitly instructed Balestriere not to touch the money, and Balestriere replied, "I'm not going to violate my lawyer duties to anyone here by playing games with any funds, real estate or anything else. Such obligations go beyond the engagement agreement or any one relationship with any client."[88] For these reasons the Arbitrator finds Professor Yaroshefsky's opinion more persuasive than Professor Simon's.

Balestriere claims, however, that Yaroshefsky was given a set of "assumed facts" and that she did not have all of the evidence before her. The other facts that Balestriere mentions, however, do not change the conclusion that Balestriere's conduct was completely inappropriate.

For example, Balestriere notes that during negotiation of the Cargill settlement, Mr. Balestriere made an accommodation—which he did not have to make—permitting certain settlement funds to go directly to accounts controlled by Mr. Diaz Rivera rather than to the firm's escrow account, as expressly required under the engagement agreement. This was done to permit Rivera to pay taxes in Mexico. Had Mr. Balestriere not made that accommodation, the settlement proceeds would have gone directly to the firm's escrow account. Thus, according to

---

[87] Simon Tr. 587.
[88] Ex. 8864.

Balestriere, had he not voluntarily made that accommodation, the March 12 email issue would never have arisen.

The Arbitrator agrees that the issue **may** not have arisen, but in the alternative scenario in which Cargill would have sent the funds directly to the firm's trust account, we do not know what emails Bernstein and Rivera might have written before Cargill directly sent the money. They could have written again "don't touch the funds." And we do not know what Balestriere's response might have been in such circumstances. The parties could have ended up in the same situation. In any event, Balestriere did make the accommodation and the March 12 email issue did arise, leading to ethically inappropriate conduct by Balestriere.

Balestriere also contends that when he made the accommodation that the funds could be sent to Rivera first, he told Rivera that the proceeds could be used to pay down the balance owed to his firm as a result of Rivera and Bernstein having paid no invoices for approximately two years.[89] This testimony is, of course, self-serving, but he says this was memorialized in a Wire Transfer Agreement and related email exchange, which established the procedures for Rivera's promptly returning most of the funds sent to him in Mexico into the firm's trust account.[90]

The Wire Transfer Agreement, however, does not expressly state that Balestriere could take funds out of the trust account. Instead, it vaguely states, "…the Parties desire to ensure that resulting settlement funds are, consistent with the email agreement dated January 24, 2018, attached hereto as Exhibit A, transferred to a trust account of the Firm **for appropriate distribution**." (emphasis added).[91] "Appropriate distribution" could mean, among other things,

---

[89] Bal. Tr. 858:25-859:22.
[90] Ex. 46.
[91] *Id.* at 7700.

that the funds only be distributed after agreement of all the parties as set forth in the previously

quoted chain of emails.

The referenced email agreement of January 24, 2018, attached as Exhibit A, is equally

vague. It simply says:

> … you agree that you will not provide… any instructions to the bank or banks **that contradict our agreement regarding the transfer of funds** \*\*\*

> After our firm receives the funds into our trust account, **which will be deemed to be received in trust, we will then proceed consistent with our existing engagement agreement as if the funds had been transferred to our account by Cargill in the first instance.**

> Other than the settlement funds going through other accounts on their way to our trust account, **we are not agreeing to modify any other part of the engagement agreement between us,** and we reserve all rights. **We agree that the handling of settlement funds** that we agreed to when our firm was engaged back in 2014- **in which all funds go to our trust account- is important because they serve to protect not only our firm, but also you, Jon, and Adina.**

> (emphasis added).[92]

The bolded language in the first paragraph above is vague and could simply refer to the

agreement that all funds would be re-transferred promptly from Mexico into the firm's trust

account after paying Mexican taxes.

The bolded language in the second paragraph is equally vague. Simply saying that the

funds will be handled in accordance with the existing engagement letter as though the funds had

been transferred to the trust account in the first instance by Cargill does not undo the express

instructions to Balestriere not to touch the funds. It also does not take account of the fact that

these were settlement proceeds and governed by the "Payment" provision of the trust agreement,

which provides that disputed funds shall be kept in the trust account. In fact, the underlined

---

[92] *Id.* at 7709.

portion of the bolded language reiterates that the payment "will be deemed to be received in trust."

The bolded language in the last paragraph to the effect that Balestriere is not agreeing to modify any part of his engagement agreement is similarly vague, plus it goes on to say that the engagement protects not only his firm but Juan Diaz Rivera and Jon Bernstein as well. Balestriere may well have been thinking only of the "Money in Trust" portion of the engagement letter, but the email exchange must also be read in light of the "Payment" provision, which provides that disputed success fee funds cannot be touched.

Balestriere also makes note of a further email exchange with Rivera after the March 12th series of emails but before Rivera wired the funds to the trust account, in which he mentioned that a vendor that Rivera and Bernstein were supposed to have paid, but did not, had sued the firm.[93] In the email, he explains that the case is close to trial, but he has negotiated a discount and "if we get the funds taken care of in the coming days we can save you and Jon over $100,000."[94] Rivera replies, "Great to hear John."[95]

Balestriere argues that the above email exchange shows that Rivera knew he was going to take funds from the trust account to pay a vendor. That may be, although nothing in the language says that the funds will be taken without the consent of Rivera and Bernstein. And even if it is implied that the funds would be taken without consent, it is one thing to take out limited funds to pay a debt for which your clients are responsible and quite another to take out all of the funds in the account to pay your own fees.

---

[93] Ex. 4034 at 8197-98.
[94] *Id.* at 198.
[95] *Id.* at 197.

Balestiere also claims that Bernstein's mock outrage is revisionist history and that there is not a single email in the record in which he complained about any "misappropriation" until after this collection action commenced.[96] He notes that later in May of 2018, far from complaining about an escrow theft, Bernstein attempted to ensure that title to El Rincon, a piece of property in Mexico involved in the Cargill settlement, and an additional $3.5 million in cash settlement proceeds would be held in the firm's escrow account, and not sent to Rivera, because he did not trust Rivera.[97]

He also notes that in June and July of 2018, Bernstein and Rivera engaged in settlement discussions with Balestriere, exchanging a series of emails in which neither party once mentioned the escrow theft.[98] In one email Bernstein stated:

> We have 4 years of good mutual understanding and I would like to think that there is a solution that we can come to that works for us. As I have told you repeatedly, this isn't a good time for me financially right now, but I am optimistic about the future.[99]

In a second email Bernstein suggested possibly paying the firm more $2 million[100] and in a third[101] more than $5 million.

The above may be true, but one must keep in mind that Bernstein was engaged in settlement discussions at the time these comments were made, and Balestriere was threatening to sue Bernstein and Rivera: "I still don't see an appreciation of the fact that in a year, with statutory interest, we will have a judgment for at least $10MM, plus our attorney's fees."[102] If one wants to avoid a lawsuit, one wants to be diplomatic with the other side. Accusing the other

---

[96] Bernstein Tr. 1222:5-1223:5.
[97] Bernstein Tr. 1226:8-1234:23, 1476:19-1480:14; Exs. 90, 95, 53-55, 505.
[98] Exs. 74-77.
[99] Ex. 74 at 6805.
[100] Ex. 75.
[101] Ex. 77 at 6743.
[102] Ex. 76 at 6863.

side of theft of escrow funds would not likely help. Even without such accusations, Balestriere

reached a point of rage just before instituting this arbitration:

> I really don't care about any more signs of supposed good faith or similar bullshit.
> I have seen from Juan and you absolutely no good faith for years while I invested
> millions in a case that yielded you and Juan a recovery worth as much as $20
> million. A dozen hours on the phone is not good faith. I want a very specific
> schedule regarding how we get paid – including a substantial payment near
> immediately that I know two very rich men can somehow muster – or I'm going
> to sue or notice a claim against you, Juan, Leticia, DIPSA, and anyone else who
> owes us fees.

> ...any disinclination I had against proceeding against you have [sic] gone out the
> window with Leticia's email and now your seeming lack of interest in
> participating in the June 15 meeting, instead having the balls to ask me to fly
> down to Florida – spending more of my time, which you have made clear you do
> not value at all, and more of my money, which you're happy to have me spend, as
> you have for two years, while you pay us nothing.

> You and Juan are jointly liable for the entire amount due. You'll get a final
> invoice and I refer you to that for exact numbers, but given the Misconduct we are
> withdrawing, meaning we are due full freight fees plus the Success Fee, such that
> you and Juan owe just about $14.5 million. I'm willing to have a discussion about
> that, but I'm done being jerked around. If you don't want to discuss, please advise
> and we can simply litigate.

> ...I'm not wasting any more of my time; in two and a half weeks we have a fully
> executed deal regarding how our firm gets paid, or we have a litigation and
> arbitration.[103]

In fairness to Balestriere, he had been litigating four complex actions on behalf of Rivera

and Bernstein, but the clients had not paid even his discounted fees for approximately two years.

The Arbitrator is willing to believe that Balestriere felt in his own mind that he was entitled to

take the money in escrow to pay off the unpaid discounted fees. The interplay between the

Money in Trust and the Payment provisions of the engagement letter is not simple, and

Balestriere may have been thinking of only the "Money in Trust" provision when he took the

---

[103] Ex. 8973.

funds. He also was justifiably upset when he discovered that Rivera had only wired a portion of

the funds that he was supposed to.

But, nonetheless, none of the foregoing justifies taking the funds from the escrow account

in the face of explicit instructions from both clients not to touch the funds until there had been

agreement of all clients, and after having misleadingly replied to them:

> I'm not going to violate my lawyer duties to anyone here by playing games with
> any funds, real estate or anything else. Such obligations go beyond the
> engagement agreement or any one relationship with any client.[104]

> [the] engagement agreement specifically contemplates us having a discussion
> regarding distribution of not just moneys but real estate.... I expect we will sit
> down and work out everything but the agreement also contemplates mediation
> and arbitration if needed. I agree on scheduling the meeting ASAP.[105]

> I commit again in writing to meet all my obligations to you and Jon, as your
> lawyer and under the engagement agreement. I'm not picking and choosing: I will
> meet all of them.[106]

Balestriere may have felt he was justified, but as Professor Simon warns in his book,

lawyers must not be tempted to take escrow funds just because they subjectively believe that

they are entitled to do so, because "that is an ethical mistake."[107]

> **D.    What Amount of Fee Forfeiture is Appropriate for Balestriere's
> Inappropriate Taking of Funds from the Client Escrow Account, and Is
> Bernstein also Entitled to Treble Damages and the Return of the
> $222,5000 in Fees he Paid for the ICC Proceeding?**
>
> **1.    Fee Forfeiture**

Professor Yaroshefsky testified that there should be a total fee forfeiture:

> [W]hen I looked to all the various factors, I determined that fee forfeiture was
> warranted here.

> It was the escrow misappropriation here [which] is among the most serious of all
> violations in New York. We take extremely seriously the fact that lawyers are

---

[104] Ex. 8864.
[105] Ex. 8862.
[106] Ex. 8865.
[107] Simon's New York Rules of Professional Conduct Annotated, 2017 Ed., at pp. 880, 902.

given moneys in trust by clients, clients are expected to be able to trust their lawyers, and taking money from escrow is theft and we've considered it theft for a long period of time. So we have very significant rules to prevent that.

So here we have escrow misappropriation. The amount misappropriated was very significant. As I said, it was accompanied by deceit. This misappropriation did not happen inadvertently, it was quite deliberate, and it occurred at a time when the entitlement to the $1.4 million...was awaiting imminent negotiation by the parties. And at the time of the misappropriation the lawyers had been preparing to sue their clients for the better part of a year. When one considers all of those factors in light of the fact that Balestriere, in the past in the Southern District, had been cited also for escrow misappropriation, the way to hold a lawyer accountable here is fee forfeiture.

And so it is my opinion that these really egregious circumstances warrant total fee forfeiture.[108]

In addition to the factors cited by Professor Yaroshefsky, there are the additional facts that Balestriere was having financial problems at the time. His firm had had to pay off a judgment against it that was obtained by Counsel Financial in the amount of approximately $2 million. This was not paid off until 2016. Presumably because of the amount paid to Counsel Financial, the firm began to fall behind in its taxes in that year. These unpaid taxes began to accumulate.[109] Balestriere finally paid off over $1 million in back taxes to the IRS in April of 2018,[110] just one month after having taken the escrow funds in March. Specifically, Balestriere admitted that he "[a]dvised the IRS that... [he]... [was] expecting money from this case and, when money came in,... [he] used it to pay. [his] back taxes."[111]

In deciding the amount of fee forfeiture, Professor Yaroshefsky stated that the Arbitrator should assess "the conduct in its totality." She also confirmed that whether forfeiture should be total or partial rests within the sound discretion of the arbitrator, and that the forfeiture may

---

[108] Yaroshefsky Tr. 2185-89.
[109] Natale Tr. at 2353.
[110] Id.
[111] Balestriere Tr 433:20-434:14.

include not only the amount misappropriated from escrow but also any and all other fees obtained by the attorney.[112]

Although Professor Yaroshefsky opines that there should be a total fee forfeiture, she did not hear all the evidence. There were no angels here on either side. Bernstein and Rivera were both sophisticated businessmen, who had not paid their legal fees for two years and, therefore, contributed to Balestriere's financial difficulties. The Arbitrator suspects they had a suspicion that Balestriere would take the money despite his misleading emails, and, as previously noted, it is quite possible that Balestriere believed he was entitled to take the funds to pay the unpaid, discounted fees and that he was thinking only of the Money in Trust provision of the engagement letter.

Taking all factors into account, the Arbitrator holds that BF has forfeited the right to any fees above the discounted fees it has already billed. This forfeiture includes any "success fee," which it has now elected to seek in the form of its undiscounted fees. For clarity, that means that BF has forfeited its right to any undiscounted fees, but it may still recover the amount of unpaid discounted fees plus appropriate interest.

### 2.    Treble Damages

Bernstein also seeks treble damages, but in order to recover treble damages the "conduct must manifest spite or malice, or a fraudulent motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton." *Marinaccio v. Clarence,* 20 N.Y.3d 506, 986 N.E.2d 903 (2013). As noted, the Arbitrator has found that the conduct of Balestriere in taking funds from the client trust account was highly inappropriate, justifying a forfeiture of any success fee, but he does not find

---

[112] Yaroshefsky Tr. 2319-2322.

under all the circumstances that it constitutes conduct manifesting spite or malice or otherwise satisfies the test for awarding punitive damages. The Arbitrator also finds that awarding punitive damages on top of a forfeiture of a success fee amounting to millions of dollars would not be just and equitable in the current circumstances. Therefore, the Arbitrator denies Bernstein's request for punitive damages.

### 3. ICC Fees

In addition, Bernstein seeks a return of the $222,500 he paid in fees for the ICC arbitration. Bernstein, however, has not demonstrated any reason why he is not liable for any discounted fees or arbitration fees that he has already paid. For the reasons stated above he is entitled to a forfeiture of BF's success fee, but not to a forfeiture or return of any other fees he has paid. Therefore, the Arbitrator denies his request for a return of the ICC fees he has paid.

### E. Is Bernstein Liable for Breach of Contract?

#### 1. Bernstein Breached the Engagement Letter by Failing to Pay Discounted Fees

Bernstein's obligation to pay the amounts owed under the engagement agreement is clear on the face of the contract:

> By signing this Agreement, you acknowledge and confirm that you are bound to the terms of this Agreement and you are, in fact, bound to such terms. You also acknowledge that **you personally undertake and assume the full performance hereof, including payments of amounts hereunder.**[113] (emphasis added)

Bernstein breached this obligation by failing to pay outstanding discounted fees incurred during the engagement.[114] Thus, subject to discussion of Bernstein's defenses and counterclaims later in this Final Award, Bernstein is responsible for these discounted fees in contract as well as on an account stated. Of course, the reasons for BF's forfeiture of its right to any success fee is

---

[113] Ex. 15, at 6370).
[114] Exs. 204- 209, 211-239 (invoices).

42

equally applicable to its contract claim as to its accounted stated claim and, therefore, the Arbitrator denies any recovery of anything other than discounted fees on this contract count.

### 2. Bernstein Breached the Mandatory Arbitration Provision of the Engagement Letter

The engagement agreement also includes a mandatory arbitration clause, requiring that all disputes between the parties be submitted to arbitration.[115] Bernstein breached this obligation. After the firm commenced this arbitration in September 2018, Bernstein filed a lawsuit in the Southern District in January 2019. Bernstein sought not only to enjoin the arbitration, but he also pled 15 affirmative causes of action, including fraud, conspiracy, malpractice, and violation of the judiciary law. Judge Carter denied Bernstein's *ex parte* application for a TRO and then for a preliminary injunction to try to halt this arbitration, and when the firm moved to compel arbitration, Bernstein did not oppose.[116] Bernstein's court action violated the mandatory arbitration provision of the engagement agreement. The firm alleges it incurred legal fees and costs responding to the improper lawsuit.[117]

At the hearing and in his pre-hearing brief, Bernstein offered no defense or explanation for taking these actions in violation of the mandatory arbitration clause. Instead, he blamed the filings on his (current) lawyers and claimed not to understand their reasoning or basis for these actions made on his behalf.[118]

The Arbitrator finds that the lawsuit was without merit, and in breach of the arbitration clause. The burden of proof is on BF, however, to establish its damages, and the Arbitrator finds that it has largely failed to do this. BF has submitted four invoices in support of its claim that it

---

[115] Ex. 15, at 6370.
[116] Balestriere Tr. 253:19-257:5; Exs. 60-64 (federal court filings).
[117] Balestriere Tr. 257:6-19; Exs. 6309-6312 (invoices).
[118] Bernstein Tr. 1240:9-20.

incurred legal fees and costs responding to the Bernstein suit,[119] but the description of all the legal services has been redacted so that it is impossible to determine what work was supposedly being done.

The Arbitrator, however, can, and has, taken judicial notice of the publicly available docket sheet for the Bernstein federal court suit. On the defense side, it consisted mainly of an opposition, including a memorandum of law, to Bernstein's motion to enjoin the arbitration, and a motion, including a memorandum of law, in support of BH's motion to compel arbitration. This was essentially all the substantive work that was done. The parties thereafter agreed to proceed with the arbitration. Both memoranda of law were signed by Jilian McNeil of BF.

Despite the above facts, the redacted invoices show no work done by Jilian McNeil. Instead, they purport to show billing by nine other timekeepers, including Balestriere, for just the month of January. Balestriere shows January time of 112.9 hours at a rate of $1,165 per hour for a total of $131,528.50, but exactly what he supposedly did on the suit is not determinable because, as noted, all of the time entries are completely redacted. All nine timekeepers (again, not including any reference to Jilian McNeil) show time entries (completely redacted) for just January totally $321,611.25. The Arbitrator finds these amounts excessive in light of the amount of work reflected on the docket sheet. Furthermore, the lack of any entries for McNeil call into question the validity of the BF time sheets altogether. Therefore, the Arbitrator finds these time sheets inadequate to support BF's claim of damages with respect to the Bernstein suit and disregards them.

In addition to the BF time sheets, BF also submits two invoices for services rendered by Debevoise & Plimpton in connection with work on the Bernstein federal suit. The first invoice is

---

[119] Exs. 6309-6312.

for January time in the amount of $46,952.64[120] and the second one is for February time in the amount of $1,642.79.[121] These invoices are also redacted, but the totals appear appropriate for the amount of time of Debevoise & Plimpton reflected on the public docket sheet. Therefore, the Arbitrator awards damages in the amount of $48,595.43 ($46,952.64 + $1,642.79), plus appropriate interest, as a result of Bernstein's bringing the federal suit in breach of the arbitration clause.

### F.    Is Bernstein Liable in Quantum Meruit?

BF also seeks to recover in quantum meruit. Although the subject was not briefed, the Arbitrator believes that quantum meruit only lies where there has been no recovery in contract. Here there has been a recovery on an account stated and in contract for the discounted fees and the Arbitrator has declared any amount above the discounted fees forfeited. Therefore, BF cannot recover in quantum meruit.

### IV.    Analysis of Bernstein's Malpractice Defense/Counterclaims

To prevail on his claim or defense of legal malpractice, Mr. Bernstein had the burden to prove that (1) the firm failed to exercise the ordinary reasonable skill and knowledge commonly possessed by members of the legal profession and (2) the firm's breach of such duty of care proximately caused Mr. Bernstein to sustain actual and ascertainable damages. *Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP*, 26 N.Y.3d 40, 49-50 (2015).

Mr. Bernstein's only attempt to demonstrate a "duty of care" breached by the firm was his reliance on the opinion of Hon. Robert S. Smith (Ret.). Judge Smith's opinion was very narrow. It was limited to the federal action and limited to the opinion that it would have been negligent for the firm to commence the federal action without first explaining to Mr. Bernstein

---

[120] Ex. 6310 at pages 6-9.
[121] Ex. 6311 at pages 5-8.

that the TGA created very significant challenges to the theory underlying the federal action.[122]

Judge Smith was express that he was not opining that the way in which the firm litigated the

federal action and attempted to overcome the challenges posed by the TGA was negligent, but

rather only that it would have been negligent not to discuss those challenges with the clients in

advance so they could make an informed decision about proceeding.[123] Bernstein's entire

malpractice claim/defense must stand or fall with this very narrow opinion, as he put forth no

other expert evidence on standard of care. *See Merlin BioMed Asset Management, LLC v. Wolf*

*Block Schorr & Solis-Cohen, LLP,* 23 A.D.3d 243 (1st Dep't 2005) (the failure to meet the

burden of producing expert testimony on the professional standard of care warrants a dismissal

of the claim).

 The factual premise of Judge Smith's opinion is that Bernstein was not aware of the

significance of the TGA. However, the Capitalization Agreement between Bernstein and

Rivera,[124] which Bernstein had entered into before engaging the firm, highlights the TGA. The

TGA is the one and only attachment to the Capitalization Agreement.[125] The Capitalization

Agreement also memorializes that Mr. Bernstein reviewed the TGA[126]

 Although Mr. Bernstein claims that he did not "read" the TGA, he seemed to concede

that he "reviewed" it.[127] Even if he "reviewed" but did not "read" it, the Arbitrator thinks that

even a cursory review would have made it obvious to an experienced lawyer that any suit in the

United States would have to plead around the TGA. Bernstein admitted that he was familiar with

mandatory arbitration and integration clauses based on his decades of experience as a

---

[122] Smith Rpt. at ¶¶ 2-5, 13, 51; Smith Tr. 1931:7-23.
[123] Smith Rpt. at ¶ 47; Smith Tr. 1932:4-1933:6.
[124] Ex. 17.
[125] *Id.,* at Ex. A
[126] *Id.,* at ¶ 7(c).
[127] Bernstein Tr. 997:23-999:1.

transactional lawyer.[128] He also admitted that he recognized the importance of the TGA. ("Q. So it's fair to say that in this agreement that was entered into before the engagement agreement with the Balestriere firm, the importance of the TGA was already recognized by you. Fair? A. Yes.").[129] The above facts were apparently not brought to the attention of Judge Smith prior to his testimony because Judge Smith acknowledged that he did not know whether Mr. Bernstein had reviewed it.[130]

The major dispute between the parties relating to the TGA is whether it was explained (or explained sufficiently) in a meeting held on December 9, 2014. Balestriere and Storch both testified that they discussed the challenges posed by the TGA with Bernstein in this meeting.[131] Time records corroborate that a lengthy meeting was held with Bernstein and Rivera that day and that the lawyers had spent a number of hours reviewing documents to prepare for that meeting.[132] Ms. Storch's contemporaneous handwritten notes demonstrate both that she reviewed the TGA in advance of the meeting and that it was discussed at the meeting.[133]

Storch claims that the issue was squarely presented to Bernstein and Rivera that if they wanted to pursue straightforward claims under the TGA, they would have to bring such claims in Mexico, but if they wanted to sue in the United States, they would have to creatively plead around the TGA.[134] She further testified: "We started there. Nobody missed it. Balestriere didn't miss it. I didn't miss it...And we told the client in no uncertain terms these are long odds...and everyone understand that eyes wide open...."[135] The Arbitrator asked Ms. Storch whether both

---

[128] Bernstein Tr. 990:16-991:7.
[129] Bernstein Tr. 902:11–17.
[130] Smith Tr. 1940:22-1948:12.
[131] Storch Tr. 1521:4-1527:15, 1806:19-1809:7; Balestriere Tr. 176:9-178:5.
[132] Ex. 200.
[133] Ex. 11056, at 0558, 0559, 0562, 0568.
[134] Storch Tr. 1521:4-1527:15, 1806:19-1809:7
[135] Storch Tr. 1526:4-1527:15.

the integration clause and the mandatory arbitration clause of the TGA were discussed with the clients, and Ms. Storch answered that they were.[136]

The only problem with Storch's testimony is that the integration clause and the arbitration clause are not discussed in her notes, as one would expect they would be if they had been discussed. There is also minimal discussion of the TGA in her notes, although there is one mention of it: "May 17, 2006 = Trust Gover."[137] March 17, 2006, was the date of the TGA. Storch claims that there were not more mentions of the TGA in her notes because she used the phrase "JV" or joint venture to refer to the TGA.

The lack of any explicit mention of the integration and arbitration clauses and the minimal mention of the TGA in Storch's notes are somewhat problematic. But the burden of proof is on Bernstein to establish that these items were not explained or understood by him as part of his defense of malpractice. He cannot credibly dispute Balestriere's and Storch's descriptions of the December 9, 2014, meeting because he first "absolutely" denied that there was such a meeting[138] and then claimed not to remember it,[139] notwithstanding that he received emails immediately after the meeting thanking him for his time and for "a very fruitful conversation."[140]

Given (a) the focus on the TGA in the Capitalization Agreement, including the memorialization that Bernstein at least "reviewed it," (b) Storch's and Balestriere's undisputed testimony about the December 9, 2014 meeting, which Bernstein cannot remember (c) the time records indicating that the parties spent many hours discussing the strategy for the federal action

---

[136] Storch Tr. 1852:22-1857:3.
[137] Ex. 11056 at 0559.
[138] Bernstein Tr. 1455:2-21.
[139] Bernstein Tr. 1455:2-1456:21.
[140] Ex. 2018.

with the clients before it was filed, (d) the fact that Mr. Bernstein was actively involved in drafting the initial complaint filed to commence the federal action[141], and (e) Mr. Bernstein's sophistication and legal training and experience, the Arbitrator finds it not credible for him to claim that he did not realize that the federal complaint was drafted to plead around the TGA and that it was therefore vulnerable to attack by Cargill on the basis of the TGA.

Accordingly, the Arbitrator holds that Bernstein has failed to prove his malpractice claim that the problems inherent in the filing the federal complaint were not adequately explained to him. Because there is no expert testimony regarding malpractice with respect to any other aspect of the case, the Arbitrator finds that he has failed to prove his malpractice claim altogether.[142]

## V. Analysis of Bernstein's Tort Counterclaims

In addition to his malpractice counterclaims, Bernstein has brought counterclaims for fraud, breach of fiduciary duty, unjust enrichment, breach of Judiciary Law §487, negligent misrepresentation and conversion. However, where a complaint contains multiple claims for breach of contract, breach of fiduciary duty, fraud, unjust enrichment violation of Judiciary Law §487 and civil conspiracy predicated on the same factual allegations as a claim for legal malpractice and seeking the same damages as the claim for legal malpractice, such claims are deemed duplicative and must be dismissed. *Mackey Reed Electric Inc. v. Morrone & Associates*

---

[141] *See, e.g.*, Ex. 25.

[142] Moreover, to the extent that Bernstein asserts that he would not have gone forward with the federal action had he understood the challenges posed by the TGA, that assertion is not credible given that he knowingly proceeded with the federal action even after the point he admits the challenges posed by the TGA were brought to his attention. Specifically, he admits that he understood the issue by July 2015, when Mr. Verde told him that the clients would lose their case because of the integration clause in the TGA during the mediation with Judge Gorenstein in July 2015. July was very early in the engagement—before Cargill withdrew its motion to dismiss the initial complaint, the amended complaint was filed, or any of the setbacks decried by Bernstein. Given the narrowness of Judge Smith's opinion (focusing only on alleged failure to explain the risks posed by the TGA's integration clause before filing the initial complaint), the only possible "malpractice" his opinion could support is the filing of the initial complaint in the federal action. It would be not applicable to any of the litigation activity that occurred after July 2015, which is to say almost all of the litigation activity. Accordingly, Bernstein's evidence of "malpractice" would be limited only to one filing, the initial complaint in the federal action, which was later superseded by an amended complaint after Mr. Bernstein admits he was well aware of the TGA integration clause issue.

49

*P.C.*, 125 A.D.3d 822, 6 N.Y.S.3d 65 (2d Dep't 2015) (breach of fiduciary duty and fraud claims dismissed as duplicative of legal malpractice claim); *Blanco v. Polanco*, 116 A.D.3d 892, 986 N.Y.S.2d 151 (2d Dep't 2014) (unjust enrichment claim dismissed as duplicative of legal malpractice claim); *Turner v. Irving Finkelstein & Meirowitz, LLP*, 61 A.D.3d 849, 879 N.Y.S.2d 145 (2d Dep't 2009) (fraud claim dismissed as duplicative of legal malpractice claim); *Kvetnaya v. Tylo*, 49 A.D.3d 608, 854 N.Y.S.2d 425 (2d Dep't 2008) (breach of fiduciary duty claim dismissed as duplicative of legal malpractice claim); *Knox v. Aronson, Mayefsky & Sloan, LLP*, 168 A.D.3d 70, 91 N.Y.S.3d 23 (1st Dep't 2018) (claim for violation of Judiciary Law § 487 dismissed as duplicative of the legal malpractice claim); *Knox v. Aronson, Mayefsky & Sloan, LLP*, 168 A.D.3d 70 (1st Dep't 2018) (Judiciary Act claim dismissed as duplicative of malpractice claim). *Xue v. Jensen*, 2020 U.S. Dist. LEXIS 217878, 2020 WL 6825676, at *34 (S.D.N.Y. 2020) (claim for civil conspiracy dismissed as duplicative of other claims).

Based on the foregoing authorities the Arbitrator holds that Bernstein's fraud, breach of fiduciary duty, unjust enrichment, breach of Judiciary Law §487 claims must be dismissed.

Moreover, to the extent Bernstein purports to assert a claim for civil conspiracy, "New York does not recognize an independent tort of conspiracy."158 *Kirch v. Liberty Media Corp.*, 449 F.3d 338, 401 (2d Cir. 2006) (citing *Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 503 N.E.2d 102, 102, 510 N.Y.S.2d 546(1986)). Because New York does not recognize an independent claim for conspiracy, a claim for civil conspiracy stands or falls with the underlying tort and cannot be sustained if the underlying tort is unsustainable. *Nissan Motor Acceptance Corp. v. Scialpi*, 94 A.D.3d 1067, 944 N.Y.S.2d 160 (2d Dep't 2012). Because all of the above claims by Bernstein and White Lilly cannot be sustained, any claim for civil conspiracy fails as well.

With respect to the claim for conversion, the Arbitrator has, in essence, already dealt with this in his discussion of fee forfeiture. The Arbitrator has ruled that Balestriere did improperly take funds from his firm's trust account. The measure of damages would be the amount of funds taken, but since the Arbitrator has already granted a forfeiture of all success/undiscounted fees, which is more than the amount of the funds taken, any further damages on account of conversion would be duplicative.

## VI.    Analysis of Bernstein's Claims for Negligent Misrepresentation and Breach of Fiduciary Duty Against Storch

In addition to the above-discussed malpractice and tort claims, Bernstein also brings a claim for negligent misrepresentation and a claim for breach of fiduciary duty against Storch. The elements of a claim for negligent misrepresentation are (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance by the plaintiff on the misinformation. *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 944 N.E.2d 1104 (2011). The elements of the cause of action for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the misconduct. *Pokoik v. Pokoik,* 115 A.D.3d 428 (1st Dep't 2014).

In bringing the claim for negligent representation against Storch, Bernstein emphasizes the privity-like relationship, rather than an actual privity or contractual relationship, because he takes the position that he, as an individual, was not a client of Storch or BF. The Arbitrator has already held, however, that Bernstein signed the engagement letter with BF and Storch in his individual capacity and hence was a client of both. Once this engagement letter was signed, any obligation of Storch shifted to a direct attorney-client relationship and any claim Bernstein had against Storch for negligent misrepresentation became a claim for malpractice.

The Arbitrator has also previously held that Bernstein has failed to establish a claim for malpractice. That holding applies equally to Storch for as long as the engagement letter remained in effect. The arbitrator has further dismissed most of Bernstein's tort claims, including any claim for breach of fiduciary duty, as being legally duplicative of his malpractice claim. That ruling applies equally to any breach of fiduciary duty claim against Storch while the engagement letter was in effect.

Therefore, Bernstein only has a breach of fiduciary claim or a negligent misrepresentation claim against Storch to the extent that it is based on her conduct prior to entering into the attorney-client relationship with him. The only conduct of Storch about which Bernstein has complained that occurred before she entered into the attorney-client relationship is her alleged failure to disclose facts about Balestriere's financial problems before she referred him to Balestriere.

Bernstein points out that before Bernstein first consulted with Storch about the Farallon matter there were a series of phone calls between Storch and Balestriere as follows:

- On April 8, 2014, in the course of a discussion between Balestriere and Storch regarding their efforts to "finalize our arrangement" [concerning referral fees generally], Balestriere wrote that Storch should wait before giving his name to any clients, saying he needed to "discuss something" with Storch, and stating "I don't mean to be cloak and dagger about the subject, but I cannot really get into it right now, though I would want to before you introduce us to the client."[143]

---

[143] Ex. 7002.

- Late that evening, Storch wrote back to say, "I'm concerned – can you give me an idea what the issue is, if any? Balestriere wrote back, "it's too long for an email" and "let's please discuss tomorrow afternoon or earlier if you're free."[144]

- That "too long for an email" call occurred, because a week later, on April 15, 2014, Storch emailed Balestriere to ask, "Johnny, can you please give me an update?" Then there was another phone call about the problem, because two hours later, Balestriere wrote back, "Thanks for the call and support. If these guys were really going to hurt us, they would have already."[145]

- On May 5, 2014, Balestriere wrote to Storch, "We have a settlement agreement, in principle only, on the deal I told you about. Let's try to talk by the end of the week. I'll advise once I have news." Storch wrote back, "That's great news. I'll keep my fingers crossed for you."[146]

Presumably, during the above phone calls Storch learned something about the Counsel Financial loan and that there "was a settlement agreement in principle" but how much more she learned is unclear. It was only after the above exchange of phone calls that Bernstein first consulted Storch about the Farallon matter. At the hearing she testified about her having talked with Balestriere and what she told Bernstein as follows:

**Francoeur**: You do recall that you had a telephone conversation with Mr. Balestriere where this subject of his financial problem was discussed, correct?

**Storch**: Yes, correct.

**Francoeur**: And I'd like you to tell me to the best of your recollection everything that he disclosed to you about this financial problem.

---

[144] Ex. 7003.
[145] Ex. 7004.
[146] Ex. 7005.

**Storch**: What I recall was that Mr. Balestriere understood that I had asked him for his interest in taking on this contingency matter because it was very clearly expressed to me by Mr. Bernstein that he needed a lawyer to take it on contingency, so Mr. Balestriere knew he was being looked at for a possible engagement. He said just being [above] board here, my firm is going through some financial issues, working things out, but my understanding was [he] was telling it to me not just between the two of us, Adina, let's keep it on the QT. No, it was the opposite of that. He was saying in the interest of being above board, like completely transparent with the implication that, you know, I would tell the client because I was the [interlocutor to] the client at that point, the potential client, and then I promptly did turn around and call Jon Bernstein and share with him exactly that. I remember where I was standing, in fact, when I had the phone call and I recall that Mr. Bernstein wasn't particularly impressed or concerned by it at all.[147]

The above testimony at trial was seven years after her series of phone calls with

Balestriere and she was not asked further questions by her counsel to elucidate more precisely

what she told Bernstein, but her testimony is clear that Balestriere had implied she should be

completely transparent with the client and that she promptly called Bernstein and shared "with

him exactly that." She may well have told Bernstein all she knew about the situation, but at a

minimum Bernstein admitted that she told him about the loan:

**Bernstein**: ...What she did say to me was, when I asked her is there anything else I should know about him, she said, **well, I think he had some issue with some loan.** And when I said to her can you tell me more, she said, well, you should ask him about it. And I said, Adina, is it something I should be concerned about. And she said you should talk to him about it.

**Gallagher**: And did you speak to Mr. Balestriere about that?

**Bernstein**: That was the first thing I asked him. Basically after we had shaken hands and sat down at the Yale Club, I said, you know, one thing I have to get clear about is Adina mentioned that there was some loan issue, can you tell me something about that.[148]

Even if Storch simply said there was some issue with a loan and suggested that Bernstein

talk to Balestriere about it, the Arbitrator does not find that that constitutes a negligent

---

[147] 4/19/21 1673:14-25 to 1674:1-17 (bracketed changes from Storch's errata sheet).
[148] 4/16/21 1281:11-25 to 1282:1-5.

misrepresentation or breach of fiduciary duty. Whatever information she had, she had second-hand from Balestriere. In such situations one typically does not want to misrepresent the facts, and it is often sensible simply to raise the issue but tell the individual to get the precise facts from the person with first-hand knowledge. The testimony of Storch indicates that she had no reason to believe that Balestriere would be anything other than completely transparent with Bernstein. Accordingly, the Arbitrator finds that Bernstein has failed to establish a negligent misrepresentation or breach of fiduciary duty.

## VII.    Analysis of Whether Storch Forfeited Her Share of Any Success Fee

Not long after the above, BF and Storch, on November 20, 2014, entered into the initial engagement letter with Bernstein and Farallon and subsequently entered into the operative engagement letter on March 17, 2015. Both engagement letters, but more importantly the operative engagement letter, provide that Storch shall receive 100% of the fees billed herself, 20% of the discounted fees billed by BF, 35% of any success fee, and if the success fee is taken in the form of recovering all fees billed as undiscounted fees, rather than discounted fees, then 35% of that amount.[149]

Because of the fee sharing arrangement both engagement letters provide that BF and the Storch firm assume joint responsibility for the representation of the clients:

> The Firm and the Storch Firm assume joint responsibility for the representation for as long as this fee-sharing agreement is in effect, and the division of fees is based upon this joint responsibility. In accepting joint responsibility, Storch will make reasonable efforts to assure adequacy of representation, provide adequate client communication, respond to client questions, and assist the Firm when necessary. The Firm will keep Storch reasonably informed of the Matter.[150]

Storch's. own expert, Richard Supple, stated in his testimony:

---

[149] *See, e.g.,* Ex. 15 at 10.
[150] *Id.*

...lawyers who assume joint responsibility for a matter are liable both for each other's ethical violations and for each other's legal malpractice, breaches of fiduciary duty, breaches of contract, and other wrongs. In effect, lawyers who assume "joint responsibility" for a matter become law partners for that particular matter.... [151]

The Arbitrator has already ruled that BF has forfeited its right to any success fee as a result of the conduct of Balestriere in connection with taking funds from the firm's client trust account. Storch should likewise forfeit any right to undiscounted fees in lieu of a success fee. Because of her joint responsibility under the engagement letter Storch has forfeited her right to 35% of the undiscounted fees.

Storch argues, however, that she withdrew from representing Bernstein before Balestriere's took funds from the firm's client trust account, and, hence, is not liable for Balestriere's actions. It is undisputed that Cargill had threatened to name her individually in a lawsuit and at that point she retained her own counsel. It is also undisputed that thereafter Bernstein asked her not to attend an upcoming settlement conference in June of 2017. The question is whether she effectively withdrew from representing Bernstein at that point.

At the hearing, Storch testified:

**Clareman**: My question is isn't it a fact that Mr. Bernstein asked that you not participate in the settlement discussions as opposed to asking you to withdraw from the representation all together?

**Storch**: No, that's not correct. My understanding is he raised a conflict of interest concern, which made – at his request, made me step down entirely from the representation. There really was nothing left to the representation at that point but for the settlement discussions. [152]

...

**Francoeur**: Did Jon Bernstein take the position that he had conflict concerns with you?

---

[151] Supple Tr. 2561-62.
[152] 4/19/21 1609:23-25 to 1700:1-9.

**Storch**: Yes, he did.

**Francoeur**: Can you tell me about that?

**Storch:** Yes. It was my understanding that he raised the concern that this would present a conflict of interest and that he did not feel that I should be part of the representation from that point forward and I accommodated that request.[153]

In December of 2017 all parties were still discussing settlement with Cargill. Because

Cargill had threatened to sue her personally, Storch was involved in those discussions only

through her attorney Partha Chattoraj. At that time, Balestriere wrote to Bernstein to assure him

that Storch had not directly participated in the settlement discussions.

> Partha touched base with me regarding his...email. He asked me to reassure you that as we continue to move this along, Adina did not participate in the settlement discussions or strategy, either directly or indirectly, at any time; I've not discussed strategy with her since, I think, the June 1 sit down we had at Katten, and I've had no settlement input from Adina since that time.
>
> ∗∗∗
>
> Even though Adina did not participate in the settlement discussions over the last six months, Partha asked me to say that she obviously wishes you well.[154]

Storch asserts that throughout the pendency of the settlement discussions and exchange of

drafts, all of the parties—including Bernstein—only communicated to her through her counsel,

and, therefore, no reasonable client could possibly believe Storch was still engaged after June

2017.

In contrast, Bernstein asserts that all that happened in June 2017, is that Bernstein, seeing

how distracted and defensive Storch was as a result of Cargill's threat to name her in a lawsuit,

asked that she not attend settlement meetings for fear that her personal concerns would cause

---

[153] 139 4/19/21 1825:10-18.
[154] Ex 11724.

Farallon's position in the negotiations, which was already devoid of any leverage, to appear that much more desperate. He says he never asked her to withdraw from the case.[155]

Bernstein claims that the written record is also inconsistent with the proposition that Storch withdrew from the case in June 2017. Over a month after she supposedly "withdrew," Storch responded to Bernstein's question, "why aren't you on this email chain" as follows:

> Because you had asked me to step aside, and he [Balestriere] was respecting that. Now that you want me to weigh back in (and I gather you haven't told John yet), I've reviewed and reflected and have two ideas. I've reached out to B. tonight and am waiting to connect with him. I just left you a phone message as well. Call me when you can.

In May 2018, Balestriere shared with Storch his draft Notice of Claim for the current arbitration, as well as his draft Notice of Withdrawal—which he had modified to include Storch.[156] On May 30, 2018, Storch and Balestriere also exchanged the following texts:

> **Storch**: Let me know when you're sending a formal letter of withdrawal of representation.
>
> **Balestriere:** I plan to by tomorrow am at the latest. I can get you a draft today.
>
> **Storch** I should join
>
> **Balestriere**: Sure. We can edit to note that we "and the Storch Firm" withdraw. JL will get you a draft.
>
> **Storch:** Send me draft thanks. Mine may be different.
>
> **Balestriere:** Got it. If you wish to write your own that's fine. Let me see before it goes out. I do want to get out our letter by early tomorrow at the latest.[157]

Balestriere did not send the actual notice of withdrawal to Bernstein and Rivera until September 2018. Bernstein asserts that that is when the withdrawal occurred and that it was only

---

[155] Bernstein Tr. 1434-37.
[156] Ex. 10067.
[157] Ex. 10004-a.

when Storch learned of the taking of client trust funds that she decided to say she had withdrawn

from the case long before it happened.

Bernstein's ethics expert testified that a withdrawal can be oral, but it has to be **clear** to

the client that there is a withdrawal:

> **Yaroshefsky**: Well, if a lawyer is in the position, having engaged in a
> representation, having sent her engagement letter, represented the client, and then
> seeks to withdraw, they certainly have to have a conversation with the client and
> **make it clear to the client that they intend to withdraw**. It's always advisable
> to put that in writing, although the ethics rule, Rule 116 on withdrawal, does not
> require a writing, but a writing is one way in which lawyers provide clarity. But
> certainly there has to be some understanding between a lawyer and the client that
> the lawyer intends to withdraw...it would be from the perspective of the
> reasonable client.[158] (emphasis added).

Yaroshefsky testified similarly at a later point in her testimony:

> **Francoeur**: Would you agree with me that, if a client raises conflict of interest
> concerns and asks the lawyer to step down, would you agree that the referring
> attorney's duties would cease as of the moment the representation terminated?

> **Yaroshefsky**: Did the lawyer step down? I mean, the lawyer's got to step down.
> The client say I want you to step down, the lawyer steps down?

> **Francoeur**: Correct.

> **Yaroshefsky**: And there's agreement among them that **they've clearly stepped
> down?** Yes, then they don't continue to have duties, unless of course there's some
> material way in which there would be a disadvantage to the client by virtue of
> them stepping down...[159]

Here, other than the one above-noted email sent approximately one month after June

2017, there was no evidence that Storch performed any duties on behalf of Bernstein. She had

retained her own counsel, and all communications were through that counsel for an extended

period of time. Because of the threat of suit against her personally, there was the possibility of a

---

[158] 4/21/21 2158:8 to 2160:1-6.
[159] 4/21/21 2283:7-25.

conflict of interest. In these circumstances she may legitimately have felt that she had withdrawn from representing Bernstein.

On the other hand, from June of 2017 forward there wasn't really anything remaining to be done on behalf of Bernstein other than negotiate the settlement with Cargill, and there is some logic to Bernstein's alleged concern that she might be a weak negotiator because of her worries about her own potential liability. Therefore, Bernstein may well have thought he had removed her from the settlement discussions, but she had not completely withdrawn from representing him.

Professor Yaroshefsky testified that a withdrawal, if not in writing, must be clear. Under all the circumstances, the Arbitrator cannot conclude that the withdrawal was clear and, therefore, holds that her engagement letter as Bernstein's attorney remained in effect until the formal withdrawal letter was sent in September of 2018. Because it was in effect, Storch is jointly responsible for Balestriere's taking of client trust funds. To be clear, the Arbitrator is not holding that she bears any ethical responsibility for his taking of these funds because she did not participate in it and knew nothing about it, but she is legally jointly responsible, and, therefore, must suffer the same penalty—the forfeiture of her percentage share of any success fee or undiscounted fees.

Even if she had withdrawn, she may still have forfeited her right to any undiscounted fees. Although this issue was not briefed, if she had withdrawn from representing the client, she would not be entitled to any fees from the client owed as a result of events that occurred after the date of withdrawal. She claims she withdrew on June 8, 2017, which was before there was any recovery from Cargill, which triggered the success fee, and, in turn, triggered BF's' right to the full undiscounted fees. In other words, if she withdrew when she says she did, she lost the right

to any undiscounted fees, which were not earned by BF or owed by Bernstein until after her withdrawal, and if she did not withdraw, she lost the right to any undiscounted fees because of her joint responsibility for Balestriere's actions.

## VIII.  Analysis of Storch's Claim for Indemnity Against BF

Storch's has asserted a claim for indemnity against BF if she is found not to have withdrawn and is held jointly liable for Balestriere's taking of client trust funds.  This claim arises out of a fee agreement letter between BF and Storch, dated September 23, 2014 (the "Fee Agreement"), which states.

> The Firm will hold harmless, defend and indemnify Storch for any malpractice claim, loss or damage arising out of, or relating in  any way to the actions, inaction or conduct of Firm attorneys or personnel.[160]

There is no similar indemnification clause in the March 17, 2015, engagement letter.  If there were, any dispute relating to indemnification would be subject to the arbitration clause in the engagement letter, and hence fall within the jurisdiction of this arbitration.  The Fee Agreement, however, provides that any dispute arising out of the Fee Agreement will be brought in court:

> Any disputes arising  from this Agreement or from any relationship between the Parties that is any way related to this Agreement shall be brought in the Courts of the State of New York. We agree that proper venue for any litigation shall be the appropriate civil court in New York County.[161]

Accordingly, the Arbitrator holds that he has no jurisdiction to hear Storch's indemnification claim and refers her to state court if she wishes to pursue any such claim.

---

[160] Ex. 11059 at 5.
[161] Ex. 11059 at 5.

**IX.    Analysis of BF's Claim for Attorneys' Fees and the Arbitrator's Computation of Interest**

BF seeks to recover its attorneys' fees, citing a fee provision in the Payment section of the May 17, 2015, engagement letter.[162]  As previously noted, the Payment section of the engagement letter deals with success fees, as contrasted with the Money in Trust provision on the same page, that deals with client trust funds which can be used to pay the firm's undiscounted fees.

The specific language in the Payment section that BF relies on in its request for attorneys' fees states: "If there is any dispute regarding **fees**, then the non-prevailing party shall pay the prevailing party's fees and **court costs** incurred in resolving the **fee dispute**."[163] (emphasis added).  The bolded reference to "fees" in the Arbitrator's opinion, can only be read as referring back to the words "Success Fee" earlier in the same paragraph and the bolded phrase "fee dispute" can likewise only be read as a dispute relating specifically to success fees.  The bolded words "court costs" also imply that the drafters envisioned some special proceeding in court, not an arbitration, to resolve the dispute over success fees.

By contrast, in the section of the engagement letter that contains the arbitration clause, and specifically refers to arbitration under the AAA's Commercial Arbitration Rules of "any claim or dispute between the parties" that "shall arise" from the engagement letter, there is a provision which states: "Notwithstanding any provision in those Arbitration Rules, each party shall pay its own professional service fees (including attorney's fees) and costs related to the arbitration...."[164]  In the Arbitrator's opinion, this section is the section that deals specifically

---

[162] Ex. 15 at 8.
[163] Id.
[164] Ex. 15, at 15.

with the instant arbitration, and it unequivocally provides that each party shall pay its own attorneys' fees despite whatever the AAA's Arbitration Rules provide.

This arbitration deals not only with success fees, as did the earlier-quoted fee provision, but also with discounted fees and any other claim that has "arisen" from the engagement letters. Even if the earlier-quoted fee provision relating to success fees were deemed also to relate to this arbitration, and not some separate court proceeding, and the Arbitrator were faced with two conflicting fee provisions, he would find that the fee provision which is more specifically addressed to this arbitration (*i.e.,* embedded in the arbitration clause itself) would control over the other.

For the foregoing reasons, the arbitrator holds that the applicable fee provision provides that each party shall bear its own attorneys' fees, and, therefore, BF's request for attorneys' fees is denied.

BF has also requested that it be awarded interest on the claims on the two claims on which it was successful at New York's statutory rate of 9% simple interest.[165] The Arbitrator finds that it is entitled by law to such interest and calculates it as follows.

The Arbitrator has determined that BF is entitled to its unpaid, discounted legal fees and costs in the amount of $714,547.82. The daily interest on this amount is $714,547.82 x .09 = $64,309.30 ÷ 365 = $176.19 daily interest. The total interest through the date of this Award is computed from April 11, 2018, the date of the final invoice, through July 23, 2021, the date of this Award, as follows: $176.19 x 1,200 days = $211,427.85. Thus, the total award is $714,547.82 + $211,427.85 = $925,975.67.

---

[165] CPLR §5004.

The Arbitrator has also determined that BF is entitled to recover its attorneys' fees in the amount of $48,595.43 as a result of having to defend Bernstein's federal action. The daily interest on this amount is $48,595.43 x .09 = $4,373,59 ÷ 365 = $11.98. The total interest through the date of this Award is computed from March 5, 2019, the date on which Bernstein stipulated to the stay of his federal court action, through July 23, 2021, the date of this Award, as follows: $11.98 x 872 days = $10,446.56. Thus, the total award on this claim is $48,595.43 + $10,446.56 = $59,041.99.

## X.    Conclusion

For the foregoing reasons, the Tribunal Orders and Awards as follows:

1. Holds that BF has proved its claim for an account stated and its claim for breach of contract against Jonathan A. Bernstein to the extent of its unpaid, discounted legal fees and costs and awards it $714,547.82, plus interest in the amount of $211,427.85, for a total of $925,975.67.

2. Holds that BF has proved its claim against Jonathan A. Bernstein for breach of the arbitration clause of the engagement agreement and awards it $48,595.43, plus interest in the amount of $10,446.56, for a total of $59,041.99.

3. Declares that BF has forfeited its claim to a success fee, undiscounted fees, or any other amounts of any kind, beyond the amount of unpaid, discounted legal fees awarded in numbers 1 and 2 above because of John Balestriere's inappropriate conduct in taking client trust funds to pay his fees.

4. Denies BF's request that it be awarded its attorneys' fees in connection with arbitrating this matter.

5. Holds that White Lilly is not a party to the engagement letter that contains the arbitration clause in this case. Therefore, it has no standing to bring claims arising out of that engagement letter, and all such claims are denied.

6. Denies Bernstein's defense and counterclaim for malpractice.

7. Dismisses Bernstein's defenses and tort counterclaims for fraud, breach of fiduciary duties, unjust enrichment, breach of Judiciary Law §487, and his defense and counterclaim for civil conspiracy to the extent such defense/counterclaim is deemed alleged.

8. Holds that Bernstein has proven its defense/counterclaim of conversion, but holds that the proper measure of damages for the taking of client trust funds is the forfeiture of any success fees and that the award of any further damages, including interest, for "conversion" of the same funds would not be just and equitable and would be duplicative.

9. Finds that Bernstein has failed to prove his entitlement to reimbursement of the $222,500 that he paid for ICC arbitration fees, to punitive damages, or to any other compensation beyond being relieved of liability for any success fee, or undiscounted fee, and, therefore, the Arbitrator denies the request for such additional compensation and finds that the award of such additional compensation beyond the forfeiture of any success fee or undiscounted fee, would not be just and equitable under all of the circumstances.

10. Holds that Storch, as a party to the operative engagement letter who was entitled to receive a share of fees received by BF as a result of that engagement, is jointly liable for the improper conduct of BF's partner John Balestriere in taking client

trust funds. Therefore, she has forfeited her claim to any share of any success fee, undiscounted fees, or any other amounts beyond her share of the unpaid, discounted fees awarded in numbers 1 and 2 above. Although jointly responsible for Balestriere's conduct by virtue of her fee sharing agreement, the Arbitrator finds that she has no ethical responsibility for Balestriere's actions because she was not involved in taking client trust fund monies and did not know about it at the time.

11. Denies Bernstein's separate claims against Storch for negligent misrepresentation and breach of fiduciary arising out of her conduct that occurred before she executed the engagement letters with Bernstein.

12. Declares that the Arbitrator lacks jurisdiction to determine Storch's cross-claim for indemnity against BF and John Balestriere.

13. The administrative fees and expenses of the International Centre for Dispute Resolution totaling $76,663.86 shall be borne as incurred; and the compensation and expenses of the arbitrator totaling $154,260.00 shall be borne as incurred.

14. All amounts awarded in this Final Award are to be paid within 30 days of transmittal of this Final Award to the Parties.

15. This award is in full settlement of all claims submitted to this Tribunal.

16. I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States.

Dated:  July 23, 2021

William H. Baker, Arbitrator

State of New York          )
                           )  SS:
County of Westchester      )

I, William H. Baker, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Date: July 23, 2021.                    William H. Baker, Arbitrator
                                        NYSDL 62424/432

State of New York          )
                           )  SS:
County of Westchester      )

On this day 23rd day of July, 2021, before me personally came and appeared William H. Baker, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

AHN TED TAESHIK
Notary Public, State of New York
No. 01AN6286995
Qualified in Westchester County
Commission Expires 08/05/2025