UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

WHITE LILLY, LLC and                    :
JONATHAN BERNSTEIN,

                                        :

                    Plaintiffs,

                                        :

        -against-                            Case No. 1:18-cv-12404 (ALC) (SN)

                                        :

BALESTRIERE PLLC, BALESTRIERE
FARIELLO, JOHN BALESTRIERE,              :
THE LAW OFFICES OF ADINA G. STORCH,
and ADINA STORCH,                        :

                    Defendants.          :

-------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF
## THE BERNSTEIN PARTIES' CROSS-MOTION TO MODIFY,
## AND CONFIRM, AS MODIFIED, THE ARBITRATION AWARD

LLOYD S. CLAREMAN        -and-    GALLAGHER LAW PLLC
121 East 61st Street, 2nd Floor          757 Third Avenue, 20th Floor
New York, NY 10065                New York, NY 10017
Tel. No. (212) 751-1585           Tel. No. (212) 983-9700
Lloyd.Clareman@clareman.com       bgallagher@gallagherlaw-pllc.com

Attorneys for Jonathan A. Bernstein and White Lilly, LLC

# Table of Contents

Table of Authorities…………………………………………………………………………ii

Preliminary Statement and Overview………………………………………………………...1

Statement of Facts……………………………………………………………………………4

    The Arbitrator Correctly Found That
    Balestriere Misappropriated Escrow Funds……………………………………………4

    The Arbitrator Irrationally Allowed Balestriere
    To Keep The Converted Escrow Funds…………………………………………………9

ARGUMENT…………………………………………………………………………………12

    Point One:  The Award Should Be Modified Because It Conflicts
    With The Public Policy Of New York State……………………………………………12

    Point Two:  The Award Should Be Modified Due To The Arbitrator's
    Material Misapprehension Of  The Conversion Damages As "Duplicative"……………15

    Point Three:  The Balestriere Parties' Motion For
    Modification Of The Award Is Baseless…………………………………………………19

        A. There Is No Causation Requirement For Fee Forfeiture………………………19

        B.  The Balestriere Parties Never Even Argued "Causation"
        To The Arbitrator…………………………………………………………………...22

    Point Four:  The Balestriere Parties' Motion For An Attachment Is Without Merit
    And Has Already Been Rejected By The New York State Supreme Court………………24

Conclusion and Request for Oral Argument…………………………………………………25

**Table of Authorities**

*Cases*

*Balestriere PLLC v. CMA Trading Inc., et al.,* No. 11 Civ. 09459 MHD,
2014 WL 7404068 (S.D.N.Y. Dec. 31, 2014)………………………………………1, 14

*Bidermann Industries Licensing, Inc. v. Avmar, N.V.,* 173 A.D.2d 401,
570 N.Y.S.2d 33 (1st Dep't 1991)………………………………………………..15

*Botany Industries, Inc. v. New York Joint Board Amalgamated Clothing Workers of America,*
375 F.Supp. 485 (S.D.N.Y.1974), *vacated and dismissed as moot,*
506 F.2d 1246 (2d Cir. 1974)………………………………………………………15n

*Denson v. Donald J. Trump for President,* 180 A.D.3d 446,
115 N.Y.S.3d 267 (1st Dep't 2020)…………………………………………………13

*Duferco Intern. Steel Trading v. T. Klaveness Shipping A/S,*
333 F.3d 383 (2003)……………………………………………………....17, 18n, 22

*Eljer Mfg., Inc. v. Kowin Development Corp.,*
14 F.3d 1250 (7th Cir. 1994)……………………………………………………..16-17

*Feiger v. Iral Jewelry, Ltd.,* 41 N.Y.2d 928, 363 N.E.2d 350 (1977)……………………..20

*Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197 (2d Cir. 1998)…………………………….17

*In re Kennedy,* 87 A.D.3d 107, 927 N.Y.S.2d 42 (1st Dep't 2011)…………………………14

*In re Wertis,* 307 A.D.2d 15, 759 N.Y.S.2d 483 (1st Dep't 2003)………………………..14

*Kinderhill Select Bloodstock, Inc. v. U.S.,* 835 F.Supp. 699, 700 (N.D.N.Y. 1993)…………24n

*New York Telephone Co. v. Communication Workers of America Local 1100 AFL-CIO Dist. 1,*
99 Civ. 909, 2000 WL 1174944 at *3 (S.D.N.Y. August 18, 2000),
*aff'd,* 256 F.3d. 89 (2d Cir. 2001)………………………………………………..13-14

*Schreiber v. Friedman,* 15-CV-6861, 2020 WL 5549082 (E.D.N.Y., Sept. 16, 2020)………….19

*Schwartz v. Merrill Lynch & Co.,* 665 F.3d 444 (2d Cir. 2011)……………………………14, 17

*TAGC Mgt., LLC v. Lehman,* 842 F.Supp2d 575 (S.D.N.Y. 2012)………………………24

*United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.,*
484 U.S. 29, 43 (1987)………………………………………………………13

*United Steelworkers of America v. Enterprise Wheel and Car Corp.,*
    363 U.S. 593, 80 S.Ct. 1358 (1960)…………………………………………………………18

*VisionChina Media Inc. v. Shareholder Representative Servs., LLC,*
    109 A.D.3d 49, 967 N.Y.S.2d 338 (1st Dep't 2013)…………………………………………..24

**Statutes and Rules**

Federal Arbitration Act, 9 U.S.C. §11………………………………………………………..16-17

Federal Rule of Civil Procedure 64……………………………………………………………..24n

New York State Rules of Professional Conduct, 22 NYCRR
    §§1200.1 *et seq.*, Rule 1.15(a)……………………………………………………12, 15, 20

New York State Rules of Professional Conduct, 22 NYCRR
    §§1200.1 *et seq.*, Rules 4.1, 8.4………………………………………………………….20

**Treatises**

*Restatement of Law Governing Lawyers* §37……………………………………………………..22

*Simon's New York Rules of Professional Conduct Annotated,* 2017 Ed………………………….13

## Preliminary Statement and Overview

This is a case where an attorney was found by an Arbitrator to have misled his clients into sending $1.4 million to his escrow account, which the attorney immediately misappropriated. The attorney's conduct in this regard was deemed by the Arbitrator to be "completely inappropriate." (Award, p. 33) This is not the first time that this attorney was found to have misappropriated escrow funds. *See Balestriere PLLC v. CMA Trading Inc., et al.,* No. 11 Civ. 09459 MHD, 2014 WL 7404068 (S.D.N.Y. Dec. 31, 2014) at *9. Yet the Arbitrator allowed the attorney to keep the $1.4 million. This Court should not confirm such an incomprehensible and unjust result, one that is contrary to clear public policy and was reached irrationally, in manifest disregard of basic law.

This Memorandum of Law is respectfully submitted by Plaintiffs White Lilly, LLC ("White Lilly") and Jonathan Bernstein ("Bernstein") (collectively "the Bernstein Parties") in support of their cross-motion for modification and confirmation, as modified, of the Final Award (the "Award") (ECF No. 61-1)[1] in the arbitration between the Bernstein Parties, the Balestriere Parties, and the Storch Parties (the "Arbitration").[2] This Memorandum is also submitted in opposition to the motion of the Balestriere Parties (ECF No. 60) seeking (a) modification of the Award, (b) confirmation of the Award as modified, and (c) an order of attachment.

The scope of judicial review of arbitration awards is exceptionally narrow – but not non-existent. It extends to situations where an award is not merely wrong, but is irrational or offensive to well-established public policy. This Court, on grounds of both public policy and rationality/manifest disregard, should decline to extend its imprimatur to a decision that rewards an attorney for an escrow theft that was accompanied by deceit.

---

[1] To avoid filing duplicative exhibits, documents pertinent to this cross-motion, such as the Award, that were filed with the Balestriere Parties' original motion are referred to by ECF filing number; and documents not previously filed are being supplied as exhibits to the accompanying Declaration of Lloyd S. Clareman ("Clareman Dec.")

[2] The "Balestriere Parties" are John Balestriere ("Balestriere") and Balestriere PLLC d/b/a Balestriere Fariello ("the Balestriere Firm" or "BF"); the "Storch Parties" are Adina Storch ("Storch") and her law practice.

In the Award, the Arbitrator found that Balestriere converted $1.4 million in disputed settlement funds from his firm's escrow account in order to obtain money that he needed to pay his back taxes. (Award, p. 40) The Arbitrator expressly found that when this money was sent by the clients to the escrow account, Balestriere had been instructed by his clients, repeatedly, not to touch these funds; and that Balestriere, in order to induce his clients to send the money, misleadingly assured them he would maintain the funds in trust. (Award, p. 39) Yet the Arbitrator concluded that Balestriere should be allowed to keep all $1.4 million of these misappropriated funds notwithstanding his clear findings of conversion and deceit by Balestriere. The Arbitrator based this conclusion on his inexplicable declaration that to do otherwise would provide the Bernstein Parties with "duplicative" damages. (Award at p. 51).

Arbitrator William H. Baker, Esq. ("the Arbitrator"), an experienced attorney who served as the sole arbitrator in the case, wrote in his Award that "the conduct of Balestriere in taking funds from the client trust account was highly inappropriate….") (Award at p. 41). The Arbitrator reiterated this finding of escrow misappropriation elsewhere in his award (*see* Award at pp. 31-32 (expressing the Arbitrator's unequivocal agreement with the testimony of Professor Ellen Yaroshefsky, an expert on attorneys' professional responsibilities, that Balestriere's misappropriation of escrow funds was accompanied by deceit of his clients); and p. 51 ("The Arbitrator has ruled that Balestriere did improperly take funds from his firm's trust account.")). But the Arbitrator ruled that Balestriere was entitled to retain the fruits of his misappropriation and to further receive almost a million dollars more in "discounted" hourly fees and interest, notwithstanding the Arbitrator's findings of misappropriation and deceit. This result, whereby a lawyer's entitlement to hourly fees somehow supersedes (1) his clients' fundamental rights to have their escrowed funds held sacrosanct and (2) their associated rights to honest, non-fraudulent

communications from their attorney, cannot pass muster even pursuant to the narrow scope of review that applies to arbitral awards.

Surely the public policy of New York State, which in the words of the Arbitrator and of Balestriere's own expert, Professor Roy Simon, treats "escrow theft [as] the 'most strictly enforced rule in New York's Rules of Professional Conduct'" (Award at p. 32) cannot permit the retention of converted escrow funds by an attorney who, as found by the Arbitrator, also had engaged in deceit in order to obtain the deposit of those funds to his escrow account in the first place; and then, as soon as the funds arrived, violated the express instructions of his clients not to touch them. (Award at p. 39: "…none of the foregoing justifies taking the funds from the escrow account in the face of explicit instructions from both clients not to touch the funds until there had been agreement of all clients, and after having misleadingly replied to them, 'I'm not going to violate my lawyer duties to anyone here by playing games with any funds, real estate or anything else. Such obligations go beyond the engagement agreement or any one relationship with any client.'") And notwithstanding the limited scope of review that is permissible with respect to arbitration awards, surely the Arbitrator's finding that an award of conversion damages would be "duplicative" of the forfeiture of a different, and illusory category of damages (Award, p. 51) is so illogical that it is subject to modification by this Court.[3]

---

[3] Balestriere applied the $1.4 million that he converted to pay down so-called discounted hourly fees that his firm had billed the clients. In addition to those discounted hourly fees, Balestriere also sought over $8 million (plus interest) in "undiscounted/success fees" despite having achieved no success in the underlying lawsuits. The two categories of damages were in no sense duplicative or overlapping – they were entirely distinct sums, as the Arbitrator elsewhere appeared to recognize. (*See, e.g.,* Award at p. 41: ("BF has forfeited its right to any undiscounted [success] fees, but it may still recover the amount of unpaid discounted fees plus appropriate interest.") Moreover, as discussed below, the "undiscounted/success fees" were illusory because Balestriere achieved no success in the underlying litigations; he lost all four of the cases he litigated on the pleadings or on the merits, and achieved nothing that the clients could not have obtained prior to any litigation. The Bernstein Parties received no proceeds whatsoever from the eventual termination of the litigation.

3

Accordingly, the Bernstein Parties ask that their cross-motion to modify the Award so as to deny the Balestriere Parties the fruits of their deceitful misappropriation of escrow funds, and for confirmation of the Award as so modified, be granted in order to vindicate and uphold the clear public policy of New York State prohibiting attorney escrow theft; and that the Balestriere Parties' motion to confirm the Award as issued (or, *a fortiori,* as modified to award them an unearned "success" fee for no success), and for an attachment, be denied.

### Statement of Facts[4]

The Balestriere Parties brought claims against Bernstein for "$714,547.82 in unpaid discounted fees and costs, plus $8,439,591.50 representing a 'success fee' equal to the amount of [the Balestriere Firm's] undiscounted fees." (Award, p. 2) The Arbitrator correctly stated that "Bernstein and White Lilly, the remaining Respondents after the above-noted dismissal of [Juan Diaz] Rivera and Farallon, seek to have all of BF's and Storch's legal fees forfeited on account of Balestriere's unethical conduct in taking funds from his firm's escrow account despite representations that he would not." (Award, p. 3) The Arbitrator noted that the Bernstein Parties sought "[c]ompensatory damages in the amount of $3,228,919, consisting of $1,823.500 in legal fees paid to BF, and $1,405,419, allegedly stolen from the escrow account…." (*Id.*)[5]

**The Arbitrator Correctly Found That Balestriere Misappropriated Escrow Funds**

In his Award at pp. 30-31, the Arbitrator found that:

"The sequence of events leading up to Balestriere's taking funds from the trust account (with some omissions discussed later) was essentially as follows:

- On March 12, 2018, Balestriere received an email from Tere Ojeda, a business colleague of Rivera, enclosing the signed contract entitled "Agreement to

---

[4] The background facts discussed herein are drawn from the Award, except for the discussion of Balestriere's failure to achieve any success in the case, which is detailed in the testimony of non-party Michael Verde, Esq., counsel for Cargill. A more comprehensive discussion of the relevant background may be found at pp. 1-7 of the Award.

[5] Juan Diaz Rivera ("Rivera") and Farallon, a subsidiary of a company controlled by Rivera, were named as Respondents in the Balestriere Firm's arbitration claim but were subsequently dismissed from the claim. (Award p. 1)

Transfer Settlement Funds" that provided for settlement proceeds to be held in the Balestriere trust account. In the email, Ojeda said: "Consistent with the conversations you have had with Juan Diaz Rivera regarding the use of these funds, **the enclosed document is signed with the understanding that funds will remain in escrow in your trust account until you, Mr. Jon Bernstein/Juan Diaz Rivera as partners agree on their use and destination**."

- In response to Ms. Ojeda's email, Balestriere emailed back: "Regarding your point below Juan and I discussed and **the protections afforded to all by the engagement agreement obviously applies here.**"

- Juan Diaz Rivera then emailed Balestriere to say: "**It's essential to my family that funds from this are not touched and remain in your trust account until we have a three way agreement on how they are applied. Jon [Bernstein] assured us this was his understanding as well.**"

- In response, Balestriere wrote to Diaz Rivera that:

  **[the] engagement agreement specifically contemplates us having a discussion regarding distribution of not just moneys but real estate…. I expect we will sit down and work out everything but the agreement also contemplates mediation and arbitration if needed. I agree on scheduling the meeting ASAP**."

- As the above exchange was occurring, Bernstein echoed Rivera's instructions with an email to Balestriere and Diaz Rivera stating: **"Absolutely. Nothing gets touched until we all agree."**

- Balestriere responded to Bernstein's email by stating:

  Emails crossed. **I state the obvious when I write that I'm not going to violate my lawyer duties to anyone here by playing games with any funds, real estate or anything else. Such obligations go beyond the engagement agreement or any one relationship with any client."**

- In another email to Diaz Rivera that day, Balestriere said:

  … **I commit again in writing to meet all my obligations to you and Jon**, as your lawyer and under the engagement agreement. **I'm not picking and choosing: I will meet all of them**.

  Let's get this first stage done and then sit down to discuss how we move forward.

- On the wire instructions of March 21, 2018 (Ex. 8877), which was the $1.33 million transfer, the following language was included in the instructions themselves, in the section entitled "Originator to Beneficiary Information" as well as in the section entitled "Bank to Bank Information":
  - line 1: "Escrow deposit in Trust Account."
  - line 2: "**Disburse based on mutual agreement.**"

- On the same day the March 21, 2018 wire was sent, Rivera sent a copy of the wire instructions to John Balestriere and Jon Bernstein as an attachment to an email in which he stated, "See enclosed. **When will we meet to discuss these funds?**"

- When asked at the hearing how he squared this email with his testimony that Rivera expected these funds to be applied to Balestriere's fees as opposed to holding them in his trust account pending a discussion about how they were to be divided, Balestriere's answer was, "It's an unfair question."

Award, pp. 30-31 (emphasis in original; footnotes omitted.)[6]

After setting forth this background, the Arbitrator provided his evaluation of Balestriere's conduct at pp. 31-32 of the Award, as follows:

"Bernstein's ethics expert, Professor Yaroshefsky described Balestriere's conduct as follows:

'… he basically leads his client to believe, put the money in trust, I'm going to leave it there, we're definitely going to leave it there, I would never violate my obligation, doesn't tell the client that he intends to take out the funds that he believes he is owed. **That certainly constitutes deceit under our ethics rules, under Rule 8.4, and he's also making false statements of fact to a client under Rule 4.1.**"

She also testified:

Lawyers owe clients a very high level of candor and complete transparency, especially when it comes to escrow funds and how they're received and how they're maintained or withdrawn, so **certainly it is my view here there was deceit.**
***
Lawyers get disbarred for engaging in that kind of conduct.'

---

[6] Juan Diaz Rivera and Farallon were Balestriere's clients; Bernstein contended in the arbitration that he was merely an agent for Farallon; but the Arbitrator found that Bernstein was the Balestriere Firm's client as well.  (Award, p. 20)

*Right after quoting that testimony, Arbitrator Baker wrote:*

"The Arbitrator agrees. Even the book of Balestriere's expert, Professor Simon, warns against taking money from a client's escrow account. In the book, Professor Simon states that Rule 1.15 prohibiting escrow theft is the "most strictly enforced rule in New York's Rules of Professional Conduct, as to which "even minor unintentional infractions…are met with swift and often harsh discipline," and warns that lawyers must not be tempted to take escrow funds just because they subjectively believe that they are entitled to do so, because "that is an ethical mistake." (Award, pp. 31-32) (underscore added; bold in original; footnotes omitted)

The Arbitrator chose to highlight in bold font Professor Yaroshefsky's testimony that Balestriere engaged in deceit in connection with his conversion of escrow funds, and expressly stated "the Arbitrator agrees" with her testimony and opinion regarding that deceit and the fact that "lawyers get disbarred for engaging in that kind of conduct." The Arbitrator thus found egregious misconduct and violations of the Rules of Professional Conduct by Balestriere.

The Arbitrator next examined, and emphatically rejected, Balestriere's (and his expert's) rationale for converting these escrow funds.[7] The Arbitrator had found earlier in his Award that "all parties understood that the amount of the success fee was disputed and would have to be negotiated. After all, Balestriere had lost all four cases at that point in time." (Award, p. 27) The Arbitrator further found that:

"Balestriere not only knew that there was a dispute over the success fee that had to be negotiated; he also knew that if the negotiation failed, an arbitration would follow. On March 12, while asking for the $1.4 million escrow payment he said: 'I expect we will sit down and work out everything but the agreement also contemplates mediation and arbitration if needed.' These are not the words of someone whose position is that his entitlement is clear, there is no disagreement, and he is merely being asked to provide a discount that he has no reason or obligation to provide. (Award, p. 28)

---

[7] *See* Award at pp. 32-33, where the Arbitrator found that Balestriere and his expert improperly conflated two distinct provisions of the engagement agreement. The Arbitrator reiterated this clearly correct finding at p. 35 of the Award, stating "these were settlement proceeds and governed by the "Payment" provision…which provides that disputed funds shall be kept in the trust account."

The Arbitrator rejected all attempts to justify Balestriere's misappropriation, stating:

"There is a substantial difference between funds that the client *intends* to be drawn on by the attorney to pay fees; and settlement proceeds that the client intends and expressly states are being provided subject to those funds remaining in escrow until all concerned agree on how to divide them. In the Arbitrator's opinion Professor Simon's opinion did not take account of this significant distinction.

Professor Simon also claimed against clear evidence to the contrary, that it was not his "understanding" that Rivera intended that the $1.4 million in settlement proceeds remain in Balestriere's trust account pending agreement among Bernstein, Rivera and Balestriere regarding their division. Both Rivera and Bernstein, explicitly instructed Balestriere not to touch the money, and Balestriere replied, "I'm not going to violate my lawyer duties to anyone here by playing games with any funds, real estate or anything else. Such obligations go beyond the engagement agreement or any one relationship with any client." For these reasons the Arbitrator finds Professor Yaroshefsky's opinion more persuasive than Professor Simon's.

Balestriere claims, however, that Yaroshefsky was given a set of "assumed facts" and that she did not have all of the evidence before her. The other facts that Balestriere mentions, however, do not change the conclusion that Balestriere's conduct was completely inappropriate. (Award at pp. 32-33)

After reviewing the various allegations and purported justifications offered by Balestriere to excuse his "completely inappropriate" misconduct in taking this $1.4 million in disputed settlement proceeds from his escrow account, the Arbitrator concluded:

"But, nonetheless, none of the foregoing justifies taking the funds from the escrow account in the face of explicit instructions from both clients not to touch the funds until there had been agreement of all clients, and after having misleadingly replied to them:

> I'm not going to violate my lawyer duties to anyone here by playing games with any funds, real estate or anything else. Such obligations go beyond the engagement agreement or any one relationship with any client.

> [the] engagement agreement specifically contemplates us having a discussion regarding distribution of not just moneys but real estate…. I expect we will sit down and work out everything but the agreement also contemplates mediation and arbitration if needed. I agree on scheduling the meeting ASAP."

I commit again in writing to meet all my obligations to you and Jon, as your lawyer and under the engagement agreement. I'm not picking and choosing: I will meet all of them.

Balestriere may have felt he was justified, but as Professor Simon warns in his book, lawyers must not be tempted to take escrow funds just because they subjectively believe that they are entitled to do so, because "that is an ethical mistake." Award, at p. 39 (footnotes with citations omitted)

## The Arbitrator Irrationally Allowed Balestriere To Keep The Converted Escrow Funds

Having thus concluded that Balestriere misappropriated $1.4 million of disputed escrow funds from the Balestriere Firm's attorney trust account, the Arbitrator turned to the question of "what amount of fee forfeiture is appropriate for Balestriere's inappropriate taking of funds from the client escrow account?" (Award, at p. 39)

The Arbitrator began his analysis by referring to the testimony of Professor Yaroshefsky:

"Professor Yaroshefsky testified that there should be a total fee forfeiture:

> [W]hen I looked to all the various factors, I determined that fee forfeiture was warranted here.

> It was the escrow misappropriation here [which] is among the most serious of all violations in New York. We take extremely seriously the fact that lawyers are given moneys in trust by clients, clients are expected to be able to trust their lawyers, and taking money from escrow is theft and we've considered it theft for a long period of time. So we have very significant rules to prevent that.

> So here we have escrow misappropriation. The amount misappropriated was very significant. As I said, it was accompanied by deceit. This misappropriation did not happen inadvertently, it was quite deliberate, and it occurred at a time when the entitlement to the $1.4 million…was awaiting imminent negotiation by the parties. And at the time of the misappropriation the lawyers had been preparing to sue their clients for the better part of a year. When one considers all of those factors in light of the fact that Balestriere, in the past in the Southern District, had been cited also for escrow misappropriation, the way to hold a lawyer accountable here is fee forfeiture.

> And so it is my opinion that these really egregious circumstances warrant total fee forfeiture.

"In addition to the factors cited by Professor Yaroshefsky, there are the additional facts that Balestriere was having financial problems at the time. His firm had had to pay off a judgment against it that was obtained by Counsel Financial in the amount of approximately $2 million. This was not paid off until 2016. Presumably because of the amount paid to Counsel Financial, the firm began to fall behind in its taxes in that year. These unpaid taxes began to accumulate. Balestriere finally paid off over $1 million in back taxes to the IRS in April of 2018, just one month after having taken the escrow funds in March. Specifically, Balestriere admitted that he "[a]dvised the IRS that … [he] … [was] expecting money from this case and, when the money came in, … [he] used it to pay [his] back taxes." (Award at pp. 39-40 (footnotes omitted))

Despite the egregious nature of this misconduct and despite the aggravating factors that the Arbitrator cited in his Award, the Arbitrator allowed Balestriere to keep the misappropriated funds, and to receive nearly a million dollars more in fees and interest from Bernstein. The Arbitrator found that "BF has forfeited its right to any undiscounted fees, but it may still recover the amount of unpaid discounted fees plus appropriate interest." (Award, at p. 41)

How can such an unimaginable, lawless, and illogical result be explained? Here is how the Arbitrator explained it:

With respect to the claim for conversion, the Arbitrator has, in essence, already dealt with this in his discussion of fee forfeiture. The Arbitrator has ruled that Balestriere did improperly take funds from his firm's trust account. The measure of damages would be the amount of funds taken, but since the Arbitrator has already granted a forfeiture of all success/undiscounted fees, which is more than the amount of the funds taken, any further damages on account of conversion would be duplicative. (Award, p. 51.)

The reasoning expressed in the final clause is irrational. Although the Arbitrator did direct "a forfeiture of all success/undiscounted fees," he completely ignored the evidence that no success fee whatsoever had been earned. The Arbitrator had asked the parties to address the questions, "can the settlement be seen as a success" and "to what extent did any success inure to the benefit of Bernstein?" in a series of written questions he provided to counsel to guide their presentations in their post-hearing briefs (see Clareman Dec., Ex. A). The Bernstein Parties had shown

overwhelmingly at the hearing (and reiterated in their briefing), that Bernstein never received a dime from the settlement. They presented testimony from Cargill's counsel in the underlying litigation, Michael Verde, Esq., that Balestriere won nothing in settlement that Cargill wasn't willing to provide before the litigation began, indeed that the amount of the settlement was much lower than what Cargill had offered prior to Balestriere's involvement. (Tr. 2375-76, 2388) (Clareman Dec., Ex. D). The Bernstein Parties further showed that Balestriere's post-settlement conduct in misappropriating the escrow funds and in fatally undermining an arrangement whereby Cargill had agreed to make a $3.1 million payment (withdrawn due to Balestriere's actions) completely eliminated any chance that Bernstein would otherwise have had to at least recoup some modest amount of the $2 million in fees that he had paid to Balestriere (not including the $1.4 million that Balestriere converted from the escrow account). *See* Testimony of Michael Verde at pp. 2364-2436 of the hearing transcript (Clareman Dec., Ex. D) and Hearing Exhibit 9354 referred to therein (Clareman Dec., Ex. E) (Cargill withdraws its consent to $3.1 million payment).

The Arbitrator simply ignored, or chose not to deal with, any of this evidence in his Award. He acknowledged that "Balestriere had lost all four cases" and that "Mr. Verde, counsel for Cargill, testified at the hearing that Balestriere had achieved nothing that Cargill had not been willing to give to Rivera and Bernstein before any litigation had begun, and thus, that Balestriere had, in essence, achieved no success." (Award, p. 27) But, inexplicably, the Arbitrator did not make any findings one way or the other about whether any success fee was actually due. Nor did he make any mention in the Award of the fact, referenced in his own questions, that Bernstein and White Lilly received no benefit – zero – from the settlement. The relatively meager proceeds went to Diaz Rivera, and when Diaz Rivera sent $1.4 million of the proceeds to Balestriere's attorney trust

account with his instructions, and Bernstein's, not to "touch" these funds until all three of them agreed upon their division, Balestriere misappropriated the money.

It therefore defies all logic, and law, that the Arbitrator found that the forfeiture of the illusory "success fee" (when no success was achieved) could somehow render "duplicative" Bernstein's recovery of $1.4 million that his lawyer misappropriated from escrow. There is no overlap, much less duplication between these two amounts. It is senseless, unjust, and unprecedented for the Arbitrator to find that a lawyer was entitled to keep misappropriated escrow funds (and even be entitled to additional payments and interest of almost $1 million from the victim of the misappropriation), because of the lawyer's forfeiture of an illusory success fee that had not been earned.

This Court should not confirm such an award and thereby lend its judicial imprimatur to a decision that holds that "virtually sacred" escrow funds may be misappropriated by an attorney, and retained by him; and indeed that the offending attorney be further compensated notwithstanding the violations of the Rules of Professional Conduct that Professor Yaroshefsky identified, as to which the Arbitrator expressly stated "The Arbitrator agrees."

## ARGUMENT

### Point One:  The Award Should Be Modified Because It Conflicts With The Public Policy Of New York State

New York State's Rules of Professional Conduct, 22 NYCRR §§1200.1 *et seq.*, at Rule 1.15(a), codified New York's longstanding public policy against the misappropriation of escrow funds by attorneys. The Rule states:

> (a) *Prohibition Against Commingling and Misappropriation of Client Funds or Property.* A lawyer in possession of any funds or other property belonging to another person, where such possession is incident to his or her practice of law, is a fiduciary, and must not misappropriate such funds or property or commingle such funds or property with his or her own.

As Balestriere's own expert, Professor Roy Simon, has commented in his treatise, the import of this Rule is clear: "Thou shalt not steal. Or borrow. Trust account funds are virtually sacred. *** Custom and case law always made clear that lawyers were prohibited from misappropriating client funds and property…." *Simon's New York Rules of Professional Conduct Annotated,* 2017 Ed., p. 883. As further explained in Professor Simon's treatise:

> ***Discipline, damages, and criminal consequences for violating Rule 1.15.*** A lawyer who violates Rule 1.15(a) by dipping a hand into client funds will face severe consequences, including discipline, damages, and even criminal prosecution.
>
> The disciplinary consequences depend on the department. In *Matter of Schnell,* 27 A.D.3d 24, 808 N.Y.S.2d 201 (1st Dep't 2006) (per curiam), the court said:
>
>> This Court considers it well settled, **virtually without exception** and absent extreme mitigating circumstances, that attorneys such as respondent who have intentionally converted client funds have committed serious professional conduct which warrants the sanction of disbarment regardless of any intent to restore the funds or the actual restoration of funds . . . .

The public policy of New York State with respect to escrow misappropriation by attorneys is crystal clear: there is a zero tolerance. Yet in this case, the Arbitrator issued an award in which he found that Balestriere converted escrow funds, but let him keep the misappropriated money. Such an award should not receive judicial confirmation.

While such instances are relatively infrequent, contravention of public policy is a basis for modification or non-confirmation of an arbitration award. *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 43 (1987) (an alleged public policy must be properly framed and the violation of such a policy must be clearly shown if an award is not to be enforced); *Denson v. Donald J. Trump for President,* 180 A.D.3d 446, 450-51, 115 N.Y.S.3d 267 (1st Dep't 2020) ("An arbitration award violates strong public policy . . . where the award itself violates a well defined constitutional, statutory or common law of this state"); *New York Telephone Co. v.*

*Communication Workers of America Local 1100 AFL-CIO Dist. 1,* 99 Civ. 909, 2000 WL 1174944 at *3 (S.D.N.Y. August 18, 2000), *aff'd,* 256 F.3d. 89 (2d Cir. 2001) (vacating award, *inter alia,* on public policy grounds where payments ordered by arbitrator would contravene existing law); *see also Schwartz v. Merrill Lynch & Co.,* 665 F.3d 444, 452 (2d Cir. 2011) ("To permit the court to refuse enforcement of an arbitrator's award on public policy grounds, the public policy must be 'well defined and dominant' and must be 'ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests'" (quoting *United Paperworkers, supra,* and *W.R. Grace & Co. v Local Union 759,* 461 U.S. 757, 103 S.Ct. 2177 (1983)).

This is the rare case where a public policy objection to confirmation should prevail. The public policy of New York State that, in the words of Professor Simon, makes funds in attorney trust accounts "virtually sacred," could not be more clear. The cases are legion in which New York Courts have held that escrow misappropriation constitutes a direct threat to the public that warrants immediate suspension of the offending attorney. *See, e.g., In re Kennedy,* 87 A.D.3d 107, 110, 927 N.Y.S.2d 42 (1st Dep't 2011) (immediate suspension required for misappropriation of trust funds by attorney "in defense of the public interest"); *In re Wertis,* 307 A.D.2d 15, 18-19, 759 N.Y.S.2d 483 (1st Dep't 2003) (same). Nor could the Arbitrator's finding be any clearer that "none of the foregoing [explanations by Balestriere] justifies taking the funds from the escrow account" (Award p. 39) and that "Balestriere's conduct was completely inappropriate." (*Id.,* p.33).

Moreover, as Professor Yaroshefsky noted in her testimony, this is not the first time that Balestriere has invaded escrow funds improperly to pay himself; he was criticized by a Magistrate Judge of this Court in 2014 for having done so. *Balestriere PLLC v. CMA Trading Inc., et al.,* No. 11 Civ. 09459 MHD, 2014 WL 7404068 (S.D.N.Y. Dec. 31, 2014) at *9 (Balestriere engaged in "ethically challenged conduct" by taking escrow funds to pay himself).

Despite quoting Professor Yaroshefsky's testimony that "certainly it is my view here that there was deceit. Lawyers get disbarred for engaging in that kind of conduct"; and despite stating immediately thereafter, "The Arbitrator agrees"; and even despite pointing out right after expressing that agreement that "Rule 1.15 prohibiting escrow theft is the 'most strictly enforced rule in New York's Rules of Professional Conduct, as to which even minor unintentional infractions…are met with swift and often harsh discipline'") (Award, p. 32) – the Arbitrator ruled that Balestriere was entitled to keep the funds he misappropriated, on grounds that awarding disgorgement of these funds would be "duplicative" of the forfeiture of "undiscounted/success fees." That conclusion was illogical – but crucially, the failure to award damages equal to the amount converted by an attorney from his trust account contravenes New York State public policy as expressed in the Rules of Professional Conduct §1.15(a), as well as in decades of jurisprudence in which attorneys have been severely sanctioned for the misappropriation of escrow funds.[8]

The Courts – state and federal – play a unique role in the supervision of attorney conduct. *See generally, Bidermann Industries Licensing, Inc. v. Avmar, N.V.,* 173 A.D.2d 401, 402, 570 N.Y.S.2d 33 (1st Dep't 1991) This Court is being asked to confirm an arbitration award that directly implicates such issues, and the Court's inherent supervisory role over attorney conduct should inform its analysis.

### Point Two: The Award Should Be Modified Due To The Arbitrator's Material Misapprehension Of The Conversion Damages As "Duplicative"

As has already been noted, the Award states, at p. 51:

---

[8] Although it was vacated as moot and lacks precedential force, the Court is respectfully referred to *Botany Industries, Inc. v. New York Joint Board Amalgamated Clothing Workers of America,* 375 F.Supp. 485 (S.D.N.Y.1974), *vacated and dismissed as moot,* 506 F.2d 1246 (2d Cir. 1974), in which the District Court noted that "[t]he power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents." 375 F.Supp. at 490-91 (quoting *Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847 (1948)).

"The Arbitrator has ruled that Balestriere did improperly take funds from his firm's trust account. The measure of damages would be the amount of funds taken, but since the Arbitrator has already granted a forfeiture of all success/undiscounted fees, which is more than the amount of the funds taken, any further damages on account of conversion would be duplicative.

This irrational assertion of "duplicative" damages provides independent grounds for modification of the Award (1) under FAA §11(a) because the Arbitrator made a "material miscalculation of figures or an evident material mistake in the description" of these conversion damages; and/or (2) because the Arbitrator, despite his stated awareness of the law that "[T]he measure of damages [for conversion] would be the amount of funds taken," manifestly disregarded the law that he correctly identified, by refusing to apply it, based upon his illogical and mistaken belief that to do so would result in "duplicative" damages. No duplication of damages would have occurred had disgorgement of the converted escrow funds been ordered, as the law required.

The modification or vacatur of an arbitration award for miscalculation, or for manifest disregard, is exceedingly rare. However, the Seventh Circuit, relying on FAA §11, has ordered modification of an arbitration award that provided for a double recovery of damages, which is analogous. In *Eljer Mfg., Inc. v. Kowin Development Corp.,* 14 F.3d 1250, 1254 (7th Cir. 1994), the Court, after observing that there is a difference between "a narrow standard of review and a nonexistent standard of review," found that "the basis for each of the arbitrator's awards is no mystery," and that "[w]hen an arbitration award orders a party to pay damages that have already been paid or which are included elsewhere in the award, a court may modify the award. Double recovery constitutes a materially unjust miscalculation which may be modified under section 11 of the Federal Arbitration Act."

There is no qualitative difference between an arbitrator's mistaken award of duplicative damages, as happened in *Eljer*; and an arbitrator's refusal to award legally mandated conversion

damages due to his "materially unjust miscalculation" that such damages would be "duplicative." If the former can give rise to modification of the award, as it did in *Eljer*, then the latter, no less material and no less unjust miscalculation should likewise be modifiable in this case.

Because the Arbitrator correctly decided that Balestriere had forfeited any entitlement to a success fee when he engaged in misappropriation and deceit, he evidently considered it unnecessary to reach and resolve the disputed question of whether any success fee would actually have been owed. The Arbitrator erred, irrationally, when he found that disgorgement of $1.4 million in misappropriated escrow funds would be "duplicative" of Balestriere's forfeiture of whatever "undiscounted/success fees" might have been due. Not only were the latter distinct from the misappropriated escrow funds; there was no "success fee" actually earned, which the Arbitrator ignored. The damages from the misappropriation of escrow funds were certainly not "duplicative."

The Arbitrator's miscalculation in this regard was so extreme that in addition to satisfying the "materially unjust miscalculation" standard that warranted modification under §11 in *Eljer,* it also reaches the extraordinary level that warrants modification based on manifest disregard of the law. *See Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir. 1998) (finding manifest disregard, which requires that "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case"). *See also Duferco Intern. Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 388-90 (2003); *Schwartz v. Merrill Lynch, supra,* 665 F.3d at 452. These cases and others make clear that in the Second Circuit, manifest disregard requires the reviewing Court to find that the law in question was clear, and that it was improperly applied notwithstanding the arbitrator's knowledge of it. *Duferco, supra,* 333 F.3d at 389-90.

The Award in this case makes plain, on its face, that these grounds are satisfied. It is self-evident (and had been pointed out by the Bernstein Parties in their briefing to the Arbitrator[9]) that conversion damages include return of the converted property.[10] Moreover, the Arbitrator manifested his awareness of this crucial legal principal right in the Award, when he stated, explicitly, that "With respect to the claim for conversion . . . Balestriere did improperly take funds from his firm's trust account. **The measure of damages would be the amount of funds taken.…**" (Award p. 51) (emphasis added)

But somehow, in the next breath, the Arbitrator irrationally disregarded this law, contending that "since the Arbitrator has already granted a forfeiture of all success/undiscounted fees, which is more than the amount of the funds taken, any further damages on account of conversion would be duplicative." (*Id.*)

There is no way to rationalize this illogical statement. This is manifest disregard of the law that resulted in the Arbitrator's "own brand of industrial justice" being applied in this case, which was no justice at all. *United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358 (1960) (an arbitrator "does not sit to dispense his own brand of industrial justice.") Here the Arbitrator imposed his own will to overcome, by miscalculation, what he was aware the law required: that "the measure of damages would be the amount of funds taken." The Award should be modified to require disgorgement, from Balestriere to Bernstein, of the funds taken – specifically, the $1,405,419 that Balestriere converted from escrow.

---

[9] *See* Post-Hearing Brief of the Bernstein Parties at pp. 78-79 (Clareman Dec., Exhibit B).
[10] In fact, this proposition is sufficiently obvious that the error inherent in failing to order the return of misappropriated property "would be instantly perceived as such by the average person qualified to serve as an arbitrator." *Duferco,* 333 F.3d at 390.

**Point Three:  The Balestriere Parties' Motion For Modification Of The Award Is Baseless**

The Balestriere Parties, in their motion, have asked that the Court "modify" the Award to *increase* the amount of damages awarded to the Balestriere Parties ten-fold, by over $10 million inclusive of interest.  They implicitly ask that the Court overturn the Arbitrator's clear findings of fact, that Balestriere committed escrow misappropriation, and nullify the Arbitrator's conclusion (whose only flaw was that it was too limited in scope) that the consequences of Balestriere's deceit of his own clients in connection with this conversion of funds should include forfeiture of any claim to the alleged "undiscounted/success fees" (which were illusory).

The Balestriere Parties' arguments in favor of modification based on manifest disregard of the law do not remotely approach the standards that the Second Circuit has announced for such relief.  They base their argument on the proposition that there is a "causation" requirement to fee forfeiture, when that is not so; moreover, they never made any such arguments to the Arbitrator.

**A. There Is No Causation Requirement For Fee Forfeiture**

The Balestriere Parties do not cite a single case – much less did they cite one to the Arbitrator – in which any Court has ever held that there is a causation requirement for fee forfeiture.  To the contrary, the case law makes clear that *any* violation of a disciplinary rule by counsel during the representation can give rise to fee forfeiture.  The Balestriere Parties' brief to this Court conspicuously fails to mention *Schreiber v. Friedman,* 15-CV-6861, 2020 WL 5549082 at *10 (E.D.N.Y., Sept. 16, 2020) one of the many authorities concerning fee forfeiture provided to the Arbitrator by the Bernstein Parties,[11] where the Court held:

> Regardless of whether, when, or why a client chooses to exercise his right to discharge counsel for cause, "[a]n attorney who violates a disciplinary rule may be discharged for cause and is not entitled to fees for services rendered." *Jay Deitz & Associates of Nassau Cty., Ltd. v. Breslow & Walker, LLP,* 59 N.Y.S.3d 443, 447 (App. Div. 2017); *see Doviak v. Finkelstein & Partners, LLP*, 934 N.Y.S.2d 467,

---

[11] *See* the Post-Hearing Reply Brief of the Bernstein Parties at p. 10 (Clareman Dec., Exhibit C).

470 (App. Div. 2011) (same; citing *Quinn v. Walsh*, 795 N.Y.S.2d 647 (2005); *In re Satin*, 696 N.Y.S.2d 223, 224 (App. Div. 1999); *Yannitelli v. D. Yannitelli & Sons Const. Corp.*, 668 N.Y.S.2d 613, 613 (App. Div.), *lv. denied*, 92 N.Y.2d 875 (N.Y. 1998), *cert. denied*, 525 U.S. 1178 (1999);[15] *Pessoni v. Rabkin*, 633 N.Y.S.2d 338 (App. Div. 1995); *Matter of Winston*, 625 N.Y.S.2d 927 (1995)).

The attorney's violation of a disciplinary rule may result in the forfeiture of her fees even if the misconduct is not discovered until after her discharge. *See, e.g.*, *Brill & Meisel v. Brown*, 979 N.Y.S.2d 283, 285 (App. Div. 2014) (citing *Coccia v. Liotti*, 896 N.Y.S.2d 90, 100 (App. Div.), *lv. dismissed*, 906 N.Y.S.2d 811 (N.Y. 2010)); *Doviak*, 934 N.Y.S.2d at 470 (quoting same).

Furthermore, as the Bernstein Parties pointed out to the Arbitrator in their Post-Hearing Reply Brief at p. 10, footnote 8:

Fee forfeiture invokes well-established principles very similar to those underlying New York's traditional "faithless servant" doctrine, whereby an agent who fails to uphold his fiduciary duties to his principal forfeits his compensation. *Feiger v. Iral Jewelry, Ltd.,* 41 N.Y.2d 928, 363 N.E.2d 350 (1977) ("One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation.")

In sum, there is no legal support whatsoever for a "causation" requirement in fee forfeiture. To the contrary, the law presented to the Arbitrator made clear that an attorney's violation of a disciplinary rule during the course of representation is sufficient to disentitle the offending attorney from receiving any compensation whatsoever for his services.

In this case, the Arbitrator found that Balestriere violated Rule 1.15 of the Rules of Professional Conduct when he misappropriated escrow funds, and he expressly stated his agreement with Professor Yaroshefsky's testimony that Balestriere engaged in deceit in violation of Rules 8.4 and 4.1 of those same Rules. (Award, pp. 31-32) He expressed his further agreement with Professor Yaroshefsky's testimony that "lawyers get disbarred for engaging in that type of conduct." (Award, p. 32) Accordingly, the Arbitrator was on the firmest of legal grounds when he ordered fee forfeiture. The Arbitrator's error in this regard was in not making the fee forfeiture total by awarding conversion damages of $1.4 million and deeming Balestriere to be disentitled to

all further compensation.  No grounds exist under the manifest disregard doctrine for asserting that the law prohibits the partial forfeiture that the Arbitrator decided to impose.  The Balestriere Parties' effort to argue manifest disregard with respect to that limited forfeiture – which is far less severe than what the law in fact permits and indeed requires in these circumstances – is frivolous.[12]

Furthermore, as already discussed, the "undiscounted/success fees" were illusory, which would make it impossible for a reviewing Court to properly "modify" an arbitration award by awarding them.  As the Arbitrator noted in his award:

> … all parties understood that the amount of the success fee was disputed and would have to be negotiated.  After all, Balestriere had lost all four cases at that point in time.  Mr. Verde, counsel for Cargill, testified at the hearing that Balestriere had achieved nothing that Cargill had not been willing to give to Rivera and Bernstein before any litigation had begun, and, thus, that Balestriere had, in essence, achieved no success.  (Award, p. 27)

The Arbitrator evidently found it unnecessary to reach those issues (since the Award does not attempt to resolve them) in light of his determination that Balestriere's deceit of his clients and misappropriation of escrow funds should result in forfeiture of whatever "undiscounted/success fees," *if any,* might have been appropriate in the absence of any such misconduct.  Nonetheless, by requesting a "modification" of the Award that would hand them a gigantic and undeserved "undiscounted/success fee" for no success, the Balestriere Parties would have this Court bypass issues that were committed to the Arbitrator.  They would have the Court implicitly find in favor of the Balestriere Parties on their claim for "undiscounted/success fees," without hearing the evidence that the Arbitrator heard showing that there was no success and that Bernstein obtained *nothing* in the underlying litigation.  The Balestriere Parties have provided no legal or logical basis upon which this Court could properly "modify" the Award to give the Balestriere Parties an extra

---

[12] The Balestriere Parties cite no expert testimony in rebuttal of Professor Yaroshefsky's testimony that total fee forfeiture was warranted, because neither their expert nor the Storch Parties' expert attempted any such rebuttal.

$10 million in windfall "success" fees and interest, despite Balestriere's egregious misconduct and despite the clear showing that no success had been achieved. The outcome they seek would ride roughshod over the "great deference" that must generally be given to arbitral findings, and to the limited scope of review that is applicable to arbitral awards. *Duferco, supra,* 333 F.3d at 388.

### B. The Balestriere Parties Never Even Argued "Causation" To The Arbitrator

The Balestriere Parties' attempt to obtain an extra $10 million from this Court by way of "modification" of the Award fails for another, independent reason. Apart from the fact that the purported "causation" requirement for fee forfeiture has no support in the law, the Balestriere Parties never even attempted to make that argument to the Arbitrator.

The Balestriere Parties' brief to this Court is devoid of reference to any authority put before the Arbitrator regarding the (non-existent) "causation" requirement. Instead, the *only* authority they refer to in their brief as having been presented by them (as opposed to authority provided by the Bernstein Parties) is *Restatement of Law Governing Lawyers* §37 (Balestriere Memorandum at 10-11). But §37 of the *Restatement* does not concern causation at all. It states that fee forfeiture is "generally inappropriate when the lawyer has not done anything willfully blameworthy."

The Balestriere Parties' brief then proceeds to argue, by selectively characterizing portions of the Award and citing testimony from Professor Simon that the Arbitrator expressly rejected (Award, pp. 32-33), that Balestriere did nothing "willfully blameworthy" and that there was merely "a misunderstanding of a contract." (Balestriere Memorandum at p. 11). These characterizations are inaccurate. The Arbitrator expressly agreed with Professor Yaroshefsky that Balestriere had engaged in affirmative deceit of his clients. (Award, p. 32) The Arbitrator expressed his agreement with Professor Yaroshefsky's testimony that lawyers get disbarred for doing what Balestriere did. (*Id.*) The Arbitrator found, as to the escrow misappropriation and associated

deceit, that "Balestriere's conduct was completely inappropriate," and that there had been "ethically inappropriate conduct by Balestriere." (Award pp. 33, 34). He also found that "none of the foregoing [explanations by Balestriere] justifies taking the funds from the escrow account in the face of explicit instructions from both clients not to touch the funds until there had been agreement of all clients, and after having misleadingly replied to them…."  (Award p. 39)

These finding make clear that Balestriere's actions were not innocent. The Arbitrator clearly found that Balestriere committed egregious violations of core provisions of New York's Rules of Professional Conduct. The Balestriere Parties tried to argue to the Arbitrator that Balestriere's taking of the escrow funds was permissible, and the Arbitrator squarely rejected their argument with extensive findings of impropriety. (Award pp. 32-33; p. 39 ("none of the foregoing justifies taking the funds from the escrow account….")) The Arbitrator repeatedly found that Balestriere lied to his clients about his intentions with regard to the escrow funds, and defied explicit instructions from both clients not to touch the funds. (Award, pp. 31-33, 39)

In sum, the Balestriere Parties may not advance a manifest disregard challenge based upon a faulty legal argument concerning "causation" that they never even presented to the Arbitrator, or based upon counter-factual arguments of innocence that the Arbitrator rejected.[13]

### Point Four:  The Balestriere Parties' Motion For An Attachment Is Without Merit And Has Already Been Rejected By The New York State Supreme Court

Without disclosing to this Court that they have previously, and unsuccessfully, sought an order of attachment against Bernstein in the New York State Supreme Court, the Balestriere Parties

---

[13] As part of their flawed "causation" argument, the Balestriere Parties observe that cases involving fee forfeiture often involve "situations where a fee was forfeited because the underling [sic] representation was improperly conflicted, something not even Bernstein…has asserted here." (Balestriere Memorandum, p. 10).  But in fact Bernstein did allege, and present evidence, that the representation by Balestriere was improperly conflicted because, as Professor Yaroshefsky testified (testimony that was quoted by the Arbitrator), "At the time of the misappropriation the lawyers had been preparing to sue their clients for the better part of a year."  (Award, p. 40)

now move to relitigate that issue in this Court. Although they make no mention of it in their papers, last year Justice Perry of the Supreme Court of the State of New York issued a decision and order in which he denied the Balestriere Parties' motion for an attachment under the CPLR. (*See Balestriere PLLC v. Juan Diaz Rivera and Jonathan Bernstein, et al.,* Index No. 654720/2018, opinion dated May 12, 2020 (Clareman Dec., Ex. F)) After observing that "[a]ttachment is a 'harsh' remedy, and is construed narrowly in favor of the party against whom the remedy is invoked," (citing *VisionChina Media Inc. v. Shareholder Representative Servs., LLC,* 109 A.D.3d 49, 58, 967 N.Y.S.2d 338 (1st Dep't 2013)), Justice Perry ruled in Bernstein's favor and against the Balestriere Parties, stating that "[t]he mere fact that defendant is a non-domiciliary residing without the State of New York is not sufficient ground for granting an attachment," (*citing TAGC Mgt., LLC v. Lehman,* 842 F.Supp2d 575, 586 (S.D.N.Y. 2012). The Court further found that the Balestriere Parties' motion "fails to sufficiently demonstrate that Bernstein will not pay any future arbitration award for legal fees," and that the Balestriere Parties "simply failed to demonstrate that Bernstein will not be able to satisfy any judgment rendered in the underlying arbitration."

The Balestriere Parties have not explained why or how this federal Court should now give them a second bite at the apple; nor have they even attempted to cure the numerous failures of proof (*e.g.,* they offer no proof that Bernstein is engaged in any kind of impropriety affecting his assets or that he would not be able to pay the Award if confirmed) that led to the denial of their motion for attachment in New York Supreme Court, which they should be prevented, by *res judicata,* from re-litigating in this Court.[14] The only grounds the Balestriere Parties cite in support

---

[14] There is no independent federal basis for an attachment that would justify a different result in this Court than Justice Perry reached in New York State Supreme Court. FRCP 64 does not create any new federal rights that are different from those in state court – it merely states that "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." The Balestriere Parties have not cited any purportedly applicable federal statute providing for attachment, and thus, since "[n]o evidence has been presented to show that any U.S. statute prevails in this case…it is proper to follow the CPLR." *Kinderhill Select Bloodstock, Inc. v. U.S.,* 835 F.Supp. 699, 700 (N.D.N.Y. 1993)

of attachment is the fact that Bernstein is not a New York domiciliary – a ground that Justice Perry expressly ruled was insufficient to warrant an attachment; and their further claim that Bernstein allegedly gave false testimony at a New Jersey Casino Commission hearing in the <u>1980's</u> that, needless to say, had no remote connection to the instant dispute.  No authority is cited by the Balestriere Parties for the proposition that an allegation of purported false testimony in a wholly unrelated case can support an order of attachment, much less when the alleged false testimony occurred 34 years ago; and the conclusion is inescapable that the Balestriere Parties' irrelevant allegations regarding a 1987 proceeding are being placed into the record for vexatious purposes.

The attachment motion has already been decided against the Balestriere Parties in the forum in which they chose to bring it; it is *res judicata*.  This Court should not indulge their futile attempt to relitigate this denied application for a second time.

### Conclusion and Request for Oral Argument

For the foregoing reasons, the Bernstein Parties' cross-motion for modification of the Award and for its confirmation as modified should be granted; and the Balestriere Parties' motion for modification and confirmation as modified, and for an order of attachment, should be denied in all respects.

The Bernstein Parties respectfully request oral argument of the pending motions.


Dated:  September 27, 2021

LLOYD S. CLAREMAN                    -and-                    GALLAGHER LAW PLLC
By: /s/ Lloyd S. Clareman                                    By:  /s/ Brian K. Gallagher
121 East 61st Street, 2nd Floor                              757 Third Avenue, 20th Floor
New York, NY 10065                                           New York, NY 10017
Tel. No. (212) 751-1585                                      Tel. No. (212) 983-9700
Lloyd.Clareman@clareman.com                                  bgallagher@gallagherlaw-pllc.com

Attorneys for Jonathan A. Bernstein and White Lilly, LLC